**Exhibit 1**

**Bidding Procedures Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| BPS US Holdings Inc., *et al.*,[1] | ) | Case No. 16-12373 (____) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

**ORDER (A) ESTABLISHING BIDDING PROCEDURES FOR THE SALE OF ALL, OR SUBSTANTIALLY ALL, OF THE DEBTORS' ASSETS; (B) APPROVING BID PROTECTIONS; (C) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (D) APPROVING FORM AND MANNER OF THE SALE, CURE AND OTHER NOTICES; AND (E) SCHEDULING AN AUCTION AND A HEARING TO CONSIDER THE APPROVAL OF THE SALE; (II) AN ORDER (A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF CLAIMS, LIENS AND ENCUMBRANCES; (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF**

Upon the motion ("Motion")[2] of the debtors and debtors in possession in the

above-captioned cases (collectively, the "Debtors" or the "Company") pursuant to sections 105,

363, 364, 365 and 503 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (as amended,

the "Bankruptcy Code"), and rules 2002, 6004, 6006, 9006, 9007 and 9014 of the Federal Rules

of Bankruptcy Procedure (each a "Bankruptcy Rule," and collectively, the "Bankruptcy Rules"),

for (I) an order (the "Bidding Procedures Order") (A) approving the Debtors' proposed auction

(the "Auction") and the bidding procedures (the "Bidding Procedures") to be employed in

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number or Canadian equivalent, are as follows: BPS US Holdings Inc. (8341); Bauer Hockey, Inc. (3094); Easton Baseball / Softball Inc. (5670); Bauer Hockey Retail Inc. (6663); Bauer Performance Sports Uniforms Inc. (1095); Performance Lacrosse Group Inc. (4200); BPS Diamond Sports Inc. (5909); PSG Innovation Inc. (9408); Performance Sports Group Ltd. (1514); KBAU Holdings Canada, Inc. (5751); Bauer Hockey Retail Corp. (1899); Easton Baseball / Softball Corp. (4068); PSG Innovation Corp. (2165); Bauer Hockey Corp. (4465); BPS Canada Intermediate Corp. (4633); BPS Diamond Sports Corp. (8049); Bauer Performance Sports Uniforms Corp. (2203); and Performance Lacrosse Group Corp. (1249). The Debtors' headquarters are located at 100 Domain Dr., Exeter, New Hampshire 03833.

[2] Capitalized terms used but not defined herein have the meaning ascribed to them in the Motion.

connection with the proposed sale (the "Sale") of all, or substantially all, of the Debtors' assets (the "Assets"); (B) approving certain bid protections pursuant to the terms of the Stalking Horse Agreement in connection therewith, including overbid protections and a Break-Up Fee (as defined in the Stalking Horse Agreement); (C) establishing procedures for the assumption and assignment of executory contracts and unexpired leases, including certain cross-border provisions related thereto; (D) approving the form and manner of notice of the Sale, the notice of assumption and assignment of executory contracts and unexpired leases, including the form and manner of notice of proposed cure amounts (the "Cure Notice") and the other notices set forth herein, including certain cross-border provisions related thereto; and (E) scheduling the Auction and a joint hearing before the U.S. and Canadian courts (the "Sale Hearing") to consider approval of the Sale (collectively, (I) (A) through (E) above, the "Bidding Procedures Relief"); and (II) an order (the "Sale Order") authorizing (A) the Sale of the Assets to the bidder with the highest or otherwise best bid (the "Successful Bidder") pursuant to the Stalking Horse Agreement or a Modified Asset Purchase Agreement, in each case free and clear of all claims, liens and encumbrances as provided therein; and (B) the Debtors' assumption and assignment of the applicable executory contracts and/or unexpired leases to the Successful Bidder; and (III) granting related relief; and the Court having considered that portion of the Motion seeking the Bidding Procedures Relief, and the arguments of counsel made and the evidence adduced, at the joint hearing held with the Canadian Court on that portion of the Motion (the "Bidding Procedures Hearing"); and due and sufficient notice of the Bidding Procedures Hearing and the relief sought therein having been given under the particular circumstances; and it appearing that no other or further notice need be provided; and it appearing that the Bidding Procedures Relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and

other parties in interest; and after due deliberation thereon and good and sufficient cause

appearing therefor, it is hereby:

**FOUND, CONCLUDED AND DETERMINED THAT:**[3]

A.    This Court has jurisdiction to consider the Motion under 28 U.S.C. §§ 157

and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this

Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory and legal

predicates for the relief requested in the Motion are Bankruptcy Code sections 105, 363, 364,

365, 503 and Bankruptcy Rules 2002, 6004, 6006 and 9014.

B.    The relief granted herein is in the best interests of the Debtors, their estates

and creditors, and other parties in interest.

C.    The Debtors have articulated good and sufficient business reasons for the

Court to (i) approve the Bidding Procedures, Bid Protections, the Assumption and Assignment

Procedures, the form and manner of the Sale Notice, the Cure Notice and the other notices of the

Motion, the Auction and the Sale Hearing as set forth herein, (ii) set the date for the Auction, the

Sale Hearing and the other dates set forth herein and (iii) grant the relief requested in the Motion

as provided herein.

D.    Due, sufficient and adequate notice of the Bidding Procedures Hearing

and the relief granted in this Order has been given in light of the circumstances and the nature of

the relief requested, and no other or further notice thereof is required.  The Debtors' notice of the

Motion and the relief requested in the Motion for which approval was sought at the Bidding

Procedures Hearing is appropriate and reasonably calculated to provide all interested parties with

---

[3] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

timely and proper notice under Bankruptcy Rules 2002, 4001, 6004 and 6006, and no other or further notice of, or hearing on, this Bidding Procedures Order and that portion of the Motion being approved hereby is required.

E.      The Debtors' proposed Sale Notice, Cure Notice and other notices contemplated hereunder with respect to the Sale, the Auction, the assumption and assignment procedures set forth in section E of the Motion (the "Assumption and Assignment Procedures"), and the Sale Hearing are appropriate and reasonably calculated to provide all interested parties with timely and proper notice thereof and no further notice of each is necessary or required.

F.      The Bidding Procedures, substantially in the form attached as **Exhibit A**, and incorporated herein by reference as if fully set forth herein, and the Bid Protections are fair, reasonable and appropriate, were negotiated in good faith by the Debtors and the Stalking Horse Purchaser and represent the best method for maximizing the value of the Debtors' estates in connection with the Sale.

G.      The Bid Protections, to the extent payable under the Stalking Horse Agreement, (i) shall be deemed an actual and necessary cost of preserving the Debtors' estates within the meaning of Bankruptcy Code section 503(b), (ii) are of substantial benefit to the Debtors' estates, (iii) are reasonable and appropriate, including in light of the size and nature of the transactions and the efforts that have been and will be expended by the Stalking Horse Purchaser, (iv) have been negotiated by the parties and their respective advisors at arm's-length and in good faith and (v) are necessary to ensure that the Stalking Horse Purchaser will continue to pursue the proposed Sale of the Assets.  The Bid Protections are material inducements for, and a condition of, the Stalking Horse Purchaser's entry into the Stalking Horse Agreement.  The

Stalking Horse Purchaser is unwilling to commit to purchase the Assets under the terms of the

Stalking Horse Agreement unless the Stalking Horse Purchaser receives the Bid Protections.

       H.      The Assumption and Assignment Procedures are reasonable and

appropriate.

### IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

       1.      Those portions of the Motion seeking approval of the Bidding Procedures

Relief are GRANTED.

       2.      Any objection to the portions of the Motion seeking approval of the

Bidding Procedures Relief or any other relief granted in this Order, to the extent not resolved,

waived or withdrawn, and all reservations of rights included therein, is hereby overruled and

denied on the merits.

       3.      The Stalking Horse Agreement (which may be obtained from counsel to

the Debtors or the Debtors' investment bankers upon written request), as modified by Bidders in

accordance with the Bidding Procedures to, among other things, delete the Bid Protections (as so

modified, the "Form APA") is hereby approved as the Form APA for purposes of the Auction,

and is appropriate and reasonably calculated to enable the Debtors and other parties in interest to

easily compare and contrast the differing terms of the Bids presented at the Auction.

### A.      Bidding Procedures

       4.      The Bidding Procedures in the form attached hereto as Exhibit A and

incorporated herein by reference as if fully set forth in this Order are hereby APPROVED.  The

Debtors are authorized to take any and all actions necessary or appropriate to implement the

Bidding Procedures.  The failure to specifically include or reference any particular provision of

the Bidding Procedures in this Order shall not diminish or impair the effectiveness of such

procedures, it being the intent of this Court that the Bidding Procedures be authorized and approved in their entirety.

**B.      The Bid Deadline**

5.      As further described in the Bidding Procedures, a potential Bidder who desires to make a Bid for the Assets that satisfies the bidding requirements set forth in the Bidding Procedures shall deliver its Bid, so as to be received by no later than **5:00 p.m. (prevailing Eastern Time)** on **January 4, 2017** (the "Bid Deadline") to (the parties in paragraph 5(a) through 5(i) collectively, the "Notice Parties"):

(i)      **the Debtors**, 100 Domain Dr., Exeter, New Hampshire 03885, Attention: Michael J. Wall, Esq. (Michael.Wall@bauer.com);

(ii)     **US counsel to the Debtors**, Paul, Weiss, Rifkind, Wharton & Garrison, LLP, 1285 Avenue of the Americas, New York, New York, 10019, Attention: Kelley A. Cornish (kcornish@paulweiss.com) and Alice Eaton (aeaton@paulweiss.com);  and Young Conaway Stargatt & Taylor LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attention: Pauline Morgan (pmorgan@ycst.com);

(iii)    **Canadian counsel to the Debtors**, Stikeman Elliot LLP, 5300 Commerce Court West, 199 Bay Street, Toronto, ON, Canada M5L 1B9, Attention: Maria Konyukhova (mkonyukhova@stikeman.com) and Jonah Mann (jmann@stikeman.com).

(iv)     **Financial advisor to the Debtors**, Centerview Partners, 31 West 52nd Street New York, N.Y. 10019, Attention: Marc Puntus (mpuntus@centerviewpartners.com);

(v)      **the Monitor**, Ernst & Young Inc., 222 Bay Street, Toronto, ON, M5K IJ7, Attention: Brian Denega (brian.m.denega@ca.ey.com);

(vi)     **US counsel to the Monitor**, Allen & Overy LLP, 1221 Avenue of the Americas, New York, NY, 10020, Attention: Ken Coleman (Ken.Coleman@AllenOvery.com);

(vii)    **Canadian counsel to the Monitor**, Thornton Grout Finnigan LLP, 100 Wellington Street West, Suite 3200, Toronto, ON, M5K IK7,

Attention: Robert Thornton (rthornton@tgf.ca), D.J. Miller (djmiller@tgf.ca) and Rachel Bengino (rbengino@tgf.ca);

(viii)  **U.S. counsel to Bank of America, N.A., in its capacity as Prepetition ABL Agent and ABL DIP Agent**, Choate Hall & Stewart LLP, Two International Place, Boston, MA 02110, Attn: John F. Ventola (jventola@choate.com) and Douglas R. Gooding (dgooding@choate.com);

(ix)   **Canadian counsel to Bank of America, N.A., in its capacity as Prepetition ABL Agent and ABL DIP Agent**, Norton Rose Fulbright, Suite 3800, Royal Bank Plaza, South Tower, 200 Bay Street, P.O. Box 84, Toronto, Ontario M5J 2Z4, Canada, Attn: David M.A. Amato (david.amato@nortonrosefulbright.com) and Serge Levy (serge.levy@nortonrosefulbright.com);

(x)    **counsel to the UCC**, [●], Attention: [●]; and

(xi)   **financial advisor to the UCC**, [●], Attention: [●].

C.    **Notices of Sale, Bidding Procedures, Bid Protections and the Sale Hearing**

6.    The notices described below are hereby approved, and service or publication thereof (as applicable) as set forth below constitutes proper, timely, adequate and sufficient notice of the Sale, the Bidding Procedures, the Bid Protections and the Sale Hearing, and no other or further notice shall be required.

