# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BPS US Holdings Inc., *et al.*,[1] | ) | Case No. 16-12373 (KJC) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Hearing Date: January 10, 2017 at 10:00 a.m. (ET)** |
| | ) | **Obj. Deadline: January 3, 2017 at 4:00 p.m. (ET)** |
| | ) | |

## DEBTORS' MOTION FOR ORDER, PURSUANT TO SECTIONS 363(b) AND 503(c) OF THE BANKRUPTCY CODE, APPROVING DEBTORS' (I) KEY EMPLOYEE INCENTIVE PLAN AND (II) KEY EMPLOYEE RETENTION PLAN

BPS US Holdings Inc. and its above-captioned affiliated debtors and debtors in possession (collectively, the "Debtors" or the "Company") hereby file this motion (this "Motion") for entry of an order approving the Debtors' key employee incentive plan for certain senior executives (the "KEIP") and key employee retention plan for certain employees (the "KERP"), and authorizing the payments contemplated thereunder.  In support of this Motion, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1.    Retaining key employees and incentivizing senior management to undertake the extraordinary efforts necessary at this most critical juncture of the Debtors' Sale

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number or Canadian equivalent, are as follows: BPS US Holdings Inc. (8341); Bauer Hockey, Inc. (3094); Easton Baseball / Softball Inc. (5670); Bauer Hockey Retail Inc. (6663); Bauer Performance Sports Uniforms Inc. (1095); Performance Lacrosse Group Inc. (4200); BPS Diamond Sports Inc. (5909); PSG Innovation Inc. (9408); Performance Sports Group Ltd. (1514); KBAU Holdings Canada, Inc. (5751); Bauer Hockey Retail Corp. (1899); Easton Baseball / Softball Corp. (4068); PSG Innovation Corp. (2165); Bauer Hockey Corp. (4465); BPS Canada Intermediate Corp. (4633); BPS Diamond Sports Corp. (8049); Bauer Performance Sports Uniforms Corp. (2203); and Performance Lacrosse Group Corp. (1249). The Debtors' headquarters are located at 100 Domain Dr., Exeter, New Hampshire 03833.

Process[2] are essential to maximizing recoveries to stakeholders in these Bankruptcy Proceedings. Having focused at the outset on obtaining Court approval of the bid procedures governing the Sale Process and DIP financing to fund these cases, the Debtors' immediately turned their attention to putting in place suitable KEIP and KERP programs.

2.      Rather than seek Court approval for the KEIP and the KERP without input from their Creditors' and Equity Committees, the Debtors first solicited feedback from advisors to both Committees.  The Debtors, through their professionals and Chief Executive Officer, provided the Committees' advisors with presentations setting forth the proposed terms of the KEIP and the KERP, along with the detailed business rationale and comparables supporting the proposals, answered questions and engaged in discussions with the advisors, entertained several rounds of counterproposals and responded with material modifications to the Debtors' initial proposal, ultimately obtaining consensus with both Committees.

3.      Thus, the KEIP and the KERP *enjoy the support of both the Creditors' Committee and the Equity Committee* upon the filing of this Motion.  Given the critical roles played by the Eligible Employees in the Debtors' Sale Process, as recognized by the Committees in supporting the implementation of the KEIP and the KERP described herein, the Debtors submit that the relief sought herein is not only in the estates' best interest, but also appropriately tailored and critical to the Debtors' ability to maximize value for all interested parties. Accordingly, for the reasons set forth herein and with the support of the Committees, the Debtors seek approval of the KEIP and the KERP on the terms described below.

---

[2] Capitalized terms used in this Preliminary Statement but not otherwise defined herein shall have the meanings ascribed to such terms in this Motion.

## JURISDICTION AND VENUE

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

5.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The statutory bases for the relief requested herein are sections 363(b) and 503(c) of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq.  (the "Bankruptcy Code") and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

**A.      General Background**

7.      The Debtors are headquartered in the U.S., but conduct substantial business in both the U.S. and Canada.  The Debtors incorporated in the U.S. are referred to herein collectively as the "U.S. Debtors."[3]  The Debtors incorporated in Canada are referred to herein collectively as the "Canadian Debtors."[4]

---

[3] The U.S. Debtors are: BPS US Holdings Inc.; Bauer Hockey, Inc.; Easton Baseball / Softball Inc.; Bauer Hockey Retail Inc.; Bauer Performance Sports Uniforms Inc.; Performance Lacrosse Group Inc.; BPS Diamond Sports Inc.; and PSG Innovation Inc.

[4] The Canadian Debtors are:  Performance Sports Group Ltd.; KBAU Holdings Canada, Inc.; Bauer Hockey Retail Corp.; Easton Baseball / Softball Corp.; PSG Innovation Corp.; Bauer Hockey Corp.; BPS Canada Intermediate Corp.; BPS Diamond Sports Corp.; Bauer Performance Sports Uniforms Corp.; and Performance Lacrosse Group Corp.

8.      On October 31, 2016 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  Each of the Debtors also made application for protection from their creditors under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA"), in the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court," and the filing, the "Canadian Proceedings").  Unless specifically noted to the contrary, the relief in this Motion applies to all of the Debtors.  However, all KEIP Participants (as defined below) are employed by a U.S. Debtor, and any amounts earned under the KEIP will be paid by such employing entity based on an appropriate allocation of Sale Proceeds.

9.      The Debtors are authorized to continue managing their properties and operating their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.

10.      On November 10, 2016, the Office of the United States Trustee for the District of Delaware (the "UST") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").  On November 28, 2016, the UST also appointed a statutory committee of equity security holders pursuant to section 1102 of the Bankruptcy Code (the "Equity Committee" and, together with the Creditors' Committee, the "Committees").  A monitor (the "Monitor")[5] has been appointed in the Canadian Proceedings.

11.      Additional information about the Debtors' business and the events leading to the commencement of these chapter 11 cases and the Canadian Proceedings (together, the

---

[5] A monitor in Canada is an independent party appointed by the CCAA Court to monitor the company's operations and to assist with the restructuring of the company.  The Monitor reports to the CCAA Court on any material matters and often provides recommendations about a proposed action to the CCAA Court.

"Bankruptcy Proceedings") can be found in the *Declaration of Brian J. Fox in Support of Debtors' Chapter 11 Petitions and First-Day Motions* [D.I. 15] (the "First Day Declaration"), which is incorporated herein by reference.