7.    Within three (3) Business Days after the entry of this Order, or as soon thereafter as practicable (the "Mailing Date"), the Debtors (or their agents) shall serve the Motion, the Stalking Horse Agreement in the form attached to the Motion, this Order and the Bidding Procedures by first-class mail, postage prepaid, or by email, where available, upon:

(a)    all entities known to have expressed a *bona fide* interest in a transaction with respect to the Assets within the past two years;

(b)    all entities known to have asserted any lien, claim or encumbrance in or upon any of the Assets;

(c)    all federal, state and local environmental, regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion;

01:19466342.2

7

(d)     the Monitor;

(e)     the U.S. Trustee;

(f)     counsel to the proposed Stalking Horse Purchaser;

(g)     counsel to the Prepetition ABL Lenders;

(h)     counsel to the Prepetition Term Loan Lenders;

(i)     the Internal Revenue Service;

(j)     the Securities and Exchange Commission;

(k)     the U.S. Attorney for the District of Delaware; and

(l)     all persons and entities that have filed a request for service of filings in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002.

8.     On the Mailing Date, or as soon thereafter as practicable, the Debtors (or their agents) shall serve by first-class mail, postage prepaid, the notice of the Sale, substantially in the form attached hereto as **Exhibit B** (the "Sale Notice"), upon all other known creditors of the Debtors and all counterparties to the Debtors' executory contracts and unexpired leases.

9.     The Debtors shall publish a notice, substantially in the form of the Sale Notice, on one occasion, in *The Wall Street Journal*, National Edition, New York Times, Reuters and Bloomberg in the U.S.; Le Devoir, Globe & Mail and National Post in Canada, on the Mailing Date or as soon as practicable thereafter.  Such publication notice shall be deemed sufficient and proper notice of the Sale to any other interested parties whose identities are unknown to the Debtors.

10.     The Sale Hearing, which shall be a joint hearing, to approve the Sale shall be held on **January 11, 2017 at 10:00 a.m. (prevailing Eastern Time)**, at (a) the United States Bankruptcy Court for the District of Delaware, 824 Market St. N, 3rd Floor, Wilmington, DE 19801, before the Honorable [_____] and (b) the Canadian Court [details].

11. All objections to the Sale (a "Sale Objection") must be in writing and filed on and served so as to be received by **January 4, 2016 at 4:00 p.m. (prevailing Eastern Time)** (the "Sale Objection Deadline") with either (a) the Clerk of the Court, 824 Market St. N, 3rd Floor, Wilmington, DE 19801, or (b) with the Canadian Court. In addition, any Sale Objection must be served on the Notice Parties and the Stalking Horse Purchaser so as to be received on the Sale Objection Deadline; provided however, that any objections to the conduct of the Auction or selection of the Successful Bid or Back-Up Bids (a "Supplemental Objection") shall be in writing, filed with either the U.S. Bankruptcy Court or the Canadian Court, together with proof of service, and served so as to be received by the Notice Parties and the Stalking Horse Purchaser, on or before **12:00 p.m. (prevailing Eastern Time)** on **January 10, 2017**. A Sale Objection or a Supplemental Objection that is filed with either the U.S. Court or the Canadian Court on or before the Sale Objection Deadline shall be deemed timely filed in both Bankruptcy Courts. 12. For purposes of this Bidding Procedures Order, notice to the Stalking Horse Purchaser must be provided to:

    a.    **U.S. Counsel to the Stalking Horse Purchaser:** Kirkland & Ellis LLP, 601 Lexington Avenue, New York, N.Y. 10022, Attention: Christopher J. Marcus.

    b.    **U.S. local counsel to the Stalking Horse Purchaser**, Klehr, Harrison, Harvey & Branzburg LLP, 919 N. Market Street, Suite 1000, Wilmington, DE 19801, Attention: Domenic E. Pacitti;

    c.    **Canadian Counsel to the Stalking Horse Purchaser**: Blake, Cassels & Graydon S.E.N.C.R.L./s.r.l., 1 Place Ville Marie, Bureau 3000, Montréal (Québec) H3B 4N8, Attention: Bernard Boucher; and

d.  **Financial Advisor to the Stalking Horse Purchaser**: Rothschild & Co., 1251 Avenue of the Americas, 33rd floor, New York, N.Y. 10020, Attention: Neil Augustine; and BDT Capital Partners, LLC, 401 North Michigan, Suite 3100, Chicago, IL 60611, Attention: John Gilligan.

13.  Failure to file and serve a Sale Objection or Supplemental Objection as aforesaid shall be deemed to be consent to the Sale for purposes of section 363(f) of the Bankruptcy Code.

14.  The Sale Hearing may be adjourned by the Debtors, in consultation with the Consultation Parties and the Stalking Horse Purchaser, from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing, or by filing a notice on the docket of the respective Bankruptcy Proceeding; provided however, that the Sale Hearing may not be adjourned to a date later than January 16, 2017.

**D.    The Auction**

15.  The Debtors are authorized to conduct the Auction with respect to the Assets.  The Auction shall take place on **January 9, 2017 at 10:00 a.m. (prevailing Eastern Time)** at the offices of Paul, Weiss, Rifkind, Wharton & Garrison, LLP, 1285 Avenue of the Americas, New York, New York, 10019, or such other place and time as the Debtors shall notify all Qualified Bidders and each of their respective counsel and advisors, the Consultation Parties and the Stalking Horse Purchaser.  The Debtors are authorized, subject to the terms of this Order, to take actions reasonably necessary, in the discretion of the Debtors, to conduct and implement the Auction.

16.  Only the Debtors, the Consultation Parties, the Stalking Horse Purchaser and any other Qualified Bidder, in each case, along with their respective representatives and

counsel, may attend the Auction (such attendance to be in person) and only the Stalking Horse

Purchaser and such other Qualified Bidder(s) will be entitled to make any Bids at the Auction;

provided, however, that any material creditor may attend the Auction if it provides the Debtors

with written notice of its intention to attend the Auction on or before the Bid Deadline.  Such

written notice must be sent to U.S. counsel for the Debtors via electronic mail to Kevin O'Neill

(koneill@paulweiss.com). The Debtors and their professionals shall direct and preside over the

Auction and the Auction shall be transcribed.

17.    The Stalking Horse Purchaser (in its capacity as a Qualified Bidder) and

each other Qualified Bidder participating in the Auction must confirm that it has (a) not engaged

in any collusion with respect to the bidding or Sale of the Assets, (b) reviewed, understands and

accepts the Bidding Procedures and (c) consented to the core jurisdiction of the Courts.

18.    Subject to the rights of parties in interest to (i) challenge the Sale or the

Sale Process, (ii) challenge the Debtors' decisions with respect to the Sale Process, (iii) argue

that such decisions are not governed by the "business judgment" standard or (iv) such other

rights as such parties may have under applicable law, the Debtors may (a) determine, in their

business judgment, pursuant to the Bidding Procedures, which Qualified Bid is the highest or

best proposal for the Assets and which is the next highest or best proposal for the Assets and

(b) reject any bid that, in the Debtors' business judgment, is (x) inadequate or insufficient,

(y) not in conformity with the requirements of the Bidding Procedures, the Bankruptcy Code, the

Bankruptcy Rules or the Local Bankruptcy Rules or (z) contrary to the best interests of the

Debtors and their estates.

19.    Notwithstanding anything to the contrary herein, and for the avoidance of

doubt, for all purposes under the Bidding Procedures, the Stalking Horse Purchaser shall be a

Qualified Bidder.

20.     Pursuant to section 363(k) of the Bankruptcy Code section, the Stalking Horse Purchaser may submit subsequent and increased credit bids at the Auction in compliance with the Bidding Procedures up to the full amount of its DIP Lien Claims.

**E.      The Stalking Horse Agreement and Bid Protections**

21.      Any obligations of the Debtors set forth in the Stalking Horse Agreement that are intended to be performed prior to the Sale Hearing and/or entry of the Sale Order are authorized as set forth herein.

22.     The Bid Protections, to the extent payable under the Stalking Horse Agreement, are granted.

23.     Pursuant to sections 105, 363, 364 and 503 of the Bankruptcy Code, the Debtors are hereby authorized to pay the Bid Protections pursuant to and subject to the terms and conditions set forth in the Stalking Horse Agreement.

24.     Upon entry of this Order, the Bid Protections shall constitute a superpriority administrative expense of the Debtors with priority over any and all administrative expenses of any kind, including those specified in sections 503(b) or 507(b) of the Bankruptcy Code, but shall be junior to any DIP Obligations and subordinate only to the Carve-Out.

25.     In accordance with section 9.2 of the Stalking Horse Agreement, Sellers shall pay to the Stalking Horse Purchaser, in cash, by wire transfer of immediately available funds, an amount equal to:

a.   in the event that the Stalking Horse Agreement is terminated by either the Stalking Horse Purchaser or the Debtors pursuant to Section 9.1(a)(iv), or by the Stalking Horse Purchaser pursuant to Section 9.1(b), or by either the Stalking Horse Purchaser or the Debtors pursuant to Section 9.1(a)(ii)

at a time when the Stalking Horse Agreement is terminable pursuant to Section 9.1(a)(iv) or Section 9.1(b), then the Stalking Horse Purchaser shall be entitled to the reimbursement of, and the Company shall and in any event within thirty (30) days after such termination, reimburse the Stalking Horse Purchaser in immediately available funds for, all reasonable out-of-pocket fees and expenses (including reasonable professional's fees and expenses) incurred by the Stalking Horse Purchaser and its Affiliates in connection with its investigation (including due diligence), preparation, negotiation and attempted consummation of the transactions contemplated by the Stalking Horse Agreement, in the maximum amount of $3,500,000 (the "Expense Reimbursement"); and

b.  in the event that the Stalking Horse Agreement is terminated (w) by the Stalking Horse Purchaser pursuant to Sections 9.1(b)(iii), (iv), (vi) or (vii); (x) by either the Stalking Horse Purchaser or the Debtors pursuant to Section 9.1(a)(iv); (y) by either the Stalking Horse Purchaser or the Debtors pursuant to Section 9.1(a)(ii) at a time that the Stalking Horse Agreement was terminable by the Stalking Horse Purchaser pursuant to Sections 9.1(b)(iii), (iv), (vi), or (vii) by either the Stalking Horse Purchaser or the Debtors pursuant to Section 9.1(a)(iv), then in any such event of termination, the Stalking Horse Purchaser shall be entitled to the payment of a break-up fee of $20,125,000 (the "Break-Up Fee").

26.    In addition, in the event that the Stalking Horse Agreement is terminated by the Stalking Horse Purchaser pursuant to Section 9.1(b) of the Stalking Horse Agreement

(other than clauses (iii), (iv), (vi)  and (vii) thereof), or by any Party pursuant to Section 9.1(a)(ii)

at a time when this Agreement was terminable pursuant to Section 9.1(b) (other than clauses (iii),

(iv), (vi)  and (vii) thereof) and the Debtors consummate (or enter into an agreement to

consummate) an Alternative Transaction (which, for the avoidance of doubt, shall include

seeking or having confirmed a plan of reorganization) within the twelve (12) months following

such termination, the Stalking Horse Purchaser shall be entitled to payment of the Break-Up Fee

upon consummation of such Alternative Transaction (the amounts comprising the Expense

Reimbursement and the Break-Up Fee are collectively referred to as the "Bid Protections");

*provided* that under no circumstances shall Debtors be obligated to pay any one of these Bid

Protections more than once.

27.    It is critical to the process of maximizing the value, and arranging an

orderly sale, of the Assets to proceed by selecting the Stalking Horse Purchaser to enter into the

Stalking Horse Agreement.  Without the Stalking Horse Purchaser having committed

considerable time and expense in connection with the Sale of the Assets, the Debtors would

potentially realize a lower price for such assets; and, therefore, the contributions of the Stalking

Horse Purchaser to the process have indisputably provided a substantial benefit to the Debtors

and their estates and creditors.

28.    The Bid Protections shall be the sole remedy of the Stalking Horse

Purchaser if the Stalking Horse Agreement is terminated under circumstances where the Bid

Protections are payable.