**B.       The Debtors' Business**

12.     As further detailed in the First Day Declaration, the Company designs, develops, manufactures, markets and sells performance sports equipment and accessories for ice hockey, roller hockey, lacrosse, baseball and softball, as well as related apparel, under the brand names of Bauer, Easton, Mission, Maverik, Cascade, Inaria and Combat.

13.     For the twelve months ending September 30, 2016, the Debtors generated approximately $569 million in revenue on a consolidated basis.  In addition, the Debtors had approximately $594 million in assets and approximately $607 million in liabilities based upon the book value of these assets and liabilities.

**C.       The Sale Process**

14.     The Debtors initiated these Bankruptcy Proceedings to stabilize their business operations and maximize the value of their assets through a going-concern sale process (the "Sale Process," and the underlying sale, the "Sale") that was commenced prior to the Petition Date.  Accordingly, the Debtors entered into an agreement (the "Stalking Horse Agreement") for the going-concern sale of substantially all of the Company's assets (the "Stalking Horse Sale") to a group of investors led by Sagard Capital Partners, L.P., which holds approximately 17% of the Company's equity (collectively, the "Stalking Horse Purchaser"), subject to a Court-supervised auction process.  The Debtors, in consultation with their advisors, determined that entering into the Stalking Horse Agreement and commencing these Bankruptcy Proceedings was the optimal course to maximize the value of the Company's business.  In

furtherance thereof, the Debtors filed that certain *Debtors' Motion for (I) an Order (A) Establishing Bidding Procedures for the Sale of All, or Substantially All, of the Debtors' Assets; (B) Approving Bid Protections; (C) Establishing Procedures Relating to the Assumption and Assignment of Executory Contracts and Unexpired Leases; (D) Approving Form and Manner of the Sale, Cure and Other Notices; and (E) Scheduling an Auction and a Hearing to Consider the Approval of the Sale; (II) an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of Claims, Liens and Encumbrances; (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [D.I. 16] (the "Bid Procedures Motion").  A hearing on the Bid Procedures Motion was held on November 30, 2016, after which the Debtors submitted, and the Court approved, a revised form of order approving the Bid Procedures Motion which consensually resolved objections filed by the UST and the Committees [D.I. 233] (the "Bid Procedures Order").  Pursuant to the Bid Procedures Order, the Court established a bid deadline of January 25, 2017, scheduled an auction on January 30, 2017, and scheduled a hearing on February 6, 2017 to consider the Sale.

15.    Pursuant to the Stalking Horse Agreement, the Stalking Horse Purchaser has agreed to acquire substantially all of the Debtors' assets for the base purchase prices of U.S. $575 million, plus the assumption of related operating liabilities, and serve as a "stalking horse" bidder in the Bankruptcy Proceedings (collectively, the "Stalking Horse Consideration").  Based on the purchase price in the Stalking Horse Agreement, the proceeds received on closing of the acquisition—if ultimately consummated—will be well in excess of the Company's outstanding secured indebtedness and are expected to provide meaningful recoveries to the Company's remaining stakeholders.

16.     Like all retail and consumer products businesses, the Debtors' vendor, customer and employee relationships are critical to the value of the enterprise.  Central to maintaining those relationships is facilitating a well-funded sale process with a stalking horse that provides a clear path through and out of these Bankruptcy Proceedings.  The Sale Process will allow the Debtors ample time to run a robust marketing process for the Debtors' assets and maximize value for stakeholders, while ensuring that the business emerges from the Bankruptcy Proceedings in a reasonable time frame.

17.     Upon the commencement of these Bankruptcy Proceedings, the Debtors and their advisors began immediately marketing the Company to alternative would-be purchasers, and have been diligently circulating marketing materials, a confidential information memorandum and non-disclosure agreements to potential buyers.  Towards that end, the Debtors' investment bankers identified the most likely buyers prior to the Petition Date, and have been extensively engaging with potential interested bidders, and have received several preliminary indications of interest from potential bidders.

18.     In sum, the Stalking Horse Sale provides for, among other things, (1) the repayment in full of all of the Debtors' secured creditors, (2) the assumption by the Stalking Horse Purchaser of certain prepetition liabilities, (3) meaningful distributions to the Company's remaining stakeholders under a plan, and (4) the continued operation of the Debtors' business as a going concern under new ownership post-closing.  Given the Debtors' challenged operating performance and ongoing accounting investigation detailed in the First Day Declaration, among other factors, the Stalking Horse Sale sets an excellent starting point for the Sale Process and presents the best pathway for maximizing the value of the Debtors' estates and stakeholder recoveries.

19.     That said, the Stalking Horse Agreement is merely the starting point for the now-unfolding Sale Process.  Indeed, the Debtors' ability to preserve the value of their assets, continue normal operations, and maximize recovery through the Sale Process hinges, in part, upon their ability to successfully retain key employees and incentivize employee performance. The dedicated assistance of the Debtors' executives, officers, and managers during the marketing and Sale Process is a critical component of the Debtors' ultimate objective: to continue business operations in compliance with requirements in the Stalking Horse Agreement, obtain viable and competing offers for the Debtors' assets that will generate more value  through the auction process than the bid presently put forth by the Stalking Horse Purchaser and, ultimately, position themselves to close on the winning bid in an efficient and expeditious manner.

20.     The Debtors seek authority to implement the KEIP and KERP, respectively, to enable them to prosecute and complete an orderly and value-maximizing Sale Process in the optimal manner.  As described further herein, the goals of these programs are as follows:

- to incentivize and retain essential personnel through the closing of a sale of substantially all of the Debtors' assets and operations;

- to facilitate the successful sale of the Company;

- to reward essential employees if critical goals are satisfied; and

- to maximize the value of the Debtors' estates for the benefit of all stakeholders.

**RELIEF REQUESTED**

21.     By this Motion, the Debtors seek entry of an order approving the KEIP

and KERP and authorizing the payments thereunder.