**F.**    **Contract Assumption and Assignment Procedures**

29.    The Assumption and Assignment Procedures as set forth in the Motion are

hereby approved and made part of this Order as if fully set forth herein.  The Assumption and

Assignment Procedures are appropriate and fair to all non-Debtor counterparties and comply in all respects with the Bankruptcy Code.

30.     The decision to assume and assign the applicable assumed and assigned contracts and/or leases to the Successful Bidder is subject to Court approval and the consummation of a Sale of the Assets.  Accordingly, absent closing of such Sale, the applicable assumed and assigned contracts and/or leases shall not be deemed assumed and/or assigned and shall, in all respects, be subject to further administration under the Bankruptcy Code.

      **(a)**      **Cure Notice**

31.     The Cure Notice, substantially in the form attached hereto as **Exhibit C**, is (a) reasonably calculated to provide sufficient effective notice to all non-Debtor counterparties to assumed and assigned contracts or leases and any other affected parties of the Debtors' intent to assume and assign some or all of such contracts or leases and to afford the non-Debtor counterparty to each such contract or lease the opportunity to exercise any rights affected by the Motion pursuant to Bankruptcy Rules 2002, 6004 and 6006, and (b) hereby approved.

32.     The inclusion of a contract on a Cure Notice shall not constitute or be deemed a determination or admission by the Debtors, the Stalking Horse Purchaser, the Successful Bidder or any other party in interest that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code or that such contract or lease will be assumed in connection with the Sale of the Assets.  The Debtors reserve all of their rights, claims and causes of action with respect to the contracts or leases listed on the Cure Notice.

33.     No less than twenty-one days prior to the Bid Deadline, the Debtors will file with this Court and serve on each non-Debtor counterparty to an executory contract or

unexpired lease related to the Assets the Cure Notice, substantially in the form attached to the

Bidding Procedures Order.  The Cure Notice shall:

(i)    state the cure amounts, if any, that the Debtors believe are necessary to assume such contracts or leases pursuant to section 365 of the Bankruptcy Code or under the CCAA (the "Cure Amount");

(ii)    notify the non-Debtor counterparty that such party's contract(s) or lease(s) may be assumed and assigned to the Successful Bidder of the Assets at the conclusion of the Auction;

(iii)    state the date of the Sale Hearing and that objections to any Cure Amount or to assumption and assignment will be heard at the Sale Hearing, or at a later hearing, as determined by the Debtors;

(iv)    state the Contract Rejection Deadline (as defined below) by which the non-Debtor counterparty shall file an objection to the Cure Amount(s) or to the assumption and assignment of the applicable contract(s) and/or lease(s) (such objection, a "Contract Objection"); provided, however, that the inclusion of a contract, lease or agreement on the Cure Notice shall not constitute an admission that such contract, lease or agreement is an executory contract or unexpired lease or that it will, in fact, be assumed and assigned in connection with the Sale of the Assets.  If no Cure Amount is listed, the Debtors believe that no amount to cure defaults under the respective executory contract or unexpired lease is owed by it thereunder.  The Debtors reserve all of their rights, claims and causes of action with respect to the contracts, leases and agreements listed on the Cure Notice; and

(v)    state whether the contract is between a non-Debtor counterparty and a Canadian Debtor (a "Canadian Contract") or between a non-Debtor counterparty and a U.S. Debtor (a "U.S. Contract").

**(b)    Contract Objection Procedures**

34.    The following procedures shall govern the filing and determination of

Contract Objections for purposes of the Bankruptcy Proceedings (the "Cross-border Objection

Procedures"):

(a)    any non-Debtor contract counterparty to a Canadian Contract shall file its Contract Objection, if any, by the Objection Deadline only with the Canadian Court and the Canadian Court shall adjudicate such Contract Objection if necessary;

(b)  any non-Debtor contract counterparty to a U.S. Contract shall file its Contract Objection, if any, by the Objection Deadline only with the U.S. Court, and the U.S. Court shall adjudicate such Contract Objection if necessary;

(c)  any Contract Objection filed by the Contract Objection Deadline with either the Canadian Court or the U.S. Court shall be deemed timely filed in both Bankruptcy Courts; and

(d)  notwithstanding anything to the contrary contained herein, any non-Debtor contract counterparty may request, in its Contract Objection, that either Bankruptcy Court determine its Contract Objection, unless the Contract Objection is consensually resolved or withdrawn, or otherwise ordered by the Bankruptcy Courts.

35.  All Contract Objections must be served so as to be received by

**January 4, 2016 at 4:00 p.m. (prevailing Eastern Time)** (the "Contract Objection Deadline").

36.  Any Contract Objection to a U.S. Contract must be in writing and filed with the Clerk of the Court, 824 Market St. N, 3rd Floor, Wilmington, DE 19801, and served so as to be received by the Contract Objection Deadline on the Notice Parties and the Stalking Horse Purchaser.

37.  Any Contract Objection to a Canadian Contract must be in writing and filed with the Canadian Court, and served so as to be received by the Contract Objection Deadline on the Notice Parties and the Stalking Horse Purchaser.

38.  Any Contract Objection must state (a) the basis for such objection and (b) with specificity what Cure Amount(s) the non-Debtor counterparty to the relevant executory contract(s) or unexpired lease(s) believes is required (in all cases with appropriate documentation in support thereof).

39.  Any Contract Objection solely to the Cure Amount(s) shall not prevent or delay the Debtors' assumption and assignment of assumed and assigned contract(s) or lease(s). If a party objects solely to Cure Amount(s), the Debtors may, with the consent of the relevant

Successful Bidder, hold the claimed Cure Amount(s) in reserve pending further order of the

Court or mutual agreement of the parties.  So long as the Cure Amount(s) are held in reserve, and

there are no other unresolved objections to assumption and assignment of the applicable assumed

and assigned contract(s) or lease(s), the Debtors can, without further delay, assume and assign

such contract(s) or lease(s).  Under such circumstances, the objecting non-Debtor counterparty's

recourse is limited to the funds held in reserve.

40.     If no objection to the Cure Amount(s) is timely received, the Cure

Amount(s) set forth in the Cure Notice shall be controlling notwithstanding anything to the

contrary in any assigned contract(s) or lease(s) or other document(s) as of the date of the Cure

Notice.

41.     On or before December 12, 2016, the Debtors shall provide notice of those

executory contracts and unexpired leases that the Stalking Horse Purchaser elects to have

assumed and assigned (the "Stalking Horse Purchaser Designated Contracts") to the Stalking

Horse Purchaser at Closing pursuant to section 365 of the Bankruptcy Code and under the

CCAA, subject to the Stalking Horse Purchaser's right to add or delete executory contracts or

unexpired leases in accordance with the Stalking Horse Agreement.

42.     Within a reasonable time thereafter, the Debtors will post on the website

for the Bankruptcy Proceedings (the "Case Website") (a) the list of the Stalking Horse Purchaser

Designated Contracts, which the Debtors will update as and when executory contracts or

unexpired leases are added or deleted by the Stalking Horse Purchaser and (b) a description of

the Stalking Horse Purchaser and information as to the Stalking Horse Purchaser's ability to

perform the Debtors' obligations under the Stalking Horse Purchaser Designated Contracts.

43.     As soon as reasonably practicable after receiving the schedule from each Qualified Bidder (as defined in the Bidding Procedures) of those executory contracts or unexpired leases it wishes to assume, and no later than the date of the Auction, the Debtors shall post such schedule on the Case Website together with information related to the adequate assurance with respect to such Qualified Bidder.

44.     To the extent that any non-Debtor counterparty wishes to object to the adequate assurance of future performance by a Qualified Bidder other than the Stalking Horse Purchaser under the applicable executory contract(s) or unexpired lease(s) (an "Adequate Assurance Objection" and together with a Contract Objection, an "Objection"), then such non-Debtor counterparty shall file a written Adequate Assurance Objection with the applicable Bankruptcy Courts and serve such objection on the Notice Parties, the Stalking Horse Purchaser and the applicable Qualified Bidder(s) so that such Adequate Assurance Objection is filed with the Bankruptcy Courts and received by the Notice Parties, the Stalking Horse Purchaser and the applicable Qualified Bidder(s) on or before **12:00 p.m. (prevailing Eastern Time)** on **Friday, January 13, 2017** (the "Adequate Assurance Objection Deadline").

45.     To the extent that any non-Debtor counterparty does not timely file and serve an Objection as set forth above, such counterparty will be:  (i) deemed to have consented to the Cure Amount(s), if any, set forth in the Cure Notice; (ii) barred, estopped and enjoined from asserting any additional Cure Amount(s) under the assumed and assigned executory contract(s) or unexpired lease(s); (iii) barred from objecting to the assumption and assignment of the applicable assumed and assigned executory contract(s) or unexpired lease(s) to the Successful Bidder, and (iv) barred from objecting to adequate assurance of future performance by the Successful Bidder.

**G.      Related Relief**

46.      The Debtors are hereby authorized and empowered to take such actions as may be reasonably necessary to implement and effect the terms and requirements established by this Order.

47.      This Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution hereof.

48.      The Debtors are authorized to proceed with the Sale without the necessity of complying with any state or local bulk transfer laws or requirements.

49.      This Order shall be binding on the Debtors, including any chapter 7 or chapter 11 trustee or other fiduciary appointed for the Debtors' estates.

50.      Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7052, 9014 or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

51.      This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Order.

Dated:  November _____, 2016
              Wilmington, Delaware

                                                        _____
                                              THE HONORABLE [                        ]
                                              UNITED STATES BANKRUPTCY JUDGE

**Exhibit A**

**Bidding Procedures**

## BIDDING PROCEDURES

These bidding procedures (the "Bidding Procedures") set forth the process by which Performance Sports Group Ltd. and certain of its subsidiaries (collectively, the "Company" or the "Sellers")[1] shall conduct a sale (the "Sale") by auction (the "Auction") of all or substantially all of their assets.

On [●], 2016, the United States Bankruptcy Court for the District of Delaware (the "U.S. Court"), and the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court" and together with the U.S. Court, the "Courts" or each, a "Court") entered orders (the "Bidding Procedures Orders"), which, among other things, authorized the Sellers to determine the highest or otherwise best offer(s) for their assets through the process and procedures set forth below.

The U.S. presides over the Sellers' jointly administered chapter 11 bankruptcy cases (the "Chapter 11 Cases") captioned *In re BPS US Holdings Inc. et al.*, Ch. 11 Case No. 16-[●] (Bankr. D. Del. Oct.●, 2016).  The Canadian Court presides over the Sellers' creditor protection proceedings (the "Canadian Proceedings" and together with the Chapter 11 Cases, the "Proceedings") commenced under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA")

On October 31, 2016, the Sellers filed in each of the Proceedings the *Motion for (I) an Order (A) Establishing Bidding Procedures for the Sale of All, or Substantially All, of the Debtors' Assets; (B) Approving Bid Protections; (C) Establishing Procedures Relating to the Assumption and Assignment of Executory Contracts and Unexpired Leases; (D) Approving Form and Manner of the Sale, Cure and Other Notices; and (E) Scheduling an Auction and a Hearing to Consider the Approval of the Sale; (II) an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of Claims, Liens and Encumbrances; and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* (the "Sale Motion").[2]  The orders approving the Sale are referred to herein, collectively, as the "Sale Orders."

As referenced in the Sale Motion, a stalking horse asset purchase agreement (including all exhibits, schedules and ancillary agreements related thereto, and as amended and in effect, the "Stalking Horse Agreement") has been entered into by and among the Sellers, and 9938982 Canada Inc. (the "Stalking Horse Purchaser"), dated as of October 31, 2016, which Stalking Horse Agreement contemplates a purchase and sale of the Acquired Assets (as defined in Section 2.1 of the Stalking Horse Agreement) to the Stalking Horse Purchaser, on the terms

---

[1] The Sellers are as follows: BPS US Holdings Inc. (8341); Bauer Hockey, Inc. (3094); Easton Baseball / Softball Inc. (5670); Bauer Hockey Retail Inc. (6663); Bauer Performance Sports Uniforms Inc. (1095); Performance Lacrosse Group Inc. (4200); BPS Diamond Sports Inc. (5909); PSG Innovation Inc. (9408); Performance Sports Group Ltd. (1514); KBAU Holdings Canada, Inc. (5751); Bauer Hockey Retail Corp. (1899); Easton Baseball / Softball Corp. (4068); PSG Innovation Corp. (2165) Bauer Hockey Corp. (4465); BPS Canada Intermediate Corp. (4633); BPS Diamond Sports Corp. (8049); Bauer Performance Sports Uniforms Corp. (2203); and Performance Lacrosse Group Corp. (1249).