**A.     The Eligible Employees**

22.     The Debtors have identified six (6) senior executives to receive payments

under the KEIP and sixty (60) non-insider employees to receive payments under the KERP

(collectively, the "Eligible Employees"), all of whom possess institutional knowledge and skills

that are essential to the Debtors' restructuring efforts.[6]  In addition to responsibilities related to

the Debtors' everyday operations, the Eligible Employees have assumed, and will continue to

assume, considerable added responsibilities in connection with these Bankruptcy Proceedings

and the Sale Process, such as continuing business operations with all of the challenges attendant

to being in bankruptcy to ensure compliance with the Stalking Horse Agreement, facilitating and

conducting management presentations for potential bidders, responding to bidder information

requests, and otherwise taking whatever steps are necessary to obtain the highest and best bid for

the Debtors' assets.  The Debtors submit that payments made under the KEIP program are

necessary to incentivize key executives to perform these duties in an optimal manner, and reward

them for their efforts during the Sale Process.  Relatedly, without the KERP program, the

Debtors likely will lose non-executive personnel who are critical to the success of these chapter

11 cases and the Sale Process.  In fact, in the last few months, three employees originally slated

for participation in the KERP have resigned to pursue other employment opportunities, in each

instance citing uncertainty and instability in the Debtors' operations as one of the reasons for

---

[6]  A summary overview of the KEIP and the KERP, including a list of Eligible Employees participating respectively
therein, is attached hereto as Exhibit B.  With respect to Eligible Employees participating in the KERP, both the
names and titles for those individuals have been redacted and filed under seal.

departing.  In addition, five other employees have resigned since the Petition Date, and there have been thirty-six employee resignations since June.  These departures have put substantial additional demands and pressures on the proposed KERP participants.

**B.      Development of the KEIP and KERP**

23.      The Debtors enlisted the services of Alvarez & Marsal North America, LLC ("A&M"), a leading global consulting firm specializing in turnaround management for large companies experiencing financial difficulty, to help develop the KEIP and the KERP in the first instance.  The Debtors selected A&M because, among other things, the consulting firm specializes in designing executive and employee incentive, retention, and severance plans for companies in chapter 11 and has access to extensive industry compensation data.  The Debtors, their counsel and A&M reviewed the Debtors' employment requirements during these chapter 11 cases, and the attendant necessary features of incentive and retention plans.  A&M assisted the Debtors in designing the KEIP and KERP, keeping in mind the Debtors' goals of maximizing the value of the Debtors' assets through the Sale Process, enhancing the Debtors' financial condition, and ensuring effective management throughout these Bankruptcy Proceedings.  The KEIP and KERP were designed in a reasonable, cost-effective way to promote the appropriate incentives and to retain personnel essential to the success of these Bankruptcy Proceedings.

24.      A&M also worked closely with the Debtors to ensure that the KEIP and KERP were competitive within the industry, and that the incentives set for the executives participating in the KEIP were appropriate.  The Debtors and A&M based the plans' initial proposed payments upon market comparisons within a bankruptcy context, historical compensation levels at the Debtors, and general market compensation studies conducted by Pearl Meyer & Partners, LLC ("Pearl Meyer"), a leading executive compensation consulting firm.

With regard to the market comparisons within the bankruptcy context, A&M reviewed fifteen incentive-based programs that have been approved for other large companies going through chapter 11 in recent years (collectively, the "Comparable KEIPs").  The Comparable KEIPs were selected because they each included payouts that were wholly or partially dependent upon the sale of a company as a going concern or, in the alternative, a significant portion of its assets.  Each Comparable KEIP contained no more than fifteen participants.

26. Accordingly, the Debtors and A&M developed the plans to be comparable to plans similar in design and scope which have been recently approved by bankruptcy courts. A&M and the Debtors used this market research in preparing proposals for the KEIP and KERP which underwent several rounds of revisions before being submitted for consideration to the Debtors' board of directors (the "Board of Directors").  The Board of Directors reviewed the proposed plans, and commented and asked questions before approving the initial versions of each plan on the evening prior to the commencement of these Bankruptcy Proceedings, October 30, 2016.

26. The Debtors and their advisors focused all of their efforts at the outset of these cases on obtaining approval of "First Day" relief, the bid procedures governing the Sale Process and DIP financing to fund these cases.  With these matters successfully concluded, the Debtors immediately approached the advisors to both the Creditors' and Equity Committees in an attempt to obtain consensus with respect to the KEIP and the KERP.  Following extensive discussions and several rounds of counterproposals with both Committees, the Debtors made significant modifications and clarifications to the KEIP and KERP, and obtained the support of both Committees.  Thus, the proposed terms of the KEIP and the KERP set forth herein reflect consensus among the Debtors and their two statutory committees.

C.    **Description of the KEIP**

27.    The KEIP provides incentive payments to six senior executives, all of whom are insiders (collectively, the "KEIP Participants"), based on a single performance metric: the level of proceeds of the sale of the Debtors' assets (the "Sale Proceeds"). The Debtors selected Sale Proceeds as the exclusive metric because the KEIP Participants have control and oversight of the Sale Process. Accordingly, incentivizing their performance will ensure that the Sale Process takes place efficiently, diligently and in a value-maximizing manner. At this early stage of the Bankruptcy Proceedings, with the Sale Process still unfolding, the KEIP Participants are not guaranteed any payments and must meet specific targets which, notably, go above and beyond closing a transaction that only secures the Stalking Horse Consideration. An overview of the KEIP structure is provided below and in Exhibit B attached hereto.

**Key Terms**

The Debtors have limited participation in the KEIP to six (6) senior executives who will share in an incentive pool funded from the proceeds of the proposed Sale. The Company believes that all of the KEIP Participants have the ability to materially impact the Sale Process, including the ability to maximize the recovery to stakeholders by effectuating the Sale at the highest possible price.

The incentive pool is determined by the amount of the Sale Proceeds. The level of performance (i.e., Tier 1 "Target", Tier 2 "Stretch", and Tier 3) will be determined based on a performance metric that measures the cash consideration obtained for the Debtors' assets.