[2] Capitalized terms used but not defined herein have the meaning ascribed to them in the Sale Motion.

and subject to the conditions provided therein.  A copy of the Stalking Horse Agreement is attached as an exhibit to the Sale Motion.  As further outlined herein, the Stalking Horse Purchaser is entitled to Credit Bid a portion or all of its DIP Lien Claims (as defined herein).

## I.    ASSETS TO BE SOLD

The Stalking Horse Agreement is an offer to purchase the Acquired Assets, which comprise substantially all of the Sellers' assets. A party may participate in the bidding process by submitting a Bid (as defined below) for all or substantially all of the Acquired Assets.

All of the Sellers' right, title and interest in and to the Acquired Assets shall be sold free and clear of any pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon (collectively, the "Liens"), with such Liens to attach to the proceeds of the sale of the Acquired Assets with the same validity and priority as such Liens applied against the Acquired Assets, except as otherwise specifically provided in the Stalking Horse Agreement or a Modified Asset Purchase Agreement (as defined below) submitted by a Successful Bidder (as defined below) (including any exhibits or schedules thereto) and reflected in the Sale Orders.

## II.    THE CONSULTATION PARTIES

The Sellers shall consult with Ernst & Young Inc., in its capacity as the court-appointed Monitor of the Canadian Proceedings (the "Monitor"), any official committee appointed by the U.S. Trustee in the Chapter 11 Cases, and Bank of America, N.A., in its capacity as Prepetition ABL Agent and ABL DIP Agent, and each of their respective counsel and advisors (each, a "Consultation Party" and collectively, the "Consultation Parties") as explicitly provided for in the Bidding Procedures; provided, however, that the Sellers shall not be required to consult with any Consultation Party during the Auction process to the extent such Consultation Party has submitted a Bid (as defined below) or has had a Bid submitted on its behalf for so long as such Bid remains open, if the Sellers determine, in their reasonable business judgment, that consulting with such Consultation Party regarding any issue, selection or determination would be likely to have a chilling effect on potential bidding or otherwise be contrary to goal of maximizing value for the Sellers' estates from the sale process.

To the extent the Bidding Procedures require the Sellers to consult with any Consultation Party in connection with making a determination or taking an action, or in connection with any other matter related to the Bidding Procedures or the Auction, the Sellers shall do so in a regular and timely manner prior to making such determination or taking such action.

Subject to the terms of any Orders entered in the Proceedings, after consultation with the Consultation Parties, the Sellers shall have the right and obligation to make all decisions regarding Bids and the Auction as provided herein as it determines to be in the best interest of their estates, whether or not Consultation Parties agree with that decision.

### III.    BIDDING PROCESS

A.    <u>Overview</u>

The Sellers and their advisors shall, subject to the other provisions of these Bidding Procedures, including the consultation obligations set forth herein:

1.    coordinate the efforts of Preliminary Interested Investors (as defined below) in conducting their due diligence investigations;

2.    receive offers from Bidders (as defined below);

3.    determine whether any person is a Qualified Bidder (as defined below); and

4.    conduct the Auction and further negotiate any offers made to purchase the Acquired Assets.

B.    <u>Key Dates For Potential Competing Bidders</u>

The Bidding Procedures provide interested parties with the opportunity to qualify for and participate in the Auction to be conducted by the Sellers and to submit competing bids for the Assets.  The Sellers shall assist Preliminary Interested Investors in conducting their respective due diligence investigations and shall accept Bids until **January 4, 2017 at 5:00 p.m. (prevailing Eastern Time)** (the "<u>Bid Deadline</u>").

The key dates for the Sale process are as follows:[3]

| | |
|---|---|
| Wed. Jan. 4, 2017 at 5:00 p.m. EDT | Bid Deadline - Due Date to submit a Qualified Bid and Good Faith Deposit (each as defined below) |
| Mon. Jan. 9, 2017 at 10:00 a.m. EDT | Auction, which will be held at Paul, Weiss, Rifkind, Wharton & Garrison, LLP, 1285 Avenue of the Americas, New York, New York, 10019 |
| Wed. Jan. 11, 2017 at 10:00 a.m. EDT | Sale Hearing, which will be conducted in the US and Canada, jointly, concurrently or as otherwise determined by the Courts.<br><br>(a) the Ontario Superior Court of Justice |

---

[3] These dates are subject to extension or adjournment as provided for herein and in consultation with the Consultation Parties.

| | (Commercial List) [Address] |
| | (b) the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, [●] Floor, Courtroom [●], Wilmington, Delaware 19801 |

C.    <u>Access to Diligence Materials</u>

To participate in the bidding process to effectuate a sale transaction for all or substantially all of the Acquired Assets (an "<u>Alternate Transaction</u>") and to receive access to due diligence materials (the "<u>Diligence Materials</u>"), a party must submit to the Sellers an executed confidentiality agreement in such form as is acceptable to the Sellers and provide preliminary evidence satisfactory to the Sellers and their advisors of such party's financial wherewithal to consummate an Alternate Transaction.

A party who executes such a confidentiality agreement for access to Diligence Materials, and provides such preliminary evidence of financial wherewithal, shall be a "<u>Preliminary Interested Investor</u>."  The Sellers will afford any Preliminary Interested Investor the time and opportunity to conduct reasonable due diligence in accordance with a diligence protocol determined by the Sellers and their advisors; <u>provided</u>, <u>however</u>, that the Sellers shall not be obligated to furnish any due diligence information after the Bid Deadline to any party that has not submitted a Qualified Bid (as defined below) on or before the Bid Deadline and may, in consultation with the Consultation Parties (as defined below), limit the amount of further due diligence available to Qualified Bidders after the Bid Deadline.

The Sellers reserve the right to withhold any Diligence Materials that the Sellers, in consultation with the Consultation Parties, determine are business-sensitive or otherwise not appropriate for disclosure to a Preliminary Interested Investor who is a competitor or customer of the Sellers or is affiliated with any competitor or customer of the Sellers.  Neither the Sellers nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Preliminary Interested Investor; *provided however* that Sellers shall provide the Stalking Horse Purchaser with access to the Diligence Materials, which are provided to Preliminary Interested Investors.

All due diligence requests must be directed to Centerview Partners LLP, Attn: Marc Puntus (mpuntus@centerviewpartners.com).

D.    <u>Due Diligence from Bidders</u>

Each Preliminary Interested Investor and each Bidder shall comply with all reasonable requests for additional information and due diligence access by the Sellers or their advisors regarding such Preliminary Interested Investor or Bidder, as applicable, and its contemplated transaction.  Failure by a Preliminary Interested Investor or Bidder (other than the Stalking Horse Purchaser) to comply with requests for additional information and due diligence access may be a basis for the Sellers to determine that such Bidder is not a Qualified Bidder.

**IV.    AUCTION QUALIFICATION PROCESS**

A.    <u>Qualifying Bids</u>

To be eligible to participate in the Auction, each offer, solicitation or proposal (each, a "<u>Bid</u>"), and each party submitting such a Bid (other than the Stalking Horse Purchaser) (each, a "<u>Bidder</u>"), must be reasonably determined by the Sellers, in consultation with the Consultation Parties, to satisfy each of the following conditions:

1.    <u>Good Faith Deposit</u>: Each Bid must be accompanied by a cash deposit, paid by wire transfer of immediately available funds, in the amount of five percent (5%) of the purchase price (excluding any Assumed Liabilities) contained in the Modified Asset Purchase Agreement (as defined below), which deposit shall be held in an interest-bearing escrow account to be identified and established by the Sellers (the "<u>Good Faith Deposit</u>").

2.    <u>Same or Better Terms</u>: In connection with any Bid for the Acquired Assets, such Bid must be on terms that the Sellers, in their business judgment and after consulting with the Consultation Parties, determine are the same or better for the Sellers than the terms of the Stalking Horse Agreement.

3.    <u>Executed Agreement</u>: Each Bid must be based on the Stalking Horse Agreement and must include binding, executed, irrevocable transaction documents, signed by an authorized representative of such Bidder, pursuant to which the Bidder proposes to effectuate an Alternate Transaction (a "<u>Modified Asset Purchase Agreement</u>").  A Bid must also include a copy of the Modified Asset Purchase Agreement (including all exhibits thereto) marked against the Stalking Horse Agreement to show all changes requested by the Bidder (including those related to purchase price and to remove any provisions that apply only to the Stalking Horse Purchaser, such as the expense reimbursement and break-up fee provisions contained in the Stalking Horse Agreement, which terms shall not be in any Modified Asset Purchase Agreement).  Each Modified Asset Purchase Agreement must provide a representation that the Qualified Bidder will (i) make all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "<u>HSR Act</u>"), if applicable, and (ii) submit and pay the fees associated with all necessary filings under the HSR Act as soon as reasonably practicable; <u>provided</u>, <u>however</u>, that the timing and likelihood of receiving HSR Act approval will be a consideration in determining the highest and best Bid.

4.    <u>Scope of Bid</u>: A Bid must be for all or substantially all of the Acquired Assets.

5.    <u>Minimum Bid</u>: A Bid must have a purchase price, including any assumption of liabilities, that, in the Sellers' reasonable business judgment

(after consultation with the Consultation Parties), has a value greater than the sum of (i) the Base Purchase Price (as defined in the Stalking Horse Agreement); *plus* (ii) $7.5 million.

6.      <u>Designation of Assigned Contracts and Leases</u>: A Bid must identify the executory contracts and unexpired leases with respect to which the Bidder seeks assignment from the Sellers.

7.      <u>Designation of Assumed Liabilities</u>: A Bid must identify all liabilities which the Bidder proposes to assume.

8.      <u>Corporate Authority</u>: A Bid must include written evidence reasonably acceptable to the Sellers demonstrating appropriate corporate authorization to consummate the proposed Alternate Transaction; <u>provided</u> that, if the Bidder is an entity specially formed for the purpose of effectuating the Alternate Transaction then the Bidder must furnish written evidence reasonably acceptable to the Sellers of the approval of the Alternate Transaction by the equity holder(s) of such Bidder.

9.      <u>Disclosure of Identity of Bidder</u>: A Bid must fully disclose the identity of each entity that will be bidding for or purchasing the Acquired Assets, including any equity holders in the case of a Bidder which is an entity specially formed for the purpose of effectuating the contemplated transaction, or otherwise participating in connection with such Bid (including any co-bidder or team bidder), and the complete terms of any such participation, including any agreements, arrangements or understandings concerning a collaborative or joint bid or any other combination concerning the proposed Bid.  A Bid must also fully disclose any connections or agreements with the Sellers, the Stalking Horse Purchaser or any other known, potential, prospective Bidder or Qualified Bidder, and/or any officer, director or equity security holder of the Sellers.

10.     <u>Proof of Financial Ability to Perform</u>: A Bid must include detailed, written evidence that the Sellers may conclude, in consultation with their advisors and the Consultation Parties, demonstrates that the Bidder has and will continue to have the necessary financial ability to close the Alternate Transaction and comply with section 365 of the Bankruptcy Code and the relevant provisions of the CCAA, including providing adequate assurance of future performance under all contracts to be assumed and assigned in such Alternate Transaction.  Such information must include, *inter alia*, the following:

(a)     contact names and numbers for verification of financing sources;

(b)     evidence of the Bidder's internal resources and proof of unconditional debt funding commitments from a recognized banking institution and, if applicable, equity commitments in an

aggregate amount equal to the cash portion of such Bid or the posting of an irrevocable letter of credit from a recognized banking institution issued in favor of the Sellers in the amount of the cash portion of such Bid as are needed to close the Alternate Transaction;

(c)    the Bidder's current financial statements (audited if they exist) or other similar financial information reasonably acceptable to the Sellers;

(d)    a description of the Bidder's pro forma capital structure; and

(e)    any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Sellers, in consultation with the Consultation Parties, demonstrating that such Bidder has the ability to close the Alternate Transaction.