**Determination of Sale Proceeds Incentive**

The Sale Proceeds incentive (the "Sale Proceeds Incentive") is designed to increase as gross proceeds realized through the Sale Processes escalate. If the Stalking Horse Sale closes on the terms presently contemplated, the KEIP Participants will not receive any payouts under the KEIP. If the Sale Proceeds exceed the Stalking Horse Consideration by $5,000,000 (i.e. the cash consideration realized by the estates from the purchase price

is $580,000,000 after payment of any applicable bid protections), the KEIP Participants will be entitled to Tier 1 "Target" payouts (i.e. 100% of their target bonuses). If Sale Proceeds exceed the Stalking Horse Consideration by at least $50,000,000 (i.e. the cash consideration realized by the estates from the purchase price reaches $625,000,000), KEIP Participants will be entitled to "Tier 2" compensation of 200% of their target bonuses. If cash consideration realized by the estates from the purchase of the available assets exceeds $625,000,000, the KEIP Participants will be entitled to an aggregate payout which equals 3% of the total consideration above $625,000,000 as additional bonus on top of the Tier 2 "Stretch" bonuses. The table below illustrates how the Sale Proceeds Incentive will be determined.

| | Price Paid by Prevailing Bidder[1] | | Aggregate KEIP Payout |
|---|---|---|---|
| | Stalking Horse | Non-Stalking Horse | |
| | $575,000,000 | n/a | $0 |
| Tier 1 | n/a | $600,750,000 | $1,776,753 |
| | $585,000,000 | $605,750,000 | $1,974,170 |
| | $590,000,000 | $610,750,000 | $2,171,587 |
| | $595,000,000 | $615,750,000 | $2,369,004 |
| | $600,000,000 | $620,750,000 | $2,566,421 |
| | $605,000,000 | $625,750,000 | $2,763,837 |
| | $610,000,000 | $630,750,000 | $2,961,254 |
| | $615,000,000 | $635,750,000 | $3,158,671 |
| | $620,000,000 | $640,750,000 | $3,356,088 |
| Tier 2 | $625,000,000 | $645,750,000 | $3,553,505 |
| Above Tier 2 | $625,000,000 + | $645,750,000 + | $3,553,505 + 3% of >$645,750,000 |

[1] Showing $5m increments for illustrative purposes. However, actual bid increment is $1m.

For gross proceeds falling between the Tier 1 "Target" level and the Tier 2 "Stretch" level, the Sale Proceeds Incentive will be determined by linear interpolation. In the event gross proceeds from the Sale Process exceed the Tier 2 "Stretch" level ($625,000,000), the Sale Proceeds Incentive will be $3,553,505 plus 3% of the excess gross sale proceeds over Tier 2 consideration.

**Allocation of the Sale Incentive Pool**

The KEIP payouts will be funded with Sale Proceeds following closing of the Sale (the "Closing Date") and paid within thirty (30) days of closing of the Sale. The Incentive Pool will be allocated among the KEIP Participants as set forth in Exhibit B.

If the Tier 1 "Target" level is met, the KEIP will have a total plan cost of $1,776,753, which amounts to an average of $296,125 per KEIP Participant. If the Tier 2 "Stretch" level is met, the KEIP will have a total plan cost of $3,553,505, which amounts to an average of $592,251 per KEIP Participant.

Payouts were determined based on a percentage of each KEIP Participant's target bonus. If the Tier 1 "Target" level is met, no KEIP Participant will receive more than $750,000; if the Tier 2 "Stretch" level is met, no KEIP Participant will receive more than $1,500,000.

**Termination Provisions**

Upon voluntary termination or termination for cause prior to the closing of the Sale, a KEIP Participant's share of the Sale Incentive Pool will be forfeited. Such forfeited allocation will not be made available to other employees.

In the event of an involuntary termination not for cause prior to the Closing Date, the KEIP Participant will be paid his or her share of the Sale Incentive Pool at the same time and in the same amount had he or she not been terminated.

**Miscellaneous Terms**

Any earned KEIP payouts will be paid by the appropriate U.S. and Canadian Debtor based on the allocation of Sale Proceeds.

KEIP payments will not be credited against any severance payments otherwise due to KEIP Participants.

KEIP Participants will not receive any payments under retention plans implemented prior to the Petition Date.

28.     Achieving the Tier 1 "Target" level for the Sale Proceeds Incentive will require significant efforts by the KEIP Participants, and achieving the Tier 2 "Stretch" level would be an extraordinary achievement given the level of the Stalking Horse Bid. With respect

to the Sale Process, the Debtors' advisors have successfully negotiated a Stalking Horse

Agreement and are continuing to market the Debtors' assets to ensure that the highest and best

offer is received.  Maximizing value, however, will require extensive and devoted assistance

from the KEIP Participants, all of whom are needed to continue operating the business under

challenging circumstances, meet diligence requests, facilitate and conduct management

presentations to foster and attract higher and better bids and, ultimately, to facilitate the closing

of the winning bid.  Moreover, these obligations will be compounded by the already-

extraordinary pressures and demands of running the Company and dealing with the day-to-day

demands of the Bankruptcy Proceedings.

**E.**      **Description of the KERP**

29.      The KERP provides retention payments to sixty (60) non-insider

employees (collectively, the "KERP Participants"), with such payments comprising 12.5% to

25% of each KERP Participants' annual base salary, with an average of approximately 21%.[7]

30.      It is essential to the Debtors that the KERP Participants remain employed

until, at a minimum, the closing of the Sale.  The KERP Participants include employees from

various functions, including, but not limited, to sales, human resources, accounting and finance,

engineering, products/brand management, research and development, design, marketing, legal

and operations functions.

31.      Prior to the Petition Date, the Company implemented a two-year retention

program geared towards ensuring that select employees remained with the Company until June

2018 (the "Prepetition Retention Program").  The Company underwent a rigorous selection

---

[7] To protect the privacy of the KERP participants and preserve company morale, the names of the KERP
participants, as well as their positions within the Company, will only be provided to the Court, the UST, counsel to
the Creditors' Committee, proposed counsel to the Equity Committee, and counsel to the Debtors' prepetition and
postpetition lenders.

process when developing the Prepetition Retention Program, whereby retention risk and business impact were analyzed for each employee to determine the appropriate scope for participation in the Prepetition Retention Program.  Only employees with a high business impact and some level of retention risk were included in the Prepetition Retention Program.  Depending on the level of retention risk, eligible employees were to receive a retention amount equal to approximately 25% (highest retention risk), 18.75% (less retention risk), or 12.5% (lower retention risk) of such Prepetition Retention Program participants' base salary.

32.    As noted above, the Company has lost three critical employees that were participants in the Prepetition Retention Program, and five other employees since the Petition Date.  Accordingly, the Debtors and their advisors determined that it was in the estates' best interest to convert the Prepetition Retention Program into the KERP during these Bankruptcy Proceedings (and expand its reach) for those individuals who are deemed to be critical to the Debtors' ongoing operations and who present retention risk and would be difficult to replace, and seek Court approval thereof.