11.    <u>Regulatory and Third Party Approvals</u>: A Bid must set forth each regulatory and third-party approval required for the Bidder to consummate the Alternate Transaction, and the time period within which the Bidder expects to receive such regulatory and third-party approvals, and those actions the Bidder will take to ensure receipt of such approvals as promptly as possible.

12.    <u>Contact Information and Affiliates</u>: A Bid must provide the identity and contact information for the Bidder and full disclosure of any affiliates of the Bidder.

13.    <u>Contingencies</u>: Each Bid (a) may not contain representations and warranties, covenants, or termination rights materially more onerous in the aggregate to the Sellers than those set forth in the Stalking Horse Agreement, as determined by the Sellers, in consultation with the Consultation Parties, in good faith, and (b) may not be conditioned on obtaining financing, any internal approvals or credit committee approvals, or on the outcome or review of due diligence, including with respect to any environmental, employee, labor, health and/or safety matters.

14.    <u>Irrevocable</u>: Each Bid must be irrevocable until ten (10) business days after the conclusion of the Sale Hearing; <u>provided</u> that if such Bid is accepted as the Successful Bid or the Backup Bid (each as defined herein), such Bid shall continue to remain irrevocable until the earlier of the closing of the Sale or the Extended Outside Date (as defined below).

15.    <u>Compliance with Diligence Requests</u>: The Bidder submitting the Bid must have complied with reasonable requests for additional information and due diligence access from the Sellers to the reasonable satisfaction of the Sellers, in consultation with the Consultation Parties.

16. <u>As-Is, Where-Is</u>:  Each Bid must include a written acknowledgement and representation that the Bidder:  (i) has had an opportunity to conduct any and all due diligence regarding the Acquired Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Acquired Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Acquired Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Stalking Horse Agreement.

17. <u>Confidentiality Agreement</u>: To the extent not already executed, the Bid must include an executed confidentiality agreement in a form acceptable to the Sellers.

18. <u>Termination Fees</u>: The Bid (other than the Bid pursuant to the Stalking Horse Agreement) must not entitle the Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment or reimbursement and, by submitting the Bid, the Bidder waives the right to pursue a substantial contribution claim under 11 U.S.C. § 503 or under the CCAA related in any way to the submission of its Bid or participation in any Auction.

19. <u>Adherence to Bid Procedures</u>:  By submitting its Bid, each Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction

20. <u>Closing Date</u>:  The Bid must include a commitment to close the transactions contemplated by the Modified Asset Purchase Agreement by no later than **February 16, 2017** (the "<u>Outside Date</u>").  In no event shall the closing of the Sale occur later than **February 28, 2017** (the "<u>Extended Outside Date</u>").

21. <u>Time Frame for Closing</u>:  The Bid must be reasonably likely (based on availability of financing, antitrust, or other regulatory issues, experience, and other considerations) to be consummated within a time frame acceptable to the Sellers, in consultation with the Consultation Parties.

22. <u>No Late Bids</u>.  Unless otherwise ordered by a Court, the Sellers shall not consider any Bids submitted after the conclusion of the Auction and any and all such bids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

23. <u>Bid Notice</u>: The following parties must receive a Bid in writing (in both PDF and Word format), on or before the Bid Deadline:

(a)      the Sellers, 100 Domain Dr., Exeter, New Hampshire 03885, Attention: Michael J. Wall, Esq. (Michael.Wall@bauer.com);

(b)      US counsel to the Sellers, Paul, Weiss, Rifkind, Wharton & Garrison, LLP, 1285 Avenue of the Americas, New York, New York, 10019, Attention: Kelley A. Cornish (kcornish@paulweiss.com) and Alice Eaton (aeaton@paulweiss.com);  and Young Conaway Stargatt & Taylor LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attention: Pauline Morgan (pmorgan@ycst.com);

(c)      Canadian counsel to the Sellers, Stikeman Elliot LLP, 5300 Commerce Court West, 199 Bay Street, Toronto, ON, Canada M5L lB9, Attention: Maria Konyukhova (mkonyukhova@stikeman.com) and Jonah Mann (jmann@stikeman.com);

(d)      financial advisor to the Sellers, Centerview Partners, 31 West 52nd Street New York, N.Y. 10019, Attention: Marc Puntus (mpuntus@centerviewpartners.com);

(e)      the Monitor, Ernst & Young Inc., 222 Bay Street, Toronto, ON, M5K IJ7, Attention: Brian Denega (brian.m.denega@ca.ey.com);

(f)      U.S. counsel to the Monitor, Allen & Overy LLP, 1221 Avenue of the Americas, New York, NY, 10020, Attention: Ken Coleman (Ken.Coleman@AllenOvery.com);

(g)      Canadian counsel to the Monitor, Thornton Grout Finnigan LLP, 100 Wellington Street West, Suite 3200, Toronto, ON, M5K IK7, Attention: Robert Thornton (rthornton@tgf.ca), D.J. Miller (djmiller@tgf.ca) and Rachel Bengino (rbengino@tgf.ca);

(h)      U.S. counsel to Bank of America, N.A., in its capacity as Prepetition ABL Agent and ABL DIP Agent, Choate Hall & Stewart LLP, Two International Place, Boston, MA  02110, Attn: John F. Ventola (jventola@choate.com) and Douglas R. Gooding (dgooding@choate.com);

(i)      Canadian counsel to Bank of America, N.A., in its capacity as Prepetition ABL Agent and ABL DIP Agent, Norton Rose Fulbright, Suite 3800, Royal Bank Plaza, South Tower, 200 Bay Street, P.O. Box 84, Toronto, Ontario M5J 2Z4, Canada, Attn: David M.A. Amato (david.amato@nortonrosefulbright.com) and Serge Levy (serge.levy@nortonrosefulbright.com);

(j)      counsel to the UCC, [●], Attention: [●]; and

(k)      financial advisor to the UCC, [●], Attention: [●].

A Bid received from a Bidder before the Bid Deadline that meets all of the above requirements for the Acquired Assets shall constitute a "Qualified Bid" and such Bidder shall constitute a "Qualified Bidder"; provided that if the Sellers receive a Bid prior to the Bid Deadline that is not a Qualified Bid, the Sellers may, in consultation with the Consultation Parties, provide the Bidder with the opportunity to remedy any deficiencies prior to the Auction; provided, further, that, for the avoidance of doubt, if any Qualified Bidder fails to comply with reasonable requests for additional information and due diligence access from the Sellers to their satisfaction, the Sellers, in consultation with the Consultation Parties, may disqualify any Qualified Bidder and Qualified Bid, in the Sellers' discretion and such Bidder shall not be entitled to attend or participate in the Auction.

Any amendments, supplements or other modifications to any Bids (including pursuant to this paragraph) shall be delivered to the parties listed in paragraph 23 above as provided therein.  All Qualified Bids will be considered, but the Sellers reserve their right to reject any or all bids, in consultation with the Consultation Parties.  However, bids that are unconditional and contemplate sales that may be consummated on or soon after the Sale Hearing are preferred.  Additionally, notwithstanding anything herein to the contrary, the Stalking Horse Agreement submitted by the Stalking Horse Purchaser shall be deemed a Qualified Bid, and the Stalking Horse Purchaser a Qualified Bidder.  The Sellers shall inform counsel to the Consultation Parties, counsel to the Stalking Horse Purchaser, and any Qualified Bidders whether the Sellers consider any Bid to be a Qualified Bid as soon as practicable but in no event later than one day before the Auction.

Each Qualified Bidder, by submitting a Bid, shall be deemed to acknowledge and agree that it is not relying upon any written or oral statements, representations, promises, warranties or guarantees of any kind whether expressed or implied, by operation of law or otherwise, made by any person or party, including the Sellers and their agents and representatives (other than as may be set forth in a definitive agreement executed by the Sellers), regarding the Sellers, any of the Acquired Assets, the Auction, these Bidding Procedures or any information provided in connection therewith.

Without the consent of the Sellers, a Qualified Bidder may not amend, modify or withdraw its Bid, except for proposed amendments to increase the amount or otherwise improve the terms of the Bid, during the period that such Bid is required to remain irrevocable and binding.

## V.      AUCTION

A.      Auction

If one or more Qualified Bids (other than the Stalking Horse Agreement) are submitted by the Bid Deadline, the Sellers will conduct the Auction to determine the highest or otherwise best Qualified Bid with respect to Acquired Assets.

B.      Assessment Criteria

The Sellers' determination of the highest or otherwise best Qualified Bid with respect to the Acquired Assets shall take into account any factors the Sellers, in consultation with the Consultation Parties, reasonably deem relevant to the value of the Qualified Bid to the estates and may include, but are not limited to, the following:

1.      the amount and nature of the consideration, including any assumed liabilities;

2.      the type and nature of any modifications to the Stalking Horse Agreement, as applicable, requested by each Bidder in such Bidder's Modified Asset Purchase Agreement;

3.      the extent to which such modifications are likely to delay closing of the sale of the applicable asset(s) and the cost to the Sellers of such modifications or delay;

4.      the total consideration to be received by the Sellers and the net consideration to be received by the Sellers after taking into account the Stalking Horse Purchaser's Bid Protections with respect to each round of bidding;

5.      the likelihood of the Bidder's ability to close a transaction and the timing thereof;

6.      the net benefit to the Sellers' estates (collectively, the "Bid Assessment Criteria").

C.      Cancellation of the Auction

If no timely, conforming Qualified Bids (other than the Qualified Bid submitted by the Stalking Horse Purchaser) for the Acquired Assets are received, the Auction for the Acquired Assets shall be canceled and the Stalking Horse Agreement shall be the Successful Bid for the Acquired Assets and the Stalking Horse Purchaser shall be the Successful Bidder for the Acquired Assets.

## VI.    PROCEDURES FOR THE AUCTION

If one or more Qualified Bids (other than the Stalking Horse Agreement) for all or substantially all of the Acquired Assets are submitted by the Bid Deadline, the Sellers shall commence the Auction on **Mon. Jan. 9, 2017 at 10:00 a.m.** (prevailing Eastern Time) at the offices of Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York, 10019 or such other place and time as the Sellers shall notify all Qualified Bidders and the Consultation Parties.

The Auction shall be conducted according to the following procedures:

A.    <u>Participation</u>

Only the Sellers, the Consultation Parties, the Stalking Horse Purchaser and any other Qualified Bidder, in each case, along with their representatives and counsel, may attend the Auction (such attendance to be in person) and only the Stalking Horse Purchaser and such other Qualified Bidders will be entitled to make any Bids at the Auction; <u>provided</u>, <u>however</u>, that any other material creditor may attend (but not participate in) the Auction if it provides the Sellers written notice of its intention to attend the Auction on or before the Bid Deadline. Such written notice must be sent to counsel for the Sellers via electronic mail to Kevin O'Neill (koneill@paulweiss.com).

B.    <u>The Sellers Shall Conduct the Auction</u>

The Sellers and their advisors shall direct and preside over the Auction and the Auction shall be transcribed.  Other than as expressly set forth herein, the Sellers (in consultation with the Consultation Parties) may conduct the Auction in the manner they reasonably determine will result in the highest or otherwise best Qualified Bid(s).

Prior to commencement of the Auction, the Sellers shall provide each Qualified Bidder participating in the Auction with a copy of the Modified Asset Purchase Agreement that is the highest or otherwise best Qualified Bid as determined by the Sellers (such highest or otherwise best Qualified Bid, the "<u>Auction Baseline Bid</u>").

In addition, at the start of the Auction, the Sellers shall describe the terms of the Auction Baseline Bid.  Each Qualified Bidder participating in the Auction must confirm that it (1) has not engaged in any collusion with respect to the bidding or sale of any of the assets described herein, (2) has reviewed, understands and accepts the Bidding Procedures and (3) has consented to the core jurisdiction of the Courts.

Before submitting any Bid with co-bidding or team bidding arrangements, whether formal or informal, among a Qualified Bidder and any third party (including any other Preliminary Interested Investor or Qualified Bidder) (such a Bid, a "<u>Joint Bid</u>"), each Qualified Bidder must disclose such Joint Bid to the Sellers, and the Sellers shall determine, in their discretion, whether the Joint Bid constitutes a Qualified Bid for purposes of participating in the Auction.  The identity of any and all co-bidders or team bidders involved in submitting any Joint Bid, if the Sellers determine that such Joint Bid constitutes a Qualified Bid, shall be disclosed on the record at the Auction.