33.    Forty-one (41) KERP Participants were participants in the Prepetition Retention Program, and nineteen (19) previous non-participants have been added to further secure the Debtors' critical workforce during this pivotal stage of the Bankruptcy Proceedings. As with the Prepetition Retention Program participants, each KERP Participant was carefully selected and deemed critical to the Debtors' ability to maximize value for the benefit of all interested parties.  Without payments under the proposed KERP, the Debtors believe that the KERP Participants are likely to pursue alternative employment, harming the value of the estates and affecting the implementation of the Sale Process.

34.     While several KERP Participants have titles that include words such as "vice president" or "director" which may suggest officer status, none of the KERP Participants are in reality "insiders."  Although the KERP Participants are important to the Debtors' business and are particularly vital during these Bankruptcy Proceedings, their titles do not reflect that such employees have access to inside information or otherwise control the Debtors' operations.  None of the KERP Participants was appointed by, or reports to, the Company's Board of Directors.  Each KERP Participant reports to intermediate managers, the scope of his or her authority is limited, and no KERP Participant reports directly to the Chief Executive Officer.  Tellingly, the Debtors did not include every employee with an official-sounding title to participate in the KERP.  The Company has a total of 76 "vice presidents" and "directors", but only 36 of these employees were selected as KERP Participants.

35.     Following is an overview of the proposed KERP:

**Key Terms**

**<u>Participation</u>**

The Debtors have limited participation in the KERP to sixty (60) employees, forty-one (41) of which were participants in the Prepetition Retention Program.  The KERP Participants represent a cross-section of various functions of the Company, including business development, product/brand management, research and development, design, sales/marketing, finance, human resources, legal, IT, supply chain and operations.

*Average salary*: $133,754.83

*Average tenure*: approximately 10 years

**Cost**

The estimated cost of the KERP, assuming all KERP Participants remain employed through the closing of the Sale, is $1,652,209, which represents an average of $27,537 per KERP Participant.

**KERP Payment and Payment Schedule**

KERP payments will be equal to 12.5%, 18.75% or 25% of base salary, depending on the relative importance of each KERP Participant to the Sale Process and, more directly, the Company's perceived retention risk assigned to such Participants. On a dollar-weighted average basis, the KERP payments will average 21% of KERP Participants' individual base salary.

KERP payments will be paid as soon as administratively possible following the closing of the Sale, provided that the KERP Participant is still employed by, and in good standing with, the Company.

**Termination Provisions**

The KERP payments are earned upon the earlier of termination without cause or closing of the Stalking Horse Agreement (or alternative Sale transaction by way of asset purchase agreement and/or plan arrangement).

**Miscellaneous Provisions**

KERP Participants will not receive any payments under the Prepetition Retention Program to the extent they were previously eligible to do so.

## BASIS FOR RELIEF REQUESTED

36.     A company's decision to file for chapter 11 necessarily creates difficulties for its employees and can lead to retention problems, low morale, and low productivity. Unfortunately, these negative consequences affect the company's ability to continue its normal business operations, maintain vendor and consumer support, and impair the company's ability to maximize sale values and achieve the highest possible recovery for its stakeholders. For this reason, bankruptcy courts and stakeholders have long authorized incentive and retention plans

designed to reduce disruption to employees while improving morale and incentivizing job performance. Courts have routinely approved payments under these plans pursuant to section 363(b) of the Bankruptcy Code as a prudent exercise of a debtor's business judgment. The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 did not eliminate the use of these plans, and continues to permit payments and added protections that are offered to employees.

37. The Debtors seek approval of the KEIP and KERP to maintain their business operations, preserve their financial condition, sell their assets as a going concern at the highest and best price and meet their debtor-in-possession duties during the pendency of these Bankruptcy Proceedings. These goals cannot be met without the support of the Eligible Employees. Each Eligible Employee faces an uncertain future and there is no guarantee of employment from the Stalking Horse Purchaser or any other potential buyer of the Debtors' businesses. Thus, it is crucial that the Debtors retain certain key employees and incentivize certain senior executives to deliver their best performance throughout the Sale Process. The Eligible Employees were selected after tremendous scrutiny and only after it was determined that each Participant was critical to the maintenance of the Debtors' operations and the success of the Sale Process. To that end, each Eligible Employee is highly skilled, and their skill, institutional knowledge and work ethic are critical to the Debtors' sale efforts. Without the implementation of the KEIP and KERP, the Eligible Employees are likely to pursue other employment and may not be incentivized to perform optimally. In the last few months, three employees who otherwise would have been KERP Participants resigned to pursue other opportunities, and the departure of five other employees has placed additional pressures and demands on the Eligible Employees.

For these reasons and others, the Debtors believe that implementation of the KEIP and KERP, on the terms approved by the Committees, is critical at this juncture of the Bankruptcy Proceedings.

## I.    THE KEIP AND KERP SHOULD BE APPROVED AS A REASONABLE EXERCISE OF THE DEBTORS' BUSINESS JUDGMENT

38.    The KEIP and KERP have been designed by the Debtors and A&M, and modified with the input of the Committees, to incentivize performance and ensure continued employment within the parameters of sections 363(b) and 503(c) of the Bankruptcy Code.[8]  The prohibitions and restrictions in section 503(c)(1) and (2) do not apply here, as those provisions restrict the ability of "insiders" to receive payments as part of retention or severance plans.  As described below, the KEIP is an incentive plan (rather than a retention or severance plan), and the KERP applies solely to non-insiders.

---

[8] (c) Notwithstanding subsection (b), there shall neither be allowed, nor paid –

(1) a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtor's business, absent a finding by the court based on evidence in the record that-
(A) the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;
(B) the services provided by the person are essential to the survival of the business; and
(C) either-
(i) the amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to nonmanagement employees for any purpose or obligation of a similar kind given to nonmanagement employees for any purpose during the calendar year in which the transfer is made or the obligation is incurred; or
(ii) if no such similar transfers were made to, or obligations were incurred for the benefit of, such management employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before the year in which such transfer is made or obligation is incurred;
(2) a severance payment to an insider of the debtor, unless-
(A) the payment is part of a program that is generally applicable to all full-time employees; and
(B) the amount of the payment is not greater than 10 times the amount of the mean severance pay given to nonmanagement employees during the calendar year in which the payment is made; or
(3) other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.