The Sellers shall consult in good faith with the Consultation Parties throughout the Auction process to the extent reasonably practicable.  Any rules developed by the Sellers will provide that all bids will be made and received in one room, on an open basis, and all other Bidders will be entitled to be present for all bidding with the understanding that the true identity of each Bidder will be fully disclosed to all other Bidders and that all material terms of each Qualified Bid submitted in response to the Auction Baseline Bid, or to any successive bids made at the Auction, will be fully disclosed to all other Bidders bidding throughout the entire Auction, and each Qualified Bidder will be permitted what the Sellers determine to be an appropriate amount of time to respond to the previous bid at the Auction.

C.    Terms of Overbids

An "Overbid" is any bid made at the Auction subsequent to the Sellers' announcement of the Auction Baseline Bid.  To submit an Overbid for purposes of this Auction, a Bidder must comply with the following conditions:

1.    Minimum Overbid Increments: Any Overbid for all or substantially all of the Acquired Assets after and above the Auction Baseline Bid shall be made in increments valued at not less than $2.5 million (or such other amount as shall be announced at the Auction) in cash or in cash equivalents, or other forms of consideration acceptable to the Sellers.

2.    Credit Bidding: Holders of DIP Lien Claims (defined below) shall be entitled to submit Overbids in cash, cash equivalents or other forms of consideration, as described above, or additional credit bid amounts up to the aggregate amount of any outstanding obligations under the DIP Credit Agreements (including any accrued but unpaid prepetition interest) to the extent permitted by applicable law, provided that only the Stalking Horse Purchaser may credit bid the amount of the Bid Protections (collectively, the "DIP Lien Claims").

3.    Remaining Terms Are the Same as for Qualified Bids: Except as modified herein, an Overbid at the Auction must comply with the conditions for a Qualified Bid set forth above, provided, however, that the Bid Deadline shall not apply.  Any Overbid must include, in addition to the amount and the form of consideration of the Overbid, a description of all changes requested by the Bidder to the Stalking Horse Agreement or Modified Asset Purchase Agreement, as the case may be, in connection therewith. Any Overbid must remain open and binding on the Bidder as provided herein.

At the Sellers' discretion, to the extent not previously provided, a Bidder submitting an Overbid at the Auction must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Sellers), reasonably demonstrating such Bidder's ability to close the Alternate Transaction proposed by such Overbid.

D.    Announcement and Consideration of Overbids

1.    Announcement of Overbids: The Sellers shall announce at the Auction the material terms of each Overbid, the total amount of consideration and form offered in each such Overbid, and the basis for calculating such total consideration.  The Sellers shall also provide all terms of each Overbid, including non-economic terms, to the Consultation Parties.

2.    Consideration of Overbids: Subject to the deadlines set forth herein, the Sellers reserve the right, in their reasonable business judgment, to make one or more continuances of the Auction to, among other things: facilitate

13

discussions between the Sellers and individual Qualified Bidders; allow individual Qualified Bidders to consider how they wish to proceed; or give Qualified Bidders the opportunity to provide the Sellers with such additional evidence as the Sellers in their reasonable business judgment may require, that the Qualified Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed Alternate Transaction at the prevailing Overbid amount. When comparing Overbids to the Qualified Bid made by the Stalking Horse Purchaser, the Sellers shall treat the credit bid (including any Overbid) made by the Stalking Horse Purchaser as being made in cash or in cash equivalents.

E.    <u>Other Procedures</u>

1.    <u>Jurisdiction of the Courts</u>: All Qualified Bidders (including the Stalking Horse Purchaser) at the Auction shall be deemed to have consented to the core jurisdiction of the Courts and waive any right to a jury trial in connection with any disputes relating to the marketing process, the Auction, and the construction and enforcement of the Qualified Bidder's fully executed sale and transaction documents, as applicable.

2.    <u>Stalking Horse Purchaser Bid</u>: The Stalking Horse Purchaser shall be entitled to (a) credit bid all or a portion of its DIP Lien Claims, consistent with these Bidding Procedures, Bankruptcy Code section 363(k) and the CCAA; and (b) submit additional bids and make modifications to the Stalking Horse Agreement at the Auction consistent with these Bidding Procedures.

3.    <u>Additional Bids; Modifications</u>: All Qualified Bidders, including the Stalking Horse Purchaser, shall have the right to submit additional bids and make additional modifications to the Stalking Horse Agreement or the Modified Asset Purchase Agreement at the Auction, as applicable, provided that any such modifications to the Stalking Horse Agreement or Modified Asset Purchase Agreement on an aggregate basis and viewed in whole, shall not, in the Sellers' business judgment, be less favorable to the Sellers than the terms of the Stalking Horse Agreement.

4.    Subsequent Bids: Each Qualified Bid must submit a subsequent Bid that satisfies the minimum bid increment in each round of bidding to continue participating in the Auction, however, Qualified Bidders shall not be allowed to skip rounds of bidding, otherwise such Qualified Bidder will be prohibited from submitting any subsequent Bid.

F.    <u>Additional Procedures</u>

The Sellers (after consulting with the Consultation Parties) may announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting

14

the Auction so long as such rules are not inconsistent in any material respect with the Bidding Procedures or the Stalking Horse Agreement.  Any Auction rules adopted by the Sellers will not modify any of the terms of the Stalking Horse Agreement or the rights of the Stalking Horse Purchaser under the Bid Procedures (as may be consensually modified at the Auction) without the consent of the Stalking Horse Purchaser.

      G.     <u>Sale Is As Is/Where Is</u>

Except as otherwise provided in the Stalking Horse Agreement, any Modified Asset Purchase Agreement or any order by the Courts approving any Sale of the Acquired Assets as contemplated hereunder, the Acquired Assets sold pursuant to the Bidding Procedures shall be conveyed at the closing of the purchase and sale in their then-present condition, "**AS IS, WITH ALL FAULTS, AND WITHOUT ANY WARRANTY WHATSOEVER, EXPRESS OR IMPLIED**."

      H.     <u>Closing the Auction</u>

The Auction shall continue in additional rounds of bidding until the Sellers select, after consultation with the Consultation Parties, the Bid that is the highest or otherwise best offer for all or substantially all of the Acquired Assets (a "<u>Successful Bid</u>," and the Bidder submitting such Successful Bid, a "<u>Successful Bidder</u>").  The Successful Bidder shall have the rights and responsibilities of the purchaser as set forth in the Stalking Horse Agreement or Modified Asset Purchase Agreement.  In selecting each Successful Bid, the Sellers, in consultation with the Consultation Parties, shall consider the Bid Assessment Criteria.

The Auction for the Acquired Assets shall close when the Successful Bidder submits a fully executed sale and transaction documents memorializing the terms of its Successful Bid.

Promptly following the Sellers' selection, after consulting with the Consultation Parties, of the Successful Bid and the conclusion of the Auction, the Sellers shall announce the Successful Bid and the Successful Bidder and shall file with the Courts notice of the Successful Bid and the Successful Bidder.

The Sellers shall not consider any Bids submitted after the conclusion of the Auction.

      I.     <u>Backup Bidder</u>

Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next highest or otherwise best Bid at the Auction with respect to all or substantially all of the Acquired Assets, as determined by the Sellers, in the exercise of their business judgment and after consulting with the Consultation Parties, will be designated as the backup bidder (the "<u>Backup Bidder</u>").  The Backup Bidder shall be required to keep its last submitted Bid (the "<u>Backup Bid</u>") open and irrevocable until the earlier of the closing of the transaction with the Successful Bidder or the Extended Outside Date.

Following the Sale Hearing, if the Successful Bidder fails to consummate the purchase of the Acquired Assets, the Sellers may deem the Backup Bidder to have the new Successful Bid, and the Sellers will be authorized, without further order of the Courts, to consummate the transaction with such Backup Bidder at the price of its last bid.  Such Backup Bidder will be deemed to be the Successful Bidder and the Sellers will be authorized, but not directed, to effectuate a sale to such Backup Bidder subject to the terms of the Backup Bid without further order of the Courts.  All Qualified Bids (other than the Successful Bid and the Backup Bid) shall be deemed rejected by the Sellers on and as of the date that the Courts approve the Bid as the Successful Bid.  The Sellers, on their behalf and on behalf of each of their respective estates, specifically reserve the right to seek all available damages, including specific performance, from any defaulting Successful Bidder (including any Backup Bidder designated as a Successful Bidder) in accordance with the terms of the Bidding Procedures; provided, however, that the Good Faith Deposit shall be the sole and exclusive monetary remedy and liquidated damages of the Sellers for any default by a Successful Bidder under the Bidding Procedures.

For the avoidance of doubt, in the event that there is a Successful Bidder (other than the Stalking Horse Purchaser) with respect to all or substantially all of the Acquired Assets, and the Stalking Horse Purchaser is the Backup Bidder, the Stalking Horse Purchaser will be deemed to be the Backup Bidder at the price of its last overbid with respect to such Acquired Assets and will be subject to the terms contained in the immediately preceding paragraph.

## VII.    BID PROTECTIONS

Pursuant to the Bidding Procedures Order, the Stalking Horse Purchaser is entitled to the Bid Protections in the amounts set forth in, and in accordance with the terms of, the Stalking Horse Agreement and the Bidding Procedures Order.

Pursuant to the Bidding Procedures Order, except for the Stalking Horse Purchaser, no other party submitting an offer or Bid or a Qualified Bid shall be entitled to any expense reimbursement, breakup fee, termination or similar fee or payment.

The Stalking Horse Purchaser shall have standing to appear and be heard on all issues related to the Auction, the Sale, and related matters, including the right to object to the sale of the Acquired Assets or any portion thereof (including the conduct of the Auction and interpretation of these Bidding Procedures Order).

## VIII.    SALE HEARING

The Successful Bid and Backup Bid (or, if no Qualified Bid other than that of the Stalking Horse Purchaser is received, then the Stalking Horse Agreement) will be subject to approval by the Courts.  The sale hearings to approve the Successful Bid and any Backup Bid (or, the Stalking Horse Agreement for the Acquired Assets, if no Qualified Bid other than that of the Stalking Horse Purchaser is received) shall take place on **Weds. Jan. 11, 2017** at [●] a.m. (EDT) before the Courts (the "Sale Hearing").  A joint hearing before both courts may take place.

The Sale Hearing may be adjourned by the Sellers, in consultation with the Consultation Parties and the Stalking Horse Purchaser, provided, however, that the Sale Orders must be entered on or before **Mon. Jan. 16, 2017.**

## IX.    RETURN OF GOOD FAITH DEPOSITS

The Good Faith Deposits of all Qualified Bidders (other than the Stalking Horse Purchaser) shall be held in one or more interest-bearing escrow accounts by the Sellers, but shall not become property of the Sellers' estates absent further order of the Courts or as expressly provided below.  The Good Faith Deposit of any Qualified Bidder that is neither a Successful Bidder nor a Backup Bidder shall be returned to such Qualified Bidder not later than five (5) business days after the conclusion of the Sale Hearing.  The Good Faith Deposit of a Backup Bidder, if any, shall be returned to such Backup Bidder no later than seventy-two (72) hours after the closing of the transaction with the Successful Bidder.  Upon the return of the Good Faith Deposits, their respective owners shall receive any and all interest that will have accrued thereon. If the Successful Bidder timely closes on the winning transaction, its Good Faith Deposit shall be credited towards the applicable purchase price.  If the Successful Bidder (or Backup Bidder, if applicable) fails to consummate an Alternate Transaction because of a breach or failure to perform on the part of such Successful Bidder (or Backup Bidder, if applicable), the Sellers will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder (or Backup Bidder, if applicable), and such Good Faith Deposit shall irrevocably become property of the Sellers.  The Good Faith Deposit of the Stalking Horse Purchaser shall be held in an escrow account as provided in the Stalking Horse Agreement and shall be returned to the Stalking Horse Purchaser in accordance with the Stalking Horse Agreement.