11 U.S.C. § 503(c).

A.    **The KEIP is an Incentive Plan Justified by the
Facts and Circumstances of these Bankruptcy Proceedings**

39.    The KEIP is an incentive plan with appropriate performance targets that will be challenging to meet and, if met, will maximize constituent recoveries.  The KEIP is not simply a retention plan meant to ensure continued employment for insiders, which is prohibited by section 503(c)(1) of the Bankruptcy Code, nor a severance plan prohibited by section 503(c)(2) of the Bankruptcy Code.  To the contrary, the KEIP is an incentive plan for several key senior executives that is designed to motivate them to achieve a successful going-concern, value maximizing sale.  Consequently, the KEIP is not prohibited under section 503(c)(1) or (2), but, rather, is permitted under section 503(c)(3) of the Bankruptcy Code.

40.    Although the KEIP might encourage the KEIP Participants to remain with the Company through the closing of the Sale, that effect does not mean that the KEIP is solely a retention-driven plan.  *See In re Global Home Prods., LLC*, 369 B.R. 778, 786 (Bankr. D. Del. 2007) (finding that proposed incentive plans were "primarily incentivizing and only coincidentally retentive" and noting, "The fact that . . . all compensation has a retention element" did "not reduce the Court's conviction" that the debtors' primary goal in approving the incentive plans was "to create value by motivating performance").  A plan that indirectly causes its participants to remain employed does not detract from the KEIP's primary purpose, which is to motivate the KEIP Participants to maximize value for the Debtors' estates and, in turn, motivate the workforce at large to ensure that recoveries are maximized.

41.    This Court has approved similar plans tied to sales goals.  *See, e.g., In re Furniture Brands International, Inc., et al.*, No. 13-12329 (Bankr. D. Del. Oct. 11, 2013) (approving incentive plan where amount increased as sale proceeds increased); *In re Trident Microsystems, Inc., et al.*, No. 12-10069 (Bankr. D. Del. Feb. 24, 2012) (approving incentive

plan where amount and number of participants increased as sale proceeds increased, including

4.46% of total consideration in excess of $70 million for top three executives).  Other courts in

this district have similarly approved incentive plans designed to meet specific restructuring

targets.  *See, e.g., In re Evergreen Solar*, No. 11-12590 (Bankr. D. Del. 2012) (approving

incentive plan where participants received 5% of gross cash proceeds from sale); *In re Eddie

Bauer Holdings, Inc*., No. 09-12099, 2010 WL 3493027 (Bankr. D. Del. Mar. 18, 2010)

(approving incentive payments of 5% of gross sale proceeds in excess of $202.5 million up to

$252.5 million); *In re Radnor Holdings Corp., et al*., No. 06-10894 (Bankr. D. Del. Oct. 4, 2006)

(approving incentive plan based on net sale proceeds with a minimum incentive pool of

$700,000, to increase by 4% of sale proceeds in excess of $118.5 million).

   42.  The ruling in *Global Home Products* is particularly instructive.  There, the

Court conducted a detailed analysis of the debtor's requested employee incentive plan within the

construct of the business judgment standard.  The court balanced a number of different factors to

determine whether the incentive plan was permitted under section 503(c) of the Bankruptcy

Code, including:

> (a) whether the plan is calculated to achieve the desired performance;
>
> (b) whether the costs of the plan are reasonable within the context of the debtor's assets;
>
> (c) whether the scope of the plan is fair and reasonable;
>
> (d) whether the plan is consistent with industry standards;
>
> (e) whether the debtor engaged in due diligence related to the need for the plan, the employees that needed to be incentivized, and what type of plans are generally available in a particular industry; and
>
> (f) whether the debtor received independent counsel in performing due diligence and creating and authorizing incentive compensation.

*See, e.g., In re Global Home Prods*., 369 B.R. at 786 (citing *In re Dana Corp*., 358 B.R.

567,576-77 (Bankr. S.D.N.Y. 2006)).  The KEIP which the Debtors seek to implement is a

reasonable exercise of the Debtors' sound business judgment because it was carefully designed

with expert assistance from A&M, reflects the well-informed considerations raised by the

Committees, and seeks to incentivize certain senior executives' performance to continue the

Debtors' day-to-day operations and ensure the consummation of a successful Sale Process,

which is the Debtors' highest priority during these Bankruptcy Proceedings.

43.    <u>First</u>, the KEIP is calculated to achieve desired performance.  Payments

from the Sale Incentive Pool are directly linked to clear sales objectives and the achievement

thereof.

44.    <u>Second</u>, the incentive payments contemplated in the KEIP are reasonable

and fair because the Sale Incentive Pool constitutes only a small percentage of the contemplated

Sale Proceeds.  A threshold achievement—the successful closing of a transaction that materially

surpasses the Stalking Horse Bid by at least $5 million in cash consideration—must be met for

the KEIP Participants to receive any distribution under the KEIP.  The payments are reasonable

because they are directly tied to increased sale proceeds that would be the direct result of the

KEIP Participants' performance.  Further, the total KEIP payments and base salary are actually

*lower* than the amount of compensation that the KEIP Participants would have expected to earn

in the absence of these Bankruptcy Proceedings.[9]  As noted above, Pearl Meyer conducted an

extensive executive compensation competition analysis prior to the Petition Date, which A&M,

in turn, compared to projected total target direct compensation for each KEIP Participant

provided Tier 1 "Target" payouts are made.  After conducting that comparison, A&M

---

[9]    The proposed KEIP, when combined with fixed compensation (base salary), will produce levels of total direct compensation that are approximately 46% <u>lower</u> than Fiscal Year 2016 target total direct compensation assuming KEIP payout at the target level of performance.  Even at the Tier 2 "Stretch" level of performance, total direct compensation under the proposed KEIP would also fall below Fiscal Year 2016 target total direct compensation for all of the KEIP Participants.  The group as a whole would be 25% lower than the Fiscal Year 2016 target total direct compensation.

determined that each KEIP Participant's total direct compensation for Fiscal Year 2017 would fall below the 25th percentile of market comparables.

45.    Third, the KEIP is reasonable in scope because it only applies to six (6) executives and officers.  The Debtors must rely on the efforts of those six KEIP Participants, and their performance will have the greatest impact on the sales value that the Debtors achieve through the Sale Process.