## X.    RESERVATION OF RIGHTS OF THE SELLERS

Except as otherwise provided in the Stalking Horse Agreement, the Bidding Procedures or the Bidding Procedures Order, the Sellers further reserve the right as they may reasonably determine to be in the best interest of their estates, in consultation with the Consultation Parties:

A.    determine which Bidder(s) is a Qualified Bidder(s);

B.    determine which Bid(s) is a Qualified Bid(s);

C.    determine which Qualified Bid is the highest or best proposal for the Acquired Assets and which is the next highest or best proposal for the Acquired Assets;

D.    reject any Bid that is (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (3) contrary to the best interests of the Sellers and their estates;

E.    impose additional terms and conditions with respect to all potential Bidders;

F.    extend the deadlines set forth herein; and

G.      modify the Bidding Procedures and implement additional procedural rules that the Sellers determine, in their business judgment will better promote the goals of the bidding process and discharge the Sellers' fiduciary duties; <u>provided</u> <u>however</u> that any modification or additions to the Bidding Procedures shall not be inconsistent with the Stalking Horse Agreement, the Bidding Procedures Order or any other Order of the Courts, unless agreed in writing by the Stalking Horse Purchaser and Sellers or otherwise ordered by the Courts.

**EXHIBIT B**

**SALE NOTICE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| BPS US Holdings Inc., *et al.,*[1] | ) | Case No. 16-_____ (____) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

## NOTICE OF BIDDING PROCEDURES, AUCTION DATE, AND SALE HEARING

**PLEASE TAKE NOTICE THAT:**

1.     On October 31, 2016, Performance Sports Group Ltd. (the "Company") and certain of its subsidiaries (collectively with the Company, the "Debtors" or "Sellers") filed for relief before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court" and together with the Bankruptcy Court, the "Courts").  The Bankruptcy Court presides over the Sellers' jointly administered chapter 11 bankruptcy cases (the "Chapter 11 Cases") captioned *In re BPS US Holdings Inc. et al.*, Ch. 11 Case No. 16-[●] (Bankr. D. Del. Oct. 31, 2016).  The Canadian Court presides over the Sellers' creditor protection proceedings (the "Canadian Proceedings" and together with the Chapter 11 Cases, the "Bankruptcy Proceedings") commenced under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA").

2.     On October 31, 2016, the Sellers filed in each of the Proceedings the *Motion for (I) an Order (A) Establishing Bidding Procedures for the Sale of All, or Substantially All, of the Debtors' Assets; (B) Approving Bid Protections; (C) Establishing Procedures Relating to the Assumption and Assignment of Executory Contracts and Unexpired Leases; (D) Approving Form and Manner of the Sale, Cure and Other Notices; and (E) Scheduling an Auction and as Hearing to Consider the Approval of the Sale; (II) an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of Claims, Liens and Encumbrances; and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief (the*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number or Canadian equivalent, are as follows: BPS US Holdings Inc. (8341); Bauer Hockey, Inc. (3094); Easton Baseball / Softball Inc. (5670); Bauer Hockey Retail Inc. (6663); Bauer Performance Sports Uniforms Inc. (1095); Performance Lacrosse Group Inc. (4200); BPS Diamond Sports Inc. (5909); PSG Innovation Inc. (9408); Performance Sports Group Ltd. (1514); KBAU Holdings Canada, Inc. (5751); Bauer Hockey Retail Corp. (1899); Easton Baseball / Softball Corp. (4068); PSG Innovation Corp. (2165); Bauer Hockey Corp. (4465); BPS Canada Intermediate Corp. (4633); BPS Diamond Sports Corp. (8049); Bauer Performance Sports Uniforms Corp. (2203); and Performance Lacrosse Group Corp. (1249). The Debtors' headquarters are located at 100 Domain Dr., Exeter, New Hampshire 03833.

"Sale Motion").[2]  By the Sale Motion, the Sellers seek, *inter alia*, to conduct a sale (the "Sale") by auction (the "Auction") of all or substantially all of their assets (the "Assets") and to assume and assign certain executory contracts and unexpired leases (the "Stalking Horse Purchaser Designated Contracts") to a group of investors led by Sagard Capital Partners, L.P. (collectively, the "Stalking Horse Purchaser") pursuant to an asset purchase agreement by and among the Sellers and the Stalking Horse Purchaser (the "Stalking Horse Agreement").  The Stalking Horse Agreement is subject to higher or otherwise better offers at the Auction.  A copy of the Stalking Horse Agreement is attached as an exhibit to the Sale Motion.

3.      On November ___, 2016, pursuant to the Sale Motion, the Court entered an order (the "Bidding Procedures Order") approving the Auction and bidding procedures (the "Bidding Procedures") in connection with the proposed Sale.  A copy of the Sale Motion, the Bidding Procedures Order and the Bidding Procedures can be obtained free of charge on http://www.primeclerk.com.

4.      The Auction shall take place on **January 9, 2017 at 10:00 a.m. (prevailing Eastern Time)** at the offices of Paul, Weiss, Rifkind, Wharton & Garrison, LLP, 1285 Avenue of the Americas, New York, New York, 10019, or such other place and time as the Sellers shall notify all Qualified Bidders (as defined in the Bidding Procedures) and the Consultation Parties (as defined in the Bidding Procedures).

5.      A hearing to approve the Sale (the "Sale Hearing"), including the assumption and assignment of certain Stalking Horse Bidder Designated Contracts (or such contracts as are designated by the successful bidder at the Auction), will be held on **January 11, 2017 at [10:00 a.m.] (prevailing Eastern Time)** before the Courts.

6.      Pursuant to the Bidding Procedures Order, any objections to the Sale ("Sale Objections") must be set forth in writing and must state with particularity the grounds for such objections or other statements of position. All Sale Objections must be in writing and filed on and served so as to be received by **January 4, 2016 at 4:00 p.m. (prevailing Eastern Time)** (the "Sale Objection Deadline") with either (a) the U.S. Court at the Clerk of the Court, 824 Market St. N, 3rd Floor, Wilmington, DE 19801, or (b) the Canadian Court at [address]; provided that objections to the conduct of the Auction or selection of the Successful Bid (as defined in the Bidding Procedures) or Backup Bid (a "Supplemental Objection"), which shall be in writing, may be filed with the Bankruptcy Court or the Canadian Court, together with proof of service, and served so as to be received by the Notice Parties (defined below) on or before **12:00 pm (prevailing Eastern Time) on January 10, 2017**.  Any Sale Objection or Supplemental Objection must be served on the following parties so as to be received by the Sale Objection Deadline: (a) **the Debtors**, 100 Domain Dr., Exeter, New Hampshire 03885, Attention: Michael J. Wall, Esq. (Michael.Wall@bauer.com); (b) **US counsel to the Debtors**, Paul, Weiss, Rifkind, Wharton & Garrison, LLP, 1285 Avenue of the Americas, New York, New York, 10019, Attention: Kelley A. Cornish (kcornish@paulweiss.com) and Alice Eaton (aeaton@paulweiss.com);  and Young Conaway Stargatt & Taylor LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attention: Pauline Morgan (pmorgan@ycst.com); (c)

---

[2] Capitalized terms used herein but not otherwise defined in this notice (the "Notice") shall have the meanings ascribed to them in the Sale Motion.

01:19466344.2

**Canadian counsel to the Debtors**, Stikeman Elliott LLP, 5300 Commerce Court West, 199 Bay Street, Toronto, ON, Canada  M5L 1B9, Attention: Maria Konyukhova (mkonyukhova@stikeman.com) and Jonah Mann (jmann@stikeman.com); (d) **Financial advisor to the Debtors**, Centerview Partners, 31 West 52nd Street New York, N.Y. 10019, Attention: Marc Puntus (mpuntus@centerviewpartners.com); (e) **the Monitor**, Ernst & Young Inc., 222 Bay Street, Toronto, ON, M5K IJ7, Attention: Brian Denega (brian.m.denega@ca.ey.com); (f) **US counsel to the Monitor**, Allen & Overy LLP, 1221 Avenue of the Americas, New York, NY, 10020, Attention: Ken Coleman (Ken.Coleman@AllenOvery.com); (g) **Canadian counsel to the Monitor**, Thornton Grout Finnigan LLP, 100 Wellington Street West, Suite 3200, Toronto, ON, M5K IK7, Attention: Robert Thornton (rthornton@tgf.ca), D.J. Miller (djmiller@tgf.ca) and Rachel Bengino (rbengino@tgf.ca); (h) **counsel to the UCC**, [●], Attention: [●]; (i) **financial advisor to the UCC**, [●], Attention: [●](j) **U.S. counsel to the Stalking Horse Purchaser** Kirkland & Ellis LLP, 601 Lexington Avenue, New York, N.Y. 10022, Attention Christopher J. Marcus;(k) **U.S. local counsel to the Stalking Horse Purchaser**, Klehr, Harrison, Harvey & Branzburg LLP, 919 N. Market Street, Suite 1000, Wilmington, DE 19801, Attention: Domenic E. Pacitti; (l) **Canadian counsel to the Stalking Horse Purchaser**, Blake, Cassels & Graydon S.E.N.C.R.L./s.r.l., 1 Place Ville Marie, Bureau 3000, Montréal (Québec) H3B 4N8, Attention Bernard Boucher; (m) **financial advisors to the Stalking Horse Purchaser**, Rothschild & Co., 1251 Avenue of the Americas, 33rd floor, New York, N.Y. 10020, Attention: Neil Augustine; and BDT Capital Partners, LLC, 401 North Michigan, Suite 3100, Chicago, IL 60611, Attention: John Gilligan; (n) **U.S. counsel to Bank of America, N.A., in its capacity as Prepetition ABL Agent and ABL DIP Agent**, Choate Hall & Stewart LLP, Two International Place, Boston, MA 02110, Attn: John F. Ventola (jventola@choate.com) and Douglas R. Gooding (dgooding@choate.com); (o) **Canadian counsel to Bank of America, N.A., in its capacity as Prepetition ABL Agent and ABL DIP Agent**, Norton Rose Fulbright, Suite 3800, Royal Bank Plaza, South Tower, 200 Bay Street, P.O. Box 84, Toronto, Ontario M5J 2Z4, Canada, Attn: David M.A. Amato (david.amato@nortonrosefulbright.com) and Serge Levy (serge.levy@nortonrosefulbright.com); and (p) the Successful Bidder if the Stalking Horse Purchaser is not the Successful Bidder.

      7.      UNLESS AN OBJECTION IS TIMELY FILED AND SERVED IN ACCORDANCE WITH THIS NOTICE, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND THE BANKRUPTCY COURT MAY GRANT THE RELIEF REQUESTED WITHOUT FURTHER HEARING AND NOTICE.

8.      This Notice is subject to the fuller terms and conditions of the Sale Motion and the Bidding Procedures Order, which shall control in the event of any conflict, and the Sellers encourage parties-in-interest to review such documents in their entirety.

Dated: October __, 2016
        Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_/s/_____
Pauline K. Morgan (No. 3650)
Sean T. Greecher (No. 4484)
Justin H. Rucki (No. 5304)
Shane M. Reil (No. 6195)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600 / Facsimile: (302) 571-1253

-and-

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
Kelley A. Cornish
Alice Belisle Eaton
Claudia R. Tobler
Christopher Hopkins
1285 Avenue of the Americas,
New York, New York 10019
Telephone: (212) 373-3000 / Facsimile:  (212) 757-3990

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

**EXHIBIT C**

**CURE NOTICE**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BPS US Holdings Inc., *et al.,*[1] | ) | Case No. 16-_____ (____) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## NOTICE OF POTENTIAL ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND PROPOSED CURE AMOUNTS

**PLEASE BE ADVISED** that on October 31, 2016 Performance Sports Group Ltd. (the "Company") and certain of its subsidiaries (collectively with the Company, the "Debtors" or "Sellers") filed for relief before the United States Bankruptcy Court for the District of Delaware (the "U.S. Court"), and the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court" and together with the U.S. Court, the "Courts"). The U.S. Court presides over the Sellers' jointly administered chapter 11 bankruptcy cases (the "Chapter 11 Cases") captioned *In re BPS US Holdings Inc. et al.*, Ch. 11 Case No. 16-[●] (Bankr. D. Del. Oct. 31, 2016). The Canadian Court presides over the Sellers' creditor protection proceedings (the "Canadian Proceedings" and together with the Chapter 11 Cases, the "Proceedings") commenced under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA").