46.    Fourth, the Debtors hired A&M to, among other things, provide its expert advice in designing the KEIP.  A&M made its initial recommendations based upon a thoughtful and thorough review of bankruptcy comparables, the market comparable analysis of Pearl Meyer and historical compensation at the Company.  The Debtors discussed their options with A&M and only arrived at the first iteration of the KEIP after several revisions.  The KEIP then underwent an effective market test prior to filing this Motion when the Debtors solicited comments from both Committees, a process that resulted in a modified plan that further incentivizes maximum performance from the KEIP Participants.  Therefore, the Debtors' consultation with A&M, ensuing approval by the Company's Board of Directors, and negotiation with the Committees demonstrate a reasonable exercise of sound business judgment by the Debtors that has been approved by their two statutory committees.

47.    Fifth, A&M reviewed multiple incentive plans implemented in chapter 11 upon receiving the list of proposed executives who would have the greatest impact on the restructuring and Sale Process, as determined by the Debtors' senior management and approved by the Debtors' compensation committee and Board of Directors.  In conjunction therewith, A&M designed the KEIP and assessed the reasonableness of its structure, keeping in mind the Comparable KEIPs and the incentive objectives that the Debtors hereby seek to establish.  The

Committees had an opportunity to consider the Debtors' initial proposals, ask questions and provide comments and make counterproposals.

48.     Sixth, the Debtors consulted with A&M in designing the KEIP, analyzing objectives related to Sale Proceeds and establishing targeted thresholds within that construct. These efforts, combined with the Debtors' review of A&M's industry studies and expert advice, and the constructive input provided by the Committees, constitute sufficient due diligence to meet the business judgment standard.

49.     Finally, the Debtors submit that maintaining business operations and closing a sale that exceeds the offer put forth by the Stalking Horse Purchaser by at least $5 million would warrant Tier 1 "Target" payouts under the KEIP.  The KEIP Participants must be incentivized to continue business operations in a manner that will both ensure compliance with the requirements of the Stalking Horse Agreement through closing, and simultaneously generate significant interest from would-be alternative buyers.  Indeed, Courts have approved incentive plans that are triggered upon the closing of a stalking horse bid, alone.[10]  In this instance, closing the Stalking Horse Agreement, on the terms contemplated, will not entitle any KEIP Participants to payouts under the KEIP, and only in the event Sale Proceeds *exceed* the Stalking Horse Bid by $5,000,000 or more will KEIP Participants receive a KEIP payout.  As a result, KEIP

---

[10] *See* in *In re Diamond Glass*, Case No. 08-10601 (Bankr. D. Del. 2009) ("even if the only thing management has to do and the covered employees have to do is hold this company together for the stalking horse bidder to close, [the Court doesn't] find that in and of itself primarily retentive. . .. Stalking horse cases, stalking horse bidders walk away.  There are material adverse changes that occur . . . [and] I don't find that just getting to a plan or just getting to a closing by a stalking horse bidder in and of itself is retentive.  I think there's a lot that can go wrong."  Tr. of Hr'g before the Honorable Christopher S. Sontchi at 89: 5-23 (*In re Diamond Glass, Inc.*, Case No. 08-10601) (Bankr. D. Del. May 8, 2008).  *See also* Tr. of Hr'g before the Honorable Brendan S. Shannon at 61: 1-24 (*In re Coldwater Creek, Inc.*, Case No. 14-10867) (Bankr. D. Del. June 2, 2014) (approving incentive program where "much of the work has already been done"); *In re RadioShack Corp.*, Case No. 15-10197 (Bankr. D. Del. Mar. 4, 2015) (D.I. 811) (approving incentive plan that contemplated payment upon metric driven by approval of stalking horse bid).

Participants have a strong incentive to drive value over and above the value of the Stalking Horse Bid.

50.    For all these reasons, the Debtors submit that the KEIP is justified by the facts and circumstances of these Bankruptcy Proceedings and, therefore, should be approved.

### B.    The KERP Applies Only to Non-Insiders, and is Not Prohibited by Sections 503(c)(1) or 503(c)(2) of the Bankruptcy Code

51.    In addition, the KERP is not subject to section 503(c)(1) or (c)(2) of the Bankruptcy Code, both of which apply to insiders exclusively.  Section 101(31)(B) of the Bankruptcy Code defines an "insider" as any director, officer, person in control of the debtor, partnership where the debtor is a general partner, general partner of the debtor, or relative of a general partner, director, officer, or person in control of the debtor.  *See* 11 U.S.C. § 101(31)(B). None of the KERP Participants meet this definition of "insider."

52.    Although any person holding an officer's title is presumptively an officer and, thus, an insider, that presumption can be rebutted.  *In re Foothills Texas, Inc*., 408 B.R. 573 (Bankr. D. Del. 2009).  Specifically, "[a] party seeking to rebut that presumption must present evidence sufficient to establish that the person holds the title of an officer in name only and, in fact, does not meet the substantive definition of the same, *i.e*., he or she is not taking part in the management of the debtor."  *Id.* at 574-75.

53.    As demonstrated above, the KERP Participants do not report to the CEO or to the Company's Board of Directors; rather, they report to intermediate managers or, in one instance, the Chief Financial Officer and Audit Committee of the Board of Directors.  *See In re Global Aviation Holdings Inc*., 478 B.R. 142, 148 (Bankr. E.D.N.Y. 2012) (finding that director-level employees were not "officers" because none of them were members of board, participated in corporate governance, attended board meetings or reported to board).  Many of the KERP

Participants' duties are limited to sales or account management and may be restricted to a particular division. Courts have declined to find insider status where the scope of authority is similarly limited. *See In re Borders Group, Inc*., 453 B.R. 459, 469 (Bankr. S.D.N.Y. 2011) (employees in retention plan were not insiders because none of them had authority to implement company policy, did not report to board of directors, and were subordinate to actual officers). The titles of the KERP Participants reflect their individual functions and roles, but do not reflect "insider" status as the Court discussed in *Foothills*. *See In re NMI Systems, Inc.*, 179 B.R. 357, 370 (Bankr. D.D.C. 1995) (finding that vice president was not an insider because he was conferred title "for purposes of marketing" only and was not "in the inner circle making the company's critical financial decisions.").

54.      Accordingly, the Debtors submit that certain KERP Participants are officers in name only, do not take part in the management of the Debtors, and therefore are not "insiders."[11] For the balance of the KERP Participants, the Debtors submit that both their titles and roles played dictate that they are not "insiders" and, therefore, not precluded from participating in the KERP.

## C.      The KEIP and KERP Should be Approved Pursuant to Sections 363(b) and 503(c)(3) of the Bankruptcy Code

55.      Because the KEIP and KERP are not prohibited by sections 503(c)(1) or 503(c)(2) of the Bankruptcy Code, the Debtors submit that the Court should authorize the Debtors to implement the plans under sections 363(b)(1) and 503(c)(3) of the Bankruptcy Code.

56.      The standard for approving payments under section 503(c)(3) is essentially the same "business judgment" standard for approving similar transactions under

---

[11] To the extent required by constituents' objections or the Court, the Debtors are prepared to submit at the hearing on this Motion additional evidence necessary to rebut any presumption of insider status conferred by the KERP Participants' titles. Should the Court find that any presumption of insider status has not been overcome, the Debtors reserve the right to move any such KERP participant from the KERP to the KEIP.

section 363(b)(l) of the Bankruptcy Code.  *See, e.g., In re Nellson Nutraceutical, Inc.,* 369 B.R.

787, 804 (Bankr. D. Del. 2007) (holding that, because bonus plan's primary motivation was not

retentive, section 503(c)(l) did not apply and business judgment standard was to be used to assess

plan); *In re Global Home Products, LLC*, 369 B.R. 778, 787 (Bankr. D. Del. 2007) (same).

57.    Section 363(b)(1) of the Bankruptcy Code allows a debtor-in-possession

to use property of the estate "other than in the ordinary course of business" after notice and a

hearing, in the exercise of the Debtors' business judgment.  11 U.S.C. § 363(b)(1); *see also, e.g.,*

*In re Martin*, 91 F.3d 389, 395 (3d. Cir. 1996) (stating that under normal circumstances, courts

will defer to debtor's judgment in using property under section 363(b) if there is legitimate

business justification).  Therefore, the estate's property may be used other than in the ordinary

course of business if the debtor can show a "sound business purpose" for such use.  *See In re*

*Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983) ("[t]he rule we adopt requires that a judge

determining a §363(b) application expressly find from the evidence presented before him

[supports a] good business reason to grant the application."); *In re Delaware Hudson Ry. Co.*,

124 B.R. 169, 179 (Bankr. D. Del. 1991).  If a debtor shows a valid business purpose, the court

applies the "business judgment rule," a presumption "that in making a business decision, the

directors of a corporation acted on an informed basis, in good faith and in the honest belief that

the action taken was in the best interest of the company."  *Smith v. Van Gorkom*, 488 A.2d 858,

872 (Del. 1985).

58.    Applying the business judgment rule in chapter 11 cases, courts have

routinely permitted employee payments that are outside the normal course of business.  *See, e.g.*,

*Dai-Ichi Kangyo Bank Ltd. v. Montgomery Ward Holding Corp.* (*In re Montgomery Ward*

*Holding Corp.*), 242 B.R. 147, 153-55 (D. Del. 1999) (affirming bankruptcy court's

authorization of key employee compensation program, holding "[i]n determining whether to authorize the use, sale, or lease of property of the estate under [section 363(b)], courts require the debtors to show that a sound business purpose justifies such actions"); *In re Global Home Products*, 369 B.R. at 784 ("The reasonable use of incentives and performance bonuses are considered the proper exercise of a debtor's business judgment."); *see also In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper* (*In re Schipper*), 933 F.2d 513, 515 (7th Cir. 1991)).

59.     The KEIP and KERP each represent a sound business purpose and satisfy the business judgment rule.  The KEIP and KERP will facilitate the Debtors' Sale Process by incentivizing, retaining, and protecting crucial employees to ensure that regular business operations continue and Sale Proceeds are maximized.  These goals cannot be met if skilled key employees depart prematurely or if executives are not incentivized.  Payments under the KEIP directly incentivize key executives to achieve the highest sale consideration and maximize recovery for the Debtors' estates.  The KERP serves another important purpose by offering non-insider employees with security and a reward for remaining loyal to the Debtors during this critical period.

60.     Moreover, the Debtors submit that by obtaining the consent of both Committees to implement the KEIP and the KERP (subject to Court approval), the reasonableness of the Debtors' business judgment is further affirmed.

61.     For the foregoing reasons, the Debtors submit that approval of the KEIP and KERP is in the best interest of the Debtors' estates, their creditors, and all parties in interest, and should therefore be granted.

## II.   RELIEF UNDER BANKRUPTCY RULE 6004 IS WARRANTED

62.     The Debtors request that the Court waive the 14-day stay period under Bankruptcy Rule 6004(h) and approve the relief requested herein to be effective immediately. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property … is stayed until the expiration of fourteen days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).

63.     As demonstrated above, approval of the KEIP and KERP is essential to incentivizing key senior executives, and retaining certain critical employees, so that the outcome of the Debtors' Sale Process can be optimized.  The Debtors submit that the Court should waive the 14-day stay under Bankruptcy Rule 6004(h), so that the crucial incentive and retentive effects of the KEIP and KERP can be realized immediately in the challenging and uncertain circumstances presented by these Bankruptcy Proceedings.

## NOTICE

64.     Notice of this Motion has been provided to:  (i) the UST; (ii) those parties served with notice of the Comeback Hearing in the Canadian Proceedings; (iii) counsel to the Creditors' Committee and proposed counsel to the Equity Committee; (iv) counsel to the Debtors' prepetition and postpetition lenders; (v) the Monitor; (vi) counsel to the Debtors' Stalking Horse Purchaser; and (vii) all parties requesting notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated:  December 20, 2016
   Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Pauline K. Morgan*
Pauline K. Morgan (No. 3650)
Sean T. Greecher (No. 4484)
Justin H. Rucki (No. 5304)
Shane M. Reil (No. 6195)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
Kelley A. Cornish
Alice Belisle Eaton
Claudia R. Tobler
Christopher Hopkins
1285 Avenue of the Americas,
New York, New York 10019
Telephone: (212) 373-3000
Facsimile:  (212) 757-3990

*Co-Counsel to the Debtors and
Debtors in Possession*