**PLEASE BE ADVISED** that on October 31, 2016 the Sellers filed in each of the Proceedings the *Motion for (I) an Order (A) Establishing Bidding Procedures for the Sale of All, or Substantially All, of the Debtors' Assets; (B) Approving Bid Protections; (C) Establishing Procedures Relating to the Assumption and Assignment of Executory Contracts and Unexpired Leases; (D) Approving Form and Manner of the Sale, Cure and Other Notices; and (E) Scheduling an Auction and as Hearing to Consider the Approval of the Sale; (II) an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of Claims, Liens and Encumbrances; and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* (the "Sale Motion").[2] By the Sale Motion,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number or Canadian equivalent, are as follows: BPS US Holdings Inc. (8341); Bauer Hockey, Inc. (3094); Easton Baseball / Softball Inc. (5670); Bauer Hockey Retail Inc. (6663); Bauer Performance Sports Uniforms Inc. (1095); Performance Lacrosse Group Inc. (4200); BPS Diamond Sports Inc. (5909); PSG Innovation Inc. (9408); Performance Sports Group Ltd. (1514); KBAU Holdings Canada, Inc. (5751); Bauer Hockey Retail Corp. (1899); Easton Baseball / Softball Corp. (4068); PSG Innovation Corp. (2165) Bauer Hockey Corp. (4465); BPS Canada Intermediate Corp. (4633); BPS Diamond Sports Corp. (8049); Bauer Performance Sports Uniforms Corp. (2203); and Performance Lacrosse Group Corp. (1249). The Debtors' headquarters are located at 100 Domain Dr., Exeter, New Hampshire 03833.

[2] Capitalized terms used herein but not otherwise defined in this notice (the "Notice") shall have the meanings ascribed to them in the Sale Motion.

the Sellers seek, *inter alia*, to conduct a sale (the "Sale") by auction (the "Auction") of all or substantially all of their assets (the "Assets") and to assume and assign certain executory contracts and unexpired leases (the "Stalking Horse Purchaser Designated Contracts") to a group of investors led by Sagard Capital Partners, L.P. (collectively, the "Stalking Horse Purchaser") pursuant to an asset purchase agreement by and among the Sellers and the Stalking Horse Purchaser (the "Stalking Horse Agreement").  The Stalking Horse Agreement is subject to higher or otherwise better offers at the Auction.  A copy of the Stalking Horse Agreement is attached as an exhibit to the Sale Motion.

PLEASE BE FURTHER ADVISED that, on November ___, 2016, pursuant to the Sale Motion, the Courts entered an Order (the "Bidding Procedures Order"), which, among other things, approves auction and bidding procedures (the "Bidding Procedures") in connection with the proposed Sale.  A copy of the Sale Motion, the Bidding Procedures Order and the Bidding Procedures can be obtained free of charge at www.primeclerk.com.

PLEASE BE FURTHER ADVISED that a hearing to approve the Sale (the "Sale Hearing"), including the assumption and assignment of certain Stalking Horse Purchaser Designated Contracts, will be held on **January 11, 2017 at 10:00 a.m. (prevailing Eastern Time)**, before the Courts.

PLEASE BE FURTHER ADVISED that pursuant to the Motion, the Sellers may assume and assign the contract(s) identified on Exhibit A (the "Subject Contract(s)") to the Successful Bidder at the Auction.[3]  The cure amount (the "Cure Amount"), if any, the Sellers believe is required to satisfy all amounts and obligations due and owing under each Subject Contract by the Sellers, including any monetary defaults and compensation for pecuniary losses, is listed on Exhibit A (the "Cure Schedule").

PLEASE BE FURTHER ADVISED that the deadline to file an objection to the assumption and assignment of the Subject Contract(s) and the Cure Amount(s) for such Subject Contract(s) (together, "Cure Objections") is January 4, 2017 at 4:00 p.m. (prevailing Eastern Time) (the "Cure Objection Deadline").  Cure Objections to Canadian Contracts, if any, must be filed with the Canadian Court, Cure Objections to U.S. Contracts, if any, must be filed in the U.S. Court, and all such Cure Objections must also be served upon: (a) **the Debtors**, 100 Domain Dr., Exeter, New Hampshire 03885, Attention: Michael J. Wall, Esq. (Michael.Wall@bauer.com); (b) **US counsel to the Debtors**, Paul, Weiss, Rifkind, Wharton & Garrison, LLP, 1285 Avenue of the Americas, New York, New York, 10019, Attention: Kelley A. Cornish (kcornish@paulweiss.com) and Alice Eaton (aeaton@paulweiss.com);  and Young Conaway Stargatt & Taylor LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attention: Pauline Morgan (pmorgan@ycst.com); (c) **Canadian counsel to the Debtors**, Stikeman Elliott LLP, 5300 Commerce Court West, 199 Bay Street, Toronto, ON, Canada  M5L 1B9, Attention: Maria Konyukhova (mkonyukhova@stikeman.com) and Jonah Mann (jmann@stikeman.com); (d) **Financial advisor to the Debtors**, Centerview Partners, 31 West

---

[3] The Sellers may modify the list of Available Contracts that will be assumed and assigned in connection with the Sale.  In addition, the inclusion of any contract or agreement on Exhibit A shall not constitute an admission by the Sellers that any such Subject Contract is an executory contract or unexpired lease within the meaning of section 365 of the Bankruptcy Code or under the CCAA and the Sellers reserve all rights with respect thereto.

52nd Street New York, NY 10019, Attention: Marc Puntus (mpuntus@centerviewpartners.com); (e) **the Monitor**, Ernst & Young Inc., 222 Bay Street, Toronto, ON, M5K IJ7, Attention: Brian Denega (brian.m.denega@ca.ey.com); (f) **US counsel to the Monitor**, Allen & Overy LLP, 1221 Avenue of the Americas, New York, NY, 10020, Attention: Ken Coleman (Ken.Coleman@AllenOvery.com); (g) **Canadian counsel to the Monitor**, Thornton Grout Finnigan LLP, 100 Wellington Street West, Suite 3200, Toronto, ON, M5K IK7, Attention: Robert Thornton (rthornton@tgf.ca), D.J. Miller (djmiller@tgf.ca) and Rachel Bengino (rbengino@tgf.ca); (h) **counsel to the UCC**, [●], Attention: [●]; (i) **financial advisor to the UCC**, [●], Attention: [●]; (j) **U.S. counsel to the Stalking Horse Purchaser**, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, N.Y. 10022, Attention Christopher J. Marcus; (k) **U.S. local counsel to the Stalking Horse Purchaser**, Klehr, Harrison, Harvey & Branzburg LLP, 919 N. Market Street, Suite 1000, Wilmington, DE 19801, Attention: Domenic E. Pacitti; (l) **Canadian counsel to the Stalking Horse Purchaser**, Blake, Cassels & Graydon S.E.N.C.R.L./s.r.l., 1 Place Ville Marie, Bureau 3000, Montréal (Québec) H3B 4N8, Attention Bernard Boucher; (m) **financial advisors to the Stalking Horse Purchaser**, Rothschild & Co., 1251 Avenue of the Americas, 33rd floor, New York, N.Y. 10020, Attention: Neil Augustine; and BDT Capital Partners, LLC, 401 North Michigan, Suite 3100, Chicago, IL 60611, Attention: John Gilligan; (n) **U.S. counsel to Bank of America, N.A., in its capacity as Prepetition ABL Agent and ABL DIP Agent**, Choate Hall & Stewart LLP, Two International Place, Boston, MA 02110, Attn: John F. Ventola (jventola@choate.com) and Douglas R. Gooding (dgooding@choate.com); (o) **Canadian counsel to Bank of America, N.A., in its capacity as Prepetition ABL Agent and ABL DIP Agent**, Norton Rose Fulbright, Suite 3800, Royal Bank Plaza, South Tower, 200 Bay Street, P.O. Box 84, Toronto, Ontario M5J 2Z4, Canada, Attn: David M.A. Amato (david.amato@nortonrosefulbright.com) and Serge Levy (serge.levy@nortonrosefulbright.com); and (p) the Successful Bidder if the Stalking Horse Purchaser is not the Successful Bidder.

      **PLEASE BE FURTHER ADVISED** that the Cure Objection must state (i) the basis for the objection and (ii) with specificity, what Cure Amount(s) the party to the Subject Contract(s) believes is required (in all cases with appropriate documentation in support thereof).

      **PLEASE BE FURTHER ADVISED** that any objection solely to the Cure Amount(s) may not prevent or delay the Sellers' assumption and assignment of the Subject Contract(s) by a Successful Bidder other than the Stalking Horse Purchaser.  If a non-Seller counterparty (a "Non-Seller Counterparty") objects solely to Cure Amount(s), the Sellers may, with the consent of the Successful Bidder, hold the claimed Cure Amount(s) in reserve pending further order of the Court or mutual agreement of the parties.  So long as Cure Amount(s) are held in reserve, and there are no other unresolved objections to assumption and assignment of the applicable Subject Contract(s), the Sellers can, without further delay, assume and assign such Subject Contract(s) to the Successful Bidder.  Under such circumstances, the objecting Non-Seller Counterparty's recourse is limited to the funds held in reserve.

      **PLEASE BE FURTHER ADVISED** that any objections to the adequate assurance of future performance by any Successful Bidder other than the Stalking Horse Purchaser under the applicable Subject Contract(s) must be filed with either the Bankruptcy Court or the Canadian Court and served on the Notice Parties and the applicable Successful Bidder so that such

objection is received on or before **12:00 p.m. (prevailing Eastern Time)** the day before the Sale Hearing (the "<u>Adequate Assurance Objection Deadline</u>").

      **PLEASE BE FURTHER ADVISED** that unless a Cure Objection or an objection to adequate assurance of future performance, as applicable, is filed and served by a Non-Seller Counterparty to any Subject Contract by the Cure Objection Deadline or the Adequate Assurance Objection Deadline, as applicable, such Non-Seller Counterparty shall be (i) deemed to have waived and released any right to assert a Cure Objection and to have otherwise consented to the assignment of such Subject Contract, (ii) forever barred from objecting to the assumption and assignment of such Subject Contract or the failure of the Successful Bidder to provide adequate assurance of future performance and (iii) forever barred and estopped from asserting or claiming any Cure Amount, other than the Cure Amount listed on the Cure Schedule.

      **PLEASE BE FURTHER ADVISED** that the hearings with respect to Cure Objection(s) or objection(s) to the adequate assurance of future performance may be held (a) at the Sale Hearing, or (b) at such other date as the Courts may designate.

*[Remainder of this page intentionally left blank]*

01:19466343.2

**PLEASE BE FURTHER ADVISED** that all requests for information concerning the Sale should be in writing and directed to US counsel to the Sellers at the address referenced below.

Dated: October __, 2016          YOUNG CONAWAY STARGATT & TAYLOR, LLP
       Wilmington, Delaware

                                      /s/_____
                                      Pauline K. Morgan (No. 3650)
                                      Sean T. Greecher (No. 4484)
                                      Justin H. Rucki (No. 5304)
                                      Shane M. Reil (No. 6195)
                                      Rodney Square
                                      1000 North King Street
                                      Wilmington, Delaware 19801
                                      Telephone: (302) 571-6600 / Facsimile: (302) 571-1253

                                                  -and-

                                      PAUL, WEISS, RIFKIND,
                                      WHARTON & GARRISON LLP
                                      Kelley A. Cornish
                                      Alice Belisle Eaton
                                      Claudia R. Tobler
                                      Christopher Hopkins
                                      1285 Avenue of the Americas,
                                      New York, New York 10019
                                      Telephone: (212) 373-3000 / Facsimile: (212) 757-3990

                                      *Proposed Co-Counsel to the Debtors and*
                                      *Debtors in Possession*

## Exhibit A

### Cure Schedule

| Name of Subject Contract | Name of Non-Debtor Counterparty | Cure Amount |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |