## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 <br> ) <br> ) Case No. 16-12373 (KJC) <br> ) <br> ) Jointly Administered <br> ) <br> ) |
| OLD BPSUSH INC., *et al.*,[1] | |
| Debtors. | |

FEB – 6 2018

## RESPONSE OF ROCCO COVELLA TO LIQUIDATION TRUSTEE'S OMNIBUS OBJECTION TO CLAIM NUMBER 483

I, Rocco Covella, appearing *pro se*, hereby file this response (the "Response") to the

*Liquidation Trustee's First Omnibus Objection to Certain Claims (Non-Substantive)* [D.I. 1635]

(the "Claim Objection") in which Mark E. Palmer, the liquidation trustee (the "Liquidation

Trustee") in the chapter 11 cases of the above-captioned affiliated debtors (each a "Debtor," and

collectively, the "Debtors") objected to proof of claim number 483 ("Claim 483"). In support of

this Response, I respectfully state as follows:

### PRELIMINARY STATEMENT

1.    I submitted a Proof of Claim, Claim 483, under a prepetition retention program.

Specifically, that prepetition retention program is formally titled *Performance Sports Group,*

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Old BPSUSH Inc. (f/k/a BPS US Holdings Inc.) (8341); Old BH Inc. (f/k/a Bauer Hockey, Inc.) (3094); Old EBS Inc. (f/k/a Easton Baseball / Softball Inc.) (5670); Old BHR Inc. (f/k/a Bauer Hockey Retail Inc.) (6663); Old BPSU Inc. (f/k/a Bauer Performance Sports Uniforms Inc.) (1095); Old PLG Inc. (f/k/a Performance Lacrosse Group Inc.) (4200); Old BPSCI Inc. (f/k/a BPS Diamond Sports Inc.) (5909); Old PSGI Inc. (f/k/a PSG Innovation Inc.) (9408); Old BHR Wind-down Corp. (f/k/a Bauer Hockey Retail Corp.) (1899); Old EBS Wind-down Corp. (f/k/a Easton Baseball / Softball Corp.) (4068); Old PSGI Wind-down Corp. (f/k/a PSG Innovation Corp.) (2165); Old BPSDS Wind-down Corp. (f/k/a BPS Diamond Sports Corp.) (8049); Old BPSU Wind-down Corp. (f/k/a Bauer Performance Sports Uniforms Corp.) (2203); Old PLG Wind-down Corp. (f/k/a Performance Lacrosse Group Corp.) (1249); and Old PSG Wind-down Ltd. (1514) (f/k/a Performance Sports Group Ltd., and also representing the estates of the Debtors formerly known as KBAU Holdings Canada, Inc., Bauer Hockey Corp., and BPS Canada Intermediate Corp., respectively). The Debtors' mailing address is 666 Burrard Street, Suite 1700, Vancouver, British Columbia, Canada, V6C 2X8.

*Ltd. Cash Incentive Award Agreement* and is dated 1 June 2016 (the "Prepetition Retention Program"). The Prepetition Retention Program is attached as Exhibit A.

2.      Under the Prepetition Retention Program, I earned a non-discretionary cash bonus of $144,108 which was never paid to me.

3.      The Liquidation Trustee offers a single, simple reason for rejecting my Claim 483:

> REASON: Claim asserts a right to payment on account of prepetition retention programs. The claimant waived the right to receive any such amounts in connection with the claimant's receipt of an award under Key Employee Retention Plan approved by the court.

4.      The problem with the Liquidation Trustee's argument is that the Key Employee Retention Plan (the "KERP") is unenforceable under applicable law. Despite it being approved by this Court, the KERP cannot and should not be enforced against me.

5.      That said, I did receive money under the KERP. As a result, I am not seeking the full amount I earned under the Prepetition Retention Program. Rather, the amount I seek takes into account the amount I received under the KERP. The total adjusted amount that I seek is $96,072.

6.      I respectfully request that the Trustee's objection be overruled and that my Claim 483 be paid at the adjusted amount of $96,072 for the reasons set forth below.

## **RELEVANT BACKGROUND**

7.      Prior to the Petition Date, I was employed by Easton Baseball/Softball, Inc., one of the Debtors in this case. Easton Baseball/Softball, Inc., throughout is corporate "life" is (was) a Delaware corporation headquartered in California. As an entity doing business in California, with California employees, Easton Baseball/Softball, Inc. is and was for all relevant times, subject to California's wage and hour rules.

8.      Prior to the Petition Date, Easton Baseball/Softball, Inc., by and through its parent company, co-Debtor Performance Sports Group, implemented the two-year Prepetition Retention Program. The Prepetition Retention Program refers to its 1 June 2016 effective date as the "Grant Date."

9.      My Prepetition Retention Program provided me "a cash incentive award in the amount of $144,108 USD (the 'Award')" provided that I stay with the company for two years from the Grant Date (i.e., until 1 June 2018). Exhibit A, page 1, Paragraph 1(a). That amount was 75% of my base salary at the time. The Prepetition Retention Program refers to 1 June 2018 as the "Vesting Date."

10.      Specifically, my Prepetition Retention Program vested at a rate of 100% "on the Vesting Date", provided that I was

> continuously engaged in active service by the Company or one of its Affiliates from the Date of Grant [1 June 2016] through such Vesting Date [1 June 2018] (the "Restricted Period") . . . .

Exhibit A, page 1, Paragraph 2(a).

11.      I was terminated upon the Debtor's sale of the assets to the Stalking Horse Bidder, and was not afforded an opportunity to fulfil my service to the Debtor for the full length of the Restricted Period.

12.      However, as with most retention bonus programs, there is a "change in control" provision in the Prepetition Retention Program. It says:

> if, prior to the end of the Restricted Period, the **Grantee's employment is terminated by the Company** or an Affiliate **without Cause** (and other than due to death or Disability) **on . . . a Change in Control, Section 13 of the Plan shall apply** to the Award.

Exhibit A, page 2, Section 2(c) (emphasis added).

3

13.    Under the Prepetition Retention Program, the "Plan" is defined in the as the *Performance Sports Group Ltd. Omnibus Equity Incentive Plan.* (the "Plan"). The Plan is attached as Exhibit B. Section 13 of the Plan states:

> *In the event that the Participant's employment with the Company* or an Affiliate *is terminated by the Company* or an Affiliate *without Cause* (and other than due to death or Disability) *on . . . a Change in Control*, the Committee may provide that *all Options* and SARs held by such Participant *shall become immediately exercisable with respect to 100% of the shares subject to such Options* and SARs, *and that the Restricted Period (and any other conditions) shall expire immediately* with respect to 100% of the shares of Restricted Stock and Restricted Stock Units and any other Awards held by such Participant (including a waiver of any applicable Performance Goals);

Exhibit B, page 19-20, Section 13(a) (emphasis added).

14.    Section 13 discusses stock options. It does not address non-discretionary cash bonuses. Still, the meaning and intent is clear – upon an employee's termination as a result of a "change in control", all options immediately vest and the Restricted Period "shall immediately expire".

15.    As mentioned, under the Prepetition Retention Program, the Restricted Period is "the Date of Grant [1 June 2016] through such Vesting Date [1 June 2018]". Exhibit A, page 1, Section 2(a). An immediate expiration of the Restricted Period is essentially an acceleration of the Restricted Period.

16.    So, upon my termination, the Restricted Period immediately accelerated and ended. Upon my termination, I was fully vested on my non-discretionary cash bonus of $144,108.

17.    Much to my surprise, on the eve of the closing of the sale to the Stalking Horse Bidder, Performance Sports Group sent me a letter, dated 11 January 2017, which is attached as Exhibit C. This letter (which is referred to as the "KERP") attempts to usurp my retention

bonus under the Prepetition Retention Program and the Plan -- without consideration and in violation of California wage and hour rules.

18.    Specifically, the KERP sought to reduce my Prepetition Retention Program bonus by 75% -- from $144,108 to $48,036. Expressed differently, my bonus under the Prepetition Retention Program was 75% of my then-current salary of approximately $192,144; *however*, under the KERP it was only 25% of my then-current annual salary. *See* Exhibit C.

19.    In an effort to effectuate this usurpation, the KERP stated:

Under the terms of the KERP approved by the courts, payments received under the KERP will be in lieu of any payments you may have been entitled to receive under previous retention programs offered by the Company prior to commencement of their Chapter 11 and CCAA proceedings.

Exhibit C.

20.    As indicated, I was surprised by the KERP. First, I was surprised that the Debtors would try to circumvent a legally enforceable non-discretionary bonus on the eve of the closing of the sale of the business to the Stalking Horse Bidder. Surprised because the Debtor attempted to do this without any legal consideration. Surprised even further that the Debtor violated California wage and hour rules. And surprised still further *since the Plan addressed the very situation which was about to occur – and acceleration of the Restricted Period and an immediate vesting of my non-discretionary cash incentive award under the Prepetition Retention Program and the Debtor's Plan.*

21.    An earned non-discretionary bonus, under California wage and hour rules, is an earned wage. As such, no California employer may shirk its obligation to pay that wage by a second contract, even if that second contract is approved or certified by a court.

22.     Still, I did sign the KERP despite its language, and I took is $48,036. However, since signing the KERP in January 2016, I learned that it was unenforceable because it was devoid of consideration and because it violates California wage and hour rules.

23.     For these reasons, I respectfully raise this response to this honorable Court. I respectfully request the Trustee's objection be overruled and that my claim 483 be paid for the reasons set forth below.

24.     However, I am not seeking the full amount of the Prepetition Retention Program's $144,108 bonus. Rather, that amount should be reduced by the amount I received under the KERP. After those adjustments, my requested amount becomes $96,072.

25.     I respectfully request that the Trustee's objection be overruled and my claim 483 be paid at the adjusted amount of $96,072 for the reasons set forth below.

## RESPONSE

26.     I am owed the difference between the amount due under the Prepetition Retention Program and the amount paid under the KERP because the attempted novation lacked consideration to extinguish the obligations of the Prepetition Retention Program. Under substantive California law, I did not validly release or waive my vested wages under the Prepetition Retention Program.

### 1. California Substantive Law Applies to this Claim Because I Rendered Services to the Debtor in California.

27.     Notwithstanding the New York choice of law provision in the Prepetition Retention Program, California's substantive wage and hour laws govern the merits of this dispute because I rendered services as an employee in the State of California. The anti-waiver provisions of the California Labor Code regarding the payment of wages preclude enforcement of a foreign state laws with respect to California wage claims. *Verdugo v. Alliantgroup, L.P.* (2015) 237

Cal.App.4th 141, 156-157 (Court held that out-of-state forum selection and choice of law clause were unenforceable in employee's claim for wages). Stated differently, California law applies its wage and hour rules to wages earned in California, *regardless* of whether other aspects of an agreement are governed by a choice of law provision.

### 2. The KERP Lacked Any Consideration and Therefore is Not an Enforceable Novation.

28.     The Prepetition Retention Program and the KERP are between the same parties and cover the same subject matter. The Prepetition Retention Program (through Section 13 of the Plan) promises a cash payment so long as I was employed by a date certain (through June 1, 2018) *unless* my "employment with the Company or an Affiliate is terminated by the Company or an Affiliate without Cause (and other than due to death or Disability) on . . . a Change in Control." Exhibit B, page 20, Section 13(a). As indicated, the Plan contemplates that, upon an employee's termination as a result of a "change in control", all benefits immediately vest and the Restricted Period "shall immediately expire". As a result, I was immediately entitled to the full amount of my non-discretionary cash retention bonus upon my termination without cause as a result of a change in control.

29.     The KERP promises a cash payment so long as I remained employed through the sale of the assets of the company, which was during the same period that was covered by the Prepetition Retention Program.

30.     Importantly, both agreements imposed identical obligations on me – to remain employed and working for the Company through a date certain.

31.     Also, the triggering event for the payment was the same under both agreements – the Company terminating me without cause in February 2017. The KERP did not impose different

obligations or provide me any benefit to which I was not already entitled to receive under the Prepetition Retention Program.

32.    Indeed, the only substantive difference between the two agreements is the amount of money that would be paid in exchange for my performance – which is significantly less under the KERP than the Prepetition Retention Program ($144,108 vs. $48,036). As of January 2017, when I signed the KERP, the terms of the Prepetition Retention Program *obligated the Debtor to pay me the full amount of my non-discretionary cash bonus under Prepetition Retention Program because a "change in control" was a forgone conclusion at that point in this case.*

33.    Under these facts, there is no question that the KERP was an attempted, but failed, novation of the Prepetition Retention Program. "A novation is a substitution by agreement of a new obligation for an existing one with the intent to extinguish the latter." *Ca. Civil Code* section 1530.

34.    One way to accomplish a novation is "the substitution of a new obligation for a new obligation between the same parties, with intent to extinguish the old obligation." *Ca. Civil Code* section 1531.

35.    However, a novation must be supported by new consideration, or it is unenforceable. *Ca. Civil Code* section 1532; *Western Lithograph Co. v. Vanomar Producers* (1921) 185 Cal. 366, 369-370.

36.    An attempted novation that does nothing more than alter pre-existing obligations between the parties that they are already obligated to perform is not supported by valid consideration. In *Western Lithograph*, the parties entered into an agreement for defendant to purchase labels from plaintiff for a specified contract price. *Id.*, 185 Cal. at 367. Later, due to increased production costs, the label maker asked the buyer to agree to pay *more* than the original

contract price for the labels and the buyer subsequently paid the higher price. *Id.* at 368. A dispute

arose and the label maker sued for the balance due under the increased price. *Id.* The Court of

Appeal reversed the judgment based upon the increased price because *there was no consideration*

*for the higher price.* Both parties were already obligated to the other under the terms of the original

agreement: "because of the promise the defendant received no benefit, nor was it agreed that it

should receive any, to which it was not already lawfully entitled. It is likewise evident that the

plaintiff did nothing and agreed to do nothing which it was not already obligated to do." *Id.* at

369.

37.    Here, the same is true.  The KERP lacked consideration because there was no

change in the parties' preexisting obligations.  Under the Prepetition Retention Program, the

Company would soon be obligated to pay me $144,108 upon the inevitable "change in control"

and the triggering of the "change in control" provisions of Section 2(c) of the Prepetition Retention

Program and Section 13 of the Plan.

38.    And, under the Prepetition Retention Program, I was already obligated to remain

employed through the closing date of the asset sale to be entitled to receive any bonus under the

"change in control" provision. The Debtor simply attempted to substitute a lesser obligation for a

greater obligation it already owed me without providing me any benefit in return.

39.    Therefore, the KERP is unenforceable and lacks consideration to extinguish the

Prepetition Retention Program.  Because I only received $48,036, but was entitled to $144,108,

the remaining $96,072 is due under the Prepetition Retention Program.

### 3. The Prepetition Retention Program Constitutes Earned Wages and Is Due and Payable Because I Satisfied the Conditions of the Agreement.

40.     The purported waiver in the KERP is unenforceable and does not bar my claim for unpaid wages under the Prepetition Retention Program, because claims for wages indisputably owed cannot be compromised or released unless the wages are paid in full.

41.     Under California law, bonuses are considered "wages" within the meaning of *Labor Code* section 200.  *Lucian v. All States Trucking Co.* (1981) 116 Cal.App.3d 972, 975; *Ware v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1972) 24 Cal.App.3d 35, 44.

42.     Once a bonus has been promised as part of the compensation for service, and the employee fulfills the agreed-to conditions, the promised bonus is considered earned wages that must be paid. *Neisendorf v. Levi Strauss & Co.* (2006) 143 Cal.App.4th 509, 522-523 (Holding employee who was on leave when bonus vested was not "active" employee owed bonus upon termination).

43.     California courts have consistently characterized bonus and profit sharing plans as constituting an offer of the stated benefits in exchange for the service of an employee, and upon the employee's completion of the required services in accordance with the terms of the plan, a binding contract is formed under which the employer is obligated to deliver the promised benefits. *Newberger v. Rifkind* (1972) 28 Cal.App.3d 1070, 1076–1077.

44.     Here, I accepted the Prepetition Retention Program and performed the agreed-to conditions because I was employed as an active employee through the date I was terminated without cause as part of the asset sale (the "change of control" event).

45.     As such, as of my termination date, the non-discretionary cash bonus under the Prepetition Retention Program was due and payable as "wages" according to the Prepetition Retention Program's terms.

46.    Under *California Labor Code* section 201, all earned "wages" must be paid at the time of discharge: "If an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately." *Ca. Labor Code* section 201(a).

47.    Under *Labor Code* section 206.5, *it is illegal for an employer to obtain a release for wages due unless the wages that were due are paid in full*: "An employer shall not require the execution of a release of a claim or right on account of wages due, or to become due, or made as an advance on wages to be earned, unless payment of those wages has been made. A release required or executed in violation of the provisions of this section shall be null and void as between the employer and the employee. *Violation of this section by the employer is a misdemeanor*." *Ca. Labor Code* section 206.5(a).

48.    Here, the KERP attempts to waive the Prepetition Retention Program, but this attempted waiver is illegal under California substantive wage and hour law.  Indeed, that is a criminal act in California.

49.    The KERP provides in pertinent part: "payments received under the [KERP] will be in lieu of any payment you may have been entitled to receive under previous retention programs." This provision attempts to require the employee to waive wages that were indisputably due under Prepetition Retention Program, in exchange for a lesser payment of wages.  Under *California Labor Code* section 206.5, such a waiver is unenforceable because there was no dispute about the amount of wages due under the Prepetition Retention Program. *Chindarah v. Pick Up Stix, Inc.* (2009) 171 Cal.App.4th 796, 803.

50.    Therefore, the "in lieu of" language in the KERP is an unenforceable attempted waiver of wages that were indisputably owed under the Prepetition Retention Program. The KERP does not preclude payment under the Prepetition Retention Program. I am entitled to the difference

between the wages I received under the KERP ($48,036) and the wages I was entitled to under the Prepetition Retention Program ($144,108).

### 4. The KERP Motion Did Not Correctly Describe the KERP Terms.

51.     Finally, it is important to note that when the Debtors sought this Court's permission for the KERP, the Debtors inappropriately mischaracterized the KERP. Specifically, the Debtors told this court that the KERP offered the same percentage bonus as the Prepetition Retention Program. That is incorrect.

52.     In Section 31 of the KERP Motion, the Debtors provide the following:

> 31.     Prior to the Petition Date, the Company implemented a two-year retention program geared towards ensuring that select employees remained with the Company until June 2018 (the "Prepetition Retention Program"). The Company underwent a rigorous selection process when developing the Prepetition Retention Program, whereby retention risk and business impact were analyzed for each employee to determine the appropriate scope for participation in the Prepetition Retention Program. Only employees with a high business impact and some level of retention risk were included in the Prepetition Retention Program. Depending on the level of retention risk, *eligible employees were to receive a retention amount equal to approximately 25%* (highest retention risk), *18.75%* (less retention risk), *or 12.5%* (lower retention risk) *of such Prepetition Retention Program participants' base salary.*

(Emphasis added).

53.     This is not correct. As Exhibit A indicates, the Prepetition Retention Program provided me a bonus of *75% of my base salary*.

54.     In addition to reviewing the KERP in light of the above arguments, I also respectfully request the Court to review the KERP with corrected description and accurate percentages. In actuality, the KERP was a radical discount to the Prepetition Retention Program. (75% - 18.75% = a discounting that equals 56.25% of my annual salary). As explained this discount was taken without legal consideration and in violation of California wage and hour rules.

## CONCLUSION

55.    For the foregoing reasons, I request that the Court enter an order (i) denying the

Claim Objection as to Claim 483; (ii) directing the Liquidation Trustee to pay my Claim 483 at

the adjusted amount of $96,072; and (iii) granting such other relief as is just and proper.


**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**[SIGNATURE ON FOLLOWING PAGE]**

## **CONCLUSION**

4.      For the foregoing reasons, I request that the Court enter an order denying the

Claim Objection as to Claim 483 and grant such other relief as is just and proper.

Dated: 5 February 2018
Thousand Oaks, California

By: _____
Rocco Covella
*Appearing Pro Se*

14

# Exhibit A



**Performance Sports Group Ltd.**
**Cash Incentive Award Agreement**

This Cash Incentive Award Agreement (this "Agreement"), dated as of June 1, 2016 (the "Date of Grant"), is made by and between Performance Sports Group Ltd., a corporation organized under the laws of British Columbia, Canada (the "Company"), and Rocco Covella (the "Grantee").

**WHEREAS**, the Compensation Committee (the "Committee") of the Board of Directors of the Company has determined that it is in the best interests of the Company to grant to the Grantee the cash incentive award provided for herein, subject to the terms set forth herein.

**NOW, THEREFORE**, for and in consideration of the premises and the mutual covenants of the parties contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, for themselves and for their successors and assigns, hereby agree as follows:

1. **Grant of Award.**

   (a)    Grant. The Company hereby grants to the Grantee a cash incentive award in the amount of $192,143 USD (the "Award"), on the terms and conditions set forth in this Agreement.

   (b)    Definitions; Interpretation. Any capitalized terms not otherwise defined in this Agreement shall have the definitions set forth in the Performance Sports Group Ltd. Omnibus Equity Incentive Plan (the "Plan"). The Committee shall have final authority to interpret and construe and to make any and all determinations under this Agreement, and its decision shall be binding and conclusive upon the Grantee and his or her legal representatives in respect of any questions arising under this Agreement.

2. **Vesting; Forfeiture.**

   (a)    The Award shall become 100% vested on the second anniversary of the Date of Grant (the "Vesting Date"), except as set forth below and provided that the Grantee (i) remains continuously engaged in active service by the Company or one of its Affiliates from the Date of Grant through such Vesting Date (the "Restricted Period") and (ii) has satisfactorily performed the requirements of the Grantee's employment position for the duration of the Restricted Period.

   (b)    If prior to the end of the Restricted Period, the Grantee's employment is terminated by the Company or an Affiliate for Cause or by the Grantee voluntarily for any reason or the Grantee breaches the covenant of confidentiality under Section 4 below, the Grantee shall forfeit 100% of the Award.

   (c)    If prior to the end of the Restricted Period, the Grantee's employment is terminated by the Company or an Affiliate without Cause or as a result of the Grantee's death or Disability, the Award shall be vested on a prorated basis only with respect to the time elapsed between the Date of Grant and the Grantee's Termination Date (as defined below) and the

remaining amount of the Award (which would have vested with respect to the time period between the Termination Date and the Vesting Dates but for such termination) shall be forfeited. Notwithstanding the foregoing, if, prior to the end of the Restricted Period, the Grantee's employment is terminated by the Company or an Affiliate without Cause (and other than due to death or Disability) on or within 12 months following a Change in Control, Section 13 of the Plan shall apply to the Award.

(d)     For the purposes of this Agreement, the Grantee's employment shall be considered to have terminated effective on the last day of the Grantee's actual and active employment with the Company or Affiliate, whether such day is selected by agreement with the individual, or unilaterally by the Grantee or the Company or Affiliate, and whether with or without advance notice to the Grantee, or as a result of the death or Disability of the Grantee. For the avoidance of doubt, no period of notice or pay in lieu of notice that is given or that ought to have been given under applicable law in respect of such termination of employment that follows or is in respect of a period after the Grantee's actual last day of actual and active employment shall be considered as extending the Grantee's period of employment for the purposes of determining his or her entitlement under the Plan (collectively referred to herein as the "Termination Date").

3.     **Settlement.** Within thirty (30) days following the Vesting Date or the Termination Date, as applicable, the Company shall make a lump sum payment to the Grantee of the vested portion of the Award, subject to any applicable withholding and employment taxes.

4.     **Confidentiality.** The Grantee acknowledges and agrees that as partial consideration for the granting of the Award, the Grantee agrees that he or she will keep confidential all information and knowledge that the Grantee has relating to the manner and amount of his or her participation in the Company's program under which the grant is made; provided, however, that such information may be disclosed as required by law and may be given in confidence to the Grantee's spouse, tax and financial advisors, or to a financial institution to the extent that such information is necessary to secure a loan.

5.     **Compliance with Legal Requirements.** The granting and settlement of the Award, and any other obligations of the Company under this Agreement, shall be subject to all applicable federal, state, provincial, and local laws, rules, and regulations and to such approvals by any regulatory or governmental agency (including stock exchanges) as may be required.

6.     **Clawback.** The Award shall be subject to clawback, forfeiture, or similar consequences described in clause (ii) of Section 15(v) of the Plan for the reasons described in clauses (i) and (iii) of Section 15(v) of the Plan and shall be subject (including on a retroactive basis) to clawback, forfeiture, or similar requirements (which requirements shall be deemed incorporated by reference into this Agreement) to the extent required by applicable law (including without limitation Section 304 of the Sarbanes-Oxley Act and Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act), or under a written policy adopted by the Company.

7.     **Miscellaneous.**

(a)     <u>Waiver</u>.  Any right of the Company contained in this Agreement may be waived in writing by the Committee.  No waiver of any right hereunder by any party shall operate as a waiver of any other right, or as a waiver of the same right with respect to any subsequent occasion for its exercise, or as a waiver of any right to damages.  No waiver by any party of any breach of this Agreement shall be held to constitute a waiver of any other breach or a waiver of the continuation of the same breach.

(b)     <u>Unfunded Benefit</u>.  All amounts credited in respect of the Award to the book-entry account under this Agreement shall continue for all purposes to be part of the general assets of the Company.  The Grantee's interest in such account shall make the Grantee only a general unsecured creditor of the Company.

(c)     <u>Notices</u>.  Every notice and other communication relating to this Agreement shall be in writing, and shall be mailed to or delivered to the party for whom it is intended at such address as may from time to time be designated by it in a notice mailed or delivered to the other party as herein provided; <u>provided, that</u>, unless and until some other address be so designated, all notices or communications by the Grantee to the Company shall be mailed or delivered to the Company at its principal executive office, and all notices or communications by the Company to the Grantee may be given to the Grantee personally or may be mailed to the Grantee's address as recorded in the records of the Company or any Subsidiary.

(d)     <u>Severability</u>.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, and each other provision of this Agreement shall be severable and enforceable to the extent permitted by law.

(e)     <u>No Rights to Continued Service</u>.  Nothing contained in this Agreement shall be construed as giving the Grantee any right to be retained, in any position, as an employee of the Company or its Affiliates or shall interfere with or restrict in any way the right of the Company or its Affiliates, which are hereby expressly reserved, to remove, terminate, or discharge the Grantee at any time for any reason whatsoever.

(f)     <u>Successors</u>.  The terms of this Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns, and of the Grantee and the beneficiaries, executors, administrators, heirs, and successors and permitted transferees of the Grantee.

(g)     <u>Entire Agreement</u>.  This Agreement and the Plan contain the entire agreement and understanding of the parties hereto with respect to the subject matter contained herein and supersede all prior communications, representations, and negotiations in respect thereto.

(h)     <u>Governing Law</u>.  This Agreement shall be construed and interpreted in accordance with the laws of the State of New York without regard to principles of conflicts of law thereof, or principles of conflicts of laws of any other jurisdiction which could cause the application of the laws of any jurisdiction other than the State of New York.

(i)    Venue; Waiver of Jury Trial.

(i)    The Grantee and the Company (on behalf of itself and its Affiliates) each consent to jurisdiction in the United States District Court for the Southern District of New York, or if that court is unable to exercise jurisdiction for any reason, the Supreme Court of the State of New York, New York County, in the event of any dispute arising hereunder, and each waives any other requirement (whether imposed by statute, rule of court, or otherwise) with respect to personal jurisdiction or service of process and waives any objection to jurisdiction based on improper venue or improper jurisdiction.

(ii)    EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THE PLAN OR THIS AGREEMENT.

(j)    Headings. The headings of the Sections hereof are provided for convenience only and are not to serve as a basis for interpretation or construction, and shall not constitute a part, of this Agreement.

(k)    Counterparts. This Agreement may be executed in one or more counterparts (including via facsimile and electronic image scan (pdf)), each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties.

*[Signature Page to Follow]*

# Exhibit B

## Performance Sports Group Ltd. Omnibus Equity Incentive Plan

**1. Purpose.** The purpose of the Performance Sports Group Ltd. Omnibus Equity Incentive Plan (the "*Plan*") is to enable Performance Sports Group Ltd., a corporation organized under the laws of British Columbia, Canada (including any successor thereto, the "*Company*"), and its Affiliates to (i) attract and retain key personnel by providing them the opportunity to acquire an equity interest in the Company or other incentive compensation measured by reference to the value of Common Shares or other performance objectives and (ii) align the interests of key personnel with those of the Company's shareholders.

**2. Effective Date; Duration.** The Plan shall be effective as of the date on which the Plan is approved by the shareholders of the Company (the "*Effective Date*"). The expiration date of the Plan, on and after which date no Awards may be granted, shall be the 10th anniversary of the Effective Date; provided, however, that such expiration shall not affect Awards then outstanding, and the terms and conditions of the Plan shall continue to apply to such Awards.

**3. Definitions.** The following definitions shall apply throughout the Plan.

(a) "Affiliate" means (i) any person or entity that directly or indirectly controls, is controlled by, or is under common control with the Company and (ii) to the extent provided by the Committee, any person or entity in which the Company has a significant interest. The term "control" (including, with correlative meaning, the terms "controlled by" and "under common control with"), as applied to any person or entity, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such person or entity, whether through the ownership of voting or other securities, by contract, or otherwise.

(b) "Award" means, individually or collectively, any Incentive Stock Option, Nonqualified Stock Option, Stock Appreciation Right, Restricted Stock, Restricted Stock Unit, Deferred Stock Unit, Other Stock-Based Award, and Performance Compensation Award granted under the Plan.

(c) "Award Agreement" means the agreement (whether in written or electronic form) or other instrument or document evidencing any Award granted under the Plan.

(d) "Beneficial Ownership" has the meaning set forth in Rule 13d-3 promulgated under Section 13 of the U.S. Exchange Act.

(e) "Board" means the Board of Directors of the Company.

(f) "Canadian Securities Laws" means, collectively, the applicable securities laws of each of the provinces and territories of Canada, including the respective regulations and rules made under those securities laws.

(g) "Cause" with respect to any Participant (a) has the meaning, if any, set forth in the employment or service agreement then in effect, if any, between such Participant and the Company or any Affiliate, or (b) if there is no such meaning set forth in such employment or service agreement or there is no such employment or service agreement then in effect, means the following events or conditions, as determined by the Committee in its reasonable judgment: (i) willful misconduct of the Participant with regard to the Company and its Affiliates that

constitutes a material breach of any of such Participant's obligations set forth in any written agreement governing the terms of the Participant's service with the Company and its Affiliates as the same may then be in effect and such breach, if curable, has not been cured within 15 days after written notice to the Participant by the Company or an Affiliate; (ii) fraud, embezzlement, theft, or other material dishonesty by the Participant with respect to the Company or any of its Affiliates; (iii) the Participant's material breach of the Participant's fiduciary duties as an officer or manager of the Company or any of its Affiliates, or as an officer, trustee, director, or other fiduciary of any pension or benefit plan of the Company or its Affiliates or willful misconduct that has, or could reasonably be expected to have, a material adverse effect upon the business, interests, or reputation of the Company or any of its Affiliates and such breach or conduct, if curable, has not been cured within 15 days after written notice to the Participant by the Company or an Affiliate; (iv) the Participant's indictment for, or a plea of *nolo contendere* to, any felony or an analogous provision under the laws of a local jurisdiction; or (v) refusal or failure by the Participant to attempt in good faith to follow or carry out the reasonable written instructions of the Board or such Participant's direct supervisor, which failure, if curable, does not cease within 15 days after written notice of such failure is given to the Participant by the Board or such Participant's direct supervisor. For purposes of this paragraph, no act, or failure to act, on the Participant's part shall be considered "willful" unless done or omitted to be done by the Participant not in good faith and without reasonable belief that the Participant's action or omission was in the best interests of the Company.

(h)     "Change in Control" means, in the case of a particular Award, unless the applicable Award Agreement (or any employment or service agreement between the Participant and the Company or an Affiliate) states otherwise, the first to occur of any of the following events:

(i)     the acquisition by any Person or related "group" (as such term is used in Sections 13(d) and 14(d) of the U.S Exchange Act) of Persons, or Persons acting jointly or in concert, of Beneficial Ownership (including control or direction) of 50% or more (on a fully diluted basis) of either (A) the then-outstanding Common Shares, including Common Shares issuable upon the exercise of options, Awards or warrants, the conversion of convertible stock or debt, and the exercise of any similar right to acquire such Common Shares (the "*Outstanding Company Common Shares*"); or (B) the combined voting power of the then-outstanding voting securities of the Company entitled to vote in the election of directors (the "*Outstanding Company Voting Securities*"); but excluding any acquisition by the Company or any of its Affiliates or by any employee benefit plan sponsored or maintained by the Company or any of its Affiliates;

(ii)     a change in the composition of the Board such that members of the Board during any consecutive 12-month period (the "*Incumbent Directors*") cease to constitute a majority of the Board. Any person becoming a director through election or nomination for election approved by a valid vote of at least two thirds of the Incumbent Directors shall be an Incumbent Director; provided, however, that no individual becoming a director as a result of an actual or threatened election contest, as such terms are used in Rule 14a-12 of Regulation 14A promulgated under the U.S Exchange Act, or as a result of any other actual or threatened solicitation of proxies or consents by or on behalf of any person other than the Board shall be an Incumbent Director;

(iii)    the approval by the shareholders of the Company of a plan of complete dissolution or liquidation of the Company; and

(iv)    the consummation of a reorganization, recapitalization, merger, amalgamation, consolidation, statutory share exchange, or similar form of corporate transaction involving the Company (a "***Business Combination***"), or sale, transfer, or other disposition of all or substantially all of the business or assets of the Company to an entity that is not an Affiliate of the Company (a "***Sale***"), unless immediately following such Business Combination or Sale: (A) more than 50% of the total voting power of the entity resulting from such Business Combination or the entity that acquired all or substantially all of the business or assets of the Company in such Sale (in either case, the "***Surviving Company***"), or the ultimate parent entity that has Beneficial Ownership of sufficient voting power to elect a majority of the board of directors (or analogous governing body) of the Surviving Company (the "***Parent Company***"), is represented by the Outstanding Company Voting Securities that were outstanding immediately prior to such Business Combination or Sale (or, if applicable, is represented by shares into which the Outstanding Company Voting Securities were converted pursuant to such Business Combination or Sale) and such voting power among the holders thereof is in substantially the same proportion as the voting power of the Outstanding Company Voting Securities among the holders thereof immediately prior to the Business Combination or Sale and (B) no Person (other than any employee benefit plan sponsored or maintained by the Surviving Company or the Parent Company) is or becomes the beneficial owner, directly or indirectly, of 50% or more of the total voting power of the outstanding voting securities eligible to elect members of the board of directors (or the analogous governing body) of the Parent Company (or, if there is no Parent Company, the Surviving Company); <u>provided</u>, that no Person or group shall be treated for purposes of this Section 3(h)(iv)(B) as having Beneficial Ownership of 50% or more of such total voting power solely as a result of the voting power held in the Company prior to the consummation of the Business Combination or Sale.

(i)    "Code" means the U.S. Internal Revenue Code of 1986, as amended, and any successor thereto. References to any section of the Code shall be deemed to include any regulations or other interpretive guidance under such section, and any amendments or successors thereto.

(j)    "Committee" means the Compensation Committee of the Board or subcommittee thereof if required with respect to actions taken to obtain the exception for performance-based compensation under Section 162(m) of the Code or to comply with Rule 16b-3 promulgated under the U.S. Exchange Act in respect of Awards or, if no such Compensation Committee or subcommittee thereof exists, or if the Board otherwise takes action hereunder on behalf of the Committee, the Board.

(k)    "Common Shares" means the common shares of the Company (and any share or other securities into which such shares may be converted or into which it may be exchanged).

(l)    "Deferred Stock Unit" means a right granted by the Company to a director to receive upon redemption, on a deferred basis, one (1) Common Share or the cash equivalent thereof on the terms contained herein.

(m)    "Disability" shall, unless in the case of a particular Award the applicable Award Agreement states otherwise, have the meaning given to it in any then-existing employment or service agreement between the Participant and the Company or an Affiliate, or in the absence of such an employment or service agreement, any condition entitling the Participant to receive benefits under a long-term disability plan of the Company or an Affiliate, or in the absence of such a plan, the complete and permanent inability by reason of illness or accident to perform the duties of the occupation in which a Participant was employed or served when such condition commenced, as determined by the Committee based upon medical evidence acceptable to it.

(n)    "$" shall refer to United States dollars.

(o)    "Eligible Director" means a person who is (i) a "non-employee director" within the meaning of Rule 16b-3 under the U.S Exchange Act, (ii) an "outside director" within the meaning of Section 162(m) of the Code and/or (iii) an "independent director" under applicable securities laws or the applicable rules of the NYSE, the TSX, or any other national securities exchange on which the Company has applied to list or quote its Common Shares, or a person meeting any similar requirement under any successor rule or regulation.

(p)    "Eligible Person" means any (i) individual employed by the Company or an Affiliate; provided, however, that no such employee covered by a collective bargaining agreement shall be an Eligible Person; (ii) director or officer of the Company or an Affiliate; or (iii) consultant or advisor to the Company or an Affiliate who may be offered securities registrable on Form S-8 under the U.S. Securities Act or offered under a prospectus exemption in accordance with Section 2.22 of National Instrument 45-106 – *Prospectus Exemptions*.

(q)    "Fair Market Value" means, (i) with respect to Common Shares on a given date, (x) if the Common Shares are listed on a national securities exchange, the closing sales price of the Common Shares reported on such exchange on such date, or if there is no such sale on that date, then on the last preceding date on which such a sale was reported; or (y) if the Common Shares are not listed on any national securities exchange, the amount determined by the Committee in good faith to be the fair market value of the Common Shares, or (ii) with respect to any other property, the amount determined by the Committee in good faith to be the fair market value of such other property.

(r)    "Incentive Stock Option" means an Option that is designated by the Committee as an incentive stock option as described in Section 422 of the Code and otherwise meets the requirements set forth in the Plan.

(s)    "Insider" means "reporting insiders" as defined in National Instrument 55-104 – Insider Reporting Requirements and Exemptions.

(t)    "Nonqualified Stock Option" means an Option that is not designated by the Committee as an Incentive Stock Option.

(u)    "NYSE" means the New York Stock Exchange.

(v)    "Option" means an Award granted under Section 7 of the Plan.

(w)    "Participant" means the recipient of an Award granted under the Plan as defined in Section 6 of the Plan.

(x)     "Performance Compensation Award" means an Award designated by the Committee as a Performance Compensation Award pursuant to Section 11 of the Plan.

(y)     "Performance Criterion" or "Performance Criteria" shall mean the criterion or criteria that the Committee shall select for purposes of establishing the Performance Goal(s) for a Performance Period with respect to any Performance Compensation Award under the Plan.

(z)     "Performance Formula" shall mean, for a Performance Period, the one or more objective formulas applied against the relevant Performance Goal to determine, with regard to the Performance Compensation Award of a particular Participant, whether all, some portion but less than all, or none of the Performance Compensation Award has been earned for the Performance Period.

(aa)     "Performance Goals" shall mean, for a Performance Period, the one or more goals established by the Committee for the Performance Period based upon the Performance Criteria.

(bb)     "Performance Period" shall mean the one or more periods of time as the Committee may select, over which the attainment of one or more Performance Goals will be measured for the purpose of determining the Participant's right to, and the payment with respect to, a Performance Compensation Award.

(cc)     "Person" has the meaning given in Section 3(a)(9) of the U.S. Exchange Act, as modified and used in Sections 13(d) and 14(d) thereof, except that such term shall not include (i) the Company or any of its subsidiaries, (ii) a trustee or other fiduciary holding securities under an employee benefit plan of the Company or any of its Affiliates, (iii) an underwriter temporarily holding securities pursuant to an offering of such securities or (iv) a corporation owned, directly or indirectly, by the shareholders of the Company in substantially the same proportions as their ownership of Common Shares of the Company.

(dd)     "Restricted Stock" means an Award of Common Shares, subject to certain specified restrictions, granted under Section 9 of the Plan.

(ee)     "Restricted Stock Unit" means an Award of an unfunded and unsecured promise to deliver Common Shares, cash, other securities or other property, subject to certain specified restrictions, granted under Section 9 of the Plan.

(ff)     "Stock Appreciation Right" or "SAR" means an Award granted under Section 8 of the Plan.

(gg)     "TSX" means the Toronto Stock Exchange.

(hh)     "U.S. Exchange Act" means the U.S. Securities Exchange Act of 1934, as amended, and any successor thereto. References to any section of (or rule promulgated under) the U.S Exchange Act shall be deemed to include any rules, regulations, or other interpretative guidance under such section or rule, and any amendments or successors thereto.

(ii)     "U.S. Participant" means each Participant who is a United States citizen or resident or whose compensation under the Plan is subject to income taxation under the Code.

(jj)     "U.S. Securities Act" means the U.S. Securities Act of 1933, as amended, and any successor thereto.  Reference in the Plan to any section of (or rule promulgated under) the U.S. Securities Act shall be deemed to include any rules, regulations, or other interpretative guidance

under such section or rule, and any amendments or successor provisions to such section, rules, regulations, or other interpretive guidance.

## 4. Administration.

(a)    The Committee shall administer the Plan and shall have the sole and plenary authority to (i) designate Participants; (ii) determine the type, size, and terms, and conditions of Awards to be granted; (iii) determine the method by which an Award may be settled, exercised, canceled, forfeited, or suspended; (iv) determine the circumstances under which the delivery of cash, property, or other amounts payable with respect to an Award may be deferred either automatically or at the Participant's or Committee's election; (v) interpret and administer, reconcile any inconsistency in, correct any defect in, and supply any omission in the Plan and any Award granted under, the Plan; (vi) establish, amend, suspend, or waive any rules and regulations and appoint such agents as the Committee shall deem appropriate for the proper administration of the Plan; (vii) accelerate the vesting, delivery, or exercisability of, or payment for or lapse of restrictions on, or waive any condition in respect of, Awards; and (viii) make any other determination and take any other action that the Committee deems necessary or desirable for the administration of the Plan or to comply with any applicable law, including Section 162(m) of the Code. To the extent required to comply with the provisions of Rule 16b-3 promulgated under the U.S. Exchange Act (if applicable and if the Board is not acting as the Committee under the Plan) or the Canadian Securities Laws or necessary to obtain the exception for performance-based compensation under Section 162(m) of the Code, or any exception or exemption under applicable securities laws or the applicable rules of the NYSE, the TSX, or any other national securities exchange on which the Company has applied to list or quote its Common Shares, as applicable, it is intended that each member of the Committee shall, at the time the Participant takes any action with respect to an Award under the Plan, be an Eligible Director. However, the fact that a Committee member shall fail to qualify as an Eligible Director shall not invalidate any Award granted or action taken by the Committee that is otherwise validly granted or taken under the Plan.

(b)    The Committee may allocate all or any portion of its responsibilities and powers to any one or more of its members or to any one or more members of the Board, except for grants of Awards to persons (i) who are non-employee members of the Board or are otherwise subject to Section 16 of the U.S. Exchange Act or (ii) who are or may reasonably be expected to be "covered employees" for purposes of Section 162(m) of the Code. Any such allocation or delegation may be revoked by the Committee at any time.

(c)    As further set forth in Section 15(f) of the Plan, the Committee shall have the authority to amend the Plan and Awards to the extent necessary to permit participation in the Plan by Eligible Persons who are located outside of the United States and Canada on terms and conditions comparable to those afforded to Eligible Persons located within the United States and Canada; provided, however, that no such action shall be taken without shareholder approval if such approval is required by applicable securities laws or the applicable rules of the NYSE, the TSX, or any other national securities exchange on which the Company has applied to list or quote its Common Shares.

(d)    Unless otherwise expressly provided in the Plan, all designations, determinations, interpretations, and other decisions regarding the Plan or any Award or any documents evidencing any Award granted pursuant to the Plan shall be within the sole discretion of the

Committee, may be made at any time, and shall be final, conclusive, and binding upon all persons or entities, including, without limitation, the Company, any Affiliate, any Participant, any holder or beneficiary of any Award, and any shareholder of the Company.

(e)      No member of the Board or the Committee, nor any employee or agent of the Company (each such person, an "*Indemnifiable Person*"), shall be liable for any action taken or omitted to be taken or any determination made with respect to the Plan or any Award hereunder (unless constituting fraud or a willful criminal act or omission).  Each Indemnifiable Person shall be indemnified and held harmless by the Company against and from all losses, costs, liabilities, and expenses (including attorneys' fees) that may be imposed upon or incurred by such Indemnifiable Person in connection with or resulting from any action, suit, or proceeding to which such Indemnifiable Person may be involved as a party, witness, or otherwise by reason of any action taken or omitted to be taken or determination made under the Plan or any Award Agreement and against and from any and all amounts paid by such Indemnifiable Person with the Company's approval (not to be unreasonably withheld), in settlement thereof, or paid by such Indemnifiable Person in satisfaction of any judgment in any such action, suit, or proceeding against such Indemnifiable Person, and the Company shall advance to such Indemnifiable Person any such expenses promptly upon written request (which request shall include an undertaking by the Indemnifiable Person to repay the amount of such advance if it shall ultimately be determined as provided below that the Indemnifiable Person is not entitled to be indemnified); provided, that the Company shall have the right, at its own expense, to assume and defend any such action, suit, or proceeding, and once the Company gives notice of its intent to assume the defense, the Company shall have sole control over such defense with counsel of recognized standing of the Company's choice.  The foregoing right of indemnification shall not be available to an Indemnifiable Person to the extent that a final judgment or other final adjudication (in either case not subject to further appeal) binding upon such Indemnifiable Person determines that the acts or omissions or determinations of such Indemnifiable Person giving rise to the indemnification claim resulted from such Indemnifiable Person's fraud or willful criminal act or omission or that such right of indemnification is otherwise prohibited by law or by the Company's Articles.  The foregoing right of indemnification shall not be exclusive of or otherwise supersede any other rights of indemnification to which such Indemnifiable Persons may be entitled under the Company's Articles, as a matter of law, individual indemnification agreement or contract, or otherwise, or any other power that the Company may have to indemnify such Indemnifiable Persons or hold them harmless.

(f)      The Board may at any time and from time to time, grant Awards and administer the Plan with respect to such Awards.  In any such case, the Board shall have all the authority granted to the Committee under the Plan.

## 5.  Grant of Awards; Shares Subject to the Plan; Limitations.

(a)      The Committee may grant Awards to one or more Eligible Persons.

(b)      Subject to Section 12 of the Plan and subsections (c) through (g) below, the following limitations apply to the grant of Awards:  (i) no more than 3,000,000 Common Shares may be reserved for issuance and delivered in the aggregate pursuant to Awards granted under the Plan; (ii) no more than 1,500,000 Common Shares may be subject to grants of Options or SARs under the Plan to any single Participant during any single fiscal year; (iii) no more than 3,000,000 Common Shares may be delivered pursuant to the exercise of Incentive Stock Options

granted under the Plan; (iv) no more than 1,500,000 Common Shares may be delivered in respect of Performance Compensation Awards denominated in Common Shares granted to any Participant for a single Performance Period (or with respect to each single fiscal year in the event a Performance Period extends beyond a single fiscal year), or in the event that such Performance Compensation Award is paid in cash, other securities, other Awards, or other property, no more than the Fair Market Value of 1,500,000 Common Shares on the last day of the Performance Period to which such Award relates; (v) the maximum amount that can be paid to any individual Participant for a single fiscal year during a Performance Period (or with respect to each single fiscal year in the event a Performance Period extends beyond a single fiscal year) pursuant to a Performance Compensation Award denominated in cash shall be $7,500,000; and (vi) the aggregate number of Common Shares reserved for issuance to all non-employee directors of the Company shall not exceed one percent (1%) of the Company's issued and outstanding Common Shares as of any date of determination, and no individual non-employee director of the Company shall receive Awards under the Plan in any year in respect of Common Shares having a Fair Market Value as of the date of grant in excess of $500,000 in the aggregate; provided, that the foregoing limitation shall not apply in respect of any Restricted Stock Units or Deferred Stock Units issued to a non-employee director in lieu of payment of cash director compensation or board or committee fees or in respect of any one-time initial equity grant upon a non-employee director's appointment to the Board.

(c)     Common Shares shall be deemed to have been used in settlement of Awards whether or not they are actually delivered; provided, that if the Fair Market Value equivalent of such shares on the date of issuance is paid in cash, such shares shall again become available for other Awards; provided, that if Common Shares issued upon exercise, vesting, or settlement of an Award, including any Option, are surrendered or tendered to the Company in payment of the Exercise Price or any taxes required to be withheld in respect of an Award in accordance with the terms and conditions of the Plan and any applicable Award Agreement, such surrendered or tendered shares shall not become available again for other Awards, and shares subject to a Stock Appreciation Right that are not issued in connection with the stock settlement of the Stock Appreciation Right upon exercise shall not become available again for other Awards under the Plan; provided, further, that in no event shall such shares increase the number of Common Shares that may be delivered pursuant to Incentive Stock Options. If and to the extent that all or any portion of an Award expires, terminates, or is canceled or forfeited for any reason without the Participant's having received any benefit therefrom, the Common Shares covered by such Award or portion thereof shall again become available for other Awards. For purposes of the foregoing sentence, the Participant shall not be deemed to have received any "benefit" (i) in the case of forfeited Restricted Stock by reason of having enjoyed voting rights and dividend rights prior to the date of forfeiture or (ii) in the case of an Award canceled by reason of a new Award's being granted in substitution therefor.

(d)     The number of Common Shares issuable to Insiders of the Company at any time, and the number of Common Shares issued to Insiders of the Company within any one (1) year period, under this Plan or when combined with all of the Company's other equity-based compensation arrangements (as described under the applicable rules of the TSX), shall not exceed ten percent (10%) of the Company's issued and outstanding Common Shares as of any date of determination, respectively.

(e)     Subject to applicable laws, including the Canadian Securities Laws, and the applicable rules of the NYSE, the TSX, or any other national securities exchange, the Committee may grant Awards in assumption of, or in substitution for, outstanding awards previously granted by the Company or any Affiliate or an entity directly or indirectly acquired by the Company or with which the Company combines ("*Substitute Awards*"), and such Substitute Awards shall not be counted against the aggregate number of Common Shares available for Awards; provided, that Substitute Awards issued or intended as Incentive Stock Options shall be counted against the aggregate number of Incentive Stock Options available under the Plan.

(f)     Unless otherwise specified in an Award Agreement, Common Shares delivered by the Company in settlement of Awards may be issued from treasury of the Company, shares purchased on the open market or by private purchase, or a combination of the foregoing.

(g)     Notwithstanding any other provision of the Plan to the contrary, no vesting date of any Award granted under the Plan to a Participant (but excluding Awards to non-employee directors) shall be less than one year following the date the Award is granted; provided, however, that (i) the Committee, in its sole discretion, may determine that, on an ad hoc basis, Awards may be granted under the Plan without regard to the foregoing minimum vesting provisions in order to achieve a specified business objective, such as an inducement to a new hire or a retention award to a key employee or group of key employees; (ii) Awards may be granted to certain Participants under the Plan without regard to the foregoing minimum vesting provisions (x) if such Participant is subject to laws or regulations imposing certain requirements or restrictions on the remuneration of such individual or (y) in order to conform with local laws applicable to such Award; (iii) Awards hereunder may be issued in the form of unrestricted Common Shares pursuant to Section 10; provided, that Awards issued pursuant to clauses (i) – (iii) above shall not be granted in respect of shares in excess of 5%, in the aggregate, of the shares authorized for issuance under the Plan; and (iv) nothing in this Section 5(g) shall preclude the Committee from taking action, in its sole discretion, to accelerate the vesting of any Award upon circumstances it deems appropriate, including, without limitation, upon or following a Change in Control or the Participant's death, disability, retirement, or involuntary termination.

**6.  Eligibility.** Participation shall be limited to Eligible Persons who have been selected by the Committee and who have entered into an Award Agreement with respect to an Award granted to them under the Plan (each such Eligible Person, a "*Participant*").

**7.  Options.**

(a)     Generally.  Each Option shall be subject to the conditions set forth in the Plan and in the applicable Award Agreement. All Options granted under the Plan shall be Nonqualified Stock Options unless the Award Agreement expressly states otherwise. Incentive Stock Options shall be granted only to U.S. Participants subject to and in compliance with Section 422 of the Code, and only to Eligible Persons who are employees of the Company and its Affiliates and who are U.S. Participants eligible to receive an Incentive Stock Option under the Code. If for any reason an Option intended to be an Incentive Stock Option (or any portion thereof) shall not qualify as an Incentive Stock Option, then, to the extent of such nonqualification, such Option or portion thereof shall be regarded as a Nonqualified Stock Option properly granted under the Plan.

(b)    Exercise Price.  The exercise price ("*Exercise Price*") per Common Share for each Option shall not be less than 100% of the Fair Market Value of such share, determined on the last trading date immediately prior to the date of grant.  Any modification to the Exercise Price of an outstanding Option shall be subject to the prohibition on repricing set forth in Section 14(d).

(c)    Vesting, Exercise and Expiration.  Subject to Section 5(g), the Committee shall determine the manner and timing of vesting, exercise, and expiration of Options.  The period between date of grant and the scheduled expiration date of the Option ("*Option Period*") shall not exceed ten years, unless the Option Period (other than in the case of an Incentive Stock Option) would expire at a time when trading in the Common Shares is prohibited by the Company's insider trading policy or a Company-imposed "blackout period," in which case the Option Period shall be extended automatically until the 10th day following the expiration of such prohibition (so long as such extension shall not violate Section 409A of the Code or applicable rules of the NYSE, the TSX, or any other national securities exchange).  Subject to Section 5(g), the Committee may accelerate the vesting and/or exercisability of any Option, which acceleration shall not affect any other terms and conditions of such Option.

(d)    Method of Exercise and Form of Payment.  No Common Shares shall be delivered pursuant to any exercise of an Option until the Participant has paid the Exercise Price to the Company in full, and an amount equal to any U.S. federal, state, non-U.S. federal, provincial, and local income and employment taxes, social contributions, and any other tax-related items required to be withheld.  Options may be exercised by delivery of written or electronic notice of exercise to the Company or its designee (including third-party administrators) in accordance with the terms of the Option and the Award Agreement accompanied by payment of the Exercise Price and such applicable taxes.  Unless otherwise stated in the Award Agreement, the Exercise Price and all applicable required withholding taxes shall be payable (i) in cash or cash equivalent, or by check, or (ii) by such other method as elected by the Participant and that the Committee may permit, in its sole discretion, including without limitation: (A) in the form of other property having a Fair Market Value on the date of exercise equal to the Exercise Price and all applicable required withholding taxes; (B) if there is a public market for the Common Shares at such time, by means of a broker-assisted "cashless exercise" pursuant to which the Company or its designee (included third-party administrators) is delivered a copy of irrevocable instructions to a stockbroker to sell the Common Shares otherwise deliverable upon the exercise of the Option and to deliver promptly to the Company an amount equal to the Exercise Price and all applicable required withholding taxes against delivery of the Common Shares to settle the applicable trade; or (C) by means of a "net exercise" procedure effected by withholding the minimum number of Common Shares otherwise deliverable in respect of an Option that are needed to pay for the Exercise Price and all applicable required withholding taxes.  Notwithstanding the foregoing, unless otherwise determined by the Committee or as set forth in an Award Agreement, if on the last day of the Option Period the Fair Market Value of the Common Shares exceeds the Exercise Price, the Participant has not exercised the Option, and the Option has not previously expired, such Option shall be deemed exercised by the Participant on such last day by means of a "net exercise" procedure described above.  In all events of cashless or net exercise, any fractional Common Shares shall be settled in cash.

(e)    Notification upon Disqualifying Disposition of an Incentive Stock Option.  Each U.S. Participant awarded an Incentive Stock Option under the Plan shall notify the Company in

writing immediately after the date on which the U.S. Participant makes a disqualifying disposition of any Common Shares acquired pursuant to the exercise of such Incentive Stock Option. A disqualifying disposition is any disposition (including, without limitation, any sale) of such Common Shares before the later of (i) two years after the date of grant of the Incentive Stock Option and (ii) one year after the date of exercise of the Incentive Stock Option. The Company may, if determined by the Committee and in accordance with procedures established by the Committee, retain possession, as agent for the applicable U.S. Participant, of any Common Shares acquired pursuant to the exercise of an Incentive Stock Option until the end of the period described in the preceding sentence, subject to complying with any instruction from such U.S. Participant as to the sale of such Common Shares.

(f)     Compliance with Laws. Notwithstanding the foregoing, in no event shall the Participant be permitted to exercise an Option in a manner that the Committee determines would violate the Sarbanes-Oxley Act of 2002, or any other applicable law(including the applicable rules and regulations of the Securities and Exchange Commission) or the applicable rules of the NYSE, the TSX, or any other national securities exchange on which the Common Shares of the Company is listed or quoted.

(g)     Incentive Stock Option Grants to 10% Shareholders. Notwithstanding anything to the contrary in this Section 7, if an Incentive Stock Option is granted to an U.S. Participant who owns stock representing more than 10% of the voting power of all classes of stock of the Company or of a subsidiary or a parent of the Company, the Option Period shall not exceed five years from the date of grant of such Option and the Option Price shall be at least 110% of the Fair Market Value (on the date of grant) of the shares subject to the Option.

(h)     $100,000 Per Year Limitation for Incentive Stock Options. To the extent that the aggregate Fair Market Value (determined as of the date of grant) of Common Shares for which Incentive Stock Options are exercisable for the first time by any U.S. Participant during any calendar year (under all plans of the Company) exceeds $100,000, such excess Incentive Stock Options shall be treated as Nonqualified Stock Options.

**8.  Stock Appreciation Rights (SARs).**

(a)     Generally. Each SAR shall be subject to the conditions set forth in the Plan and the Award Agreement. Any Option granted under the Plan may include a tandem SAR. The Committee also may award SARs independent of any Option.

(b)     Strike Price. The strike price ("*Strike Price*") per Common Share for each SAR shall not be less than 100% of the Fair Market Value of such share, determined as of the last trading date immediately preceding the date of grant; provided, however, that a SAR granted in tandem with (or in substitution for) an Option previously granted shall have a Strike Price equal to the Exercise Price of the corresponding Option. Any modification to the Strike Price of an outstanding SAR shall be subject to the prohibition on repricing set forth in Section 14(d).

(c)     Vesting and Expiration. A SAR granted in tandem with an Option shall become exercisable and shall expire according to the same vesting schedule and expiration provisions as the corresponding Option. Subject to Section 5(g), a SAR granted independently of an Option shall vest and become exercisable and shall expire in such manner and on such date or dates determined by the Committee and shall expire after such period, not to exceed ten years, as may be determined by the Committee (the "*SAR Period*"); provided, however, that notwithstanding

any vesting or exercisability dates set by the Committee, the Committee may accelerate the vesting and/or exercisability of any SAR, which acceleration shall not affect the terms and conditions of such SAR other than with respect to vesting and/or exercisability. If the SAR Period would expire at a time when trading in the Common Shares is prohibited by the Company's insider trading policy or a Company-imposed "blackout period," the SAR Period shall be extended automatically until the 10th day following the expiration of such prohibition (so long as such extension shall not violate Section 409A of the Code or applicable rules of the NYSE, the TSX, or any other national securities exchange).

(d)     Method of Exercise. SARs may be exercised by delivery of written or electronic notice of exercise to the Company or its designee (including a third-party administrator) in accordance with the terms of the Award, specifying the number of SARs to be exercised and the date on which such SARs were awarded. Notwithstanding the foregoing, unless otherwise determined by the Committee or as set forth in an Award Agreement, if on the last day of the SAR Period, the Fair Market Value exceeds the Strike Price, the Participant has not exercised the SAR, and the SAR has not previously expired, such SAR shall be deemed to have been exercised by the Participant on such last day, and the Company shall make the appropriate payment therefor.

(e)     Payment. Upon the exercise of a SAR, the Company shall pay to the holder thereof an amount equal to the number of Common Shares subject to the SAR that are being exercised multiplied by the excess, if any, of the Fair Market Value of one Common Share on the exercise date over the Strike Price, less an amount equal to any U.S. federal, non-U.S. federal, state, provincial, and local income and employment taxes, social contributions, and any other tax-related items required to be withheld. The Company shall pay such amount in cash, in Common Shares valued at Fair Market Value as determined on the date of exercise, or any combination thereof, as determined by the Committee. Any fractional Common Shares shall be settled in cash.

## 9.  Restricted Stock, Restricted Stock Units, and Deferred Stock Units.

(a)     Generally. Each Restricted Stock, Restricted Stock Unit, and Deferred Stock Unit Award shall be subject to the conditions set forth in the Plan and the applicable Award Agreement. Subject to such rules, approvals, and conditions as the Committee may impose from time to time, an Eligible Person who is a non-employee director may elect to receive all or a portion of his cash director fees and other cash director compensation payable for director services provided to the Company by such Participant in any fiscal year, in whole or in part, in the form of Deferred Stock Units. Subject to Section 5(g), the Committee shall establish restrictions applicable to Restricted Stock and Restricted Stock Units, including the period over which the restrictions shall apply (the "***Restricted Period***"), and the time or times at which Restricted Stock or Restricted Stock Units shall become vested. Deferred Stock Units shall be fully vested upon grant. The Committee may accelerate the vesting and/or the lapse of any or all of the restrictions on Restricted Stock and Restricted Stock Units, which acceleration shall not affect any other terms and conditions of such Awards. No Common Shares shall be issued at the time an Award of Restricted Stock Units or Deferred Stock Units is made, and the Company will not be required to set aside a fund for the payment of any such Award.

(b)     Share Certificates; Escrow or Similar Arrangement. Upon the grant of Restricted Stock, the Committee shall cause Common Share(s) to be registered in the name of the

Participant and held in book-entry form subject to the Company's directions. The Committee may also cause a share certificate registered in the name of the Participant to be issued. In such event, the Committee may provide that such certificates shall be held by the Company or in escrow rather than delivered to the Participant, pending vesting and release of restrictions, in which case the Committee may require the Participant to execute and deliver to the Company or its designee (including third-party administrators) (i) an escrow agreement satisfactory to the Committee, if applicable, and (ii) the appropriate stock power (endorsed in blank) with respect to the Restricted Stock. If the Participant shall fail to execute and deliver the escrow agreement and blank stock power within the amount of time specified by the Committee, the Award shall be null and void. Subject to the restrictions set forth in this Section 9 and the Award Agreement, the Participant shall have the rights and privileges of a shareholder as to such Restricted Stock, including without limitation the right to vote such Restricted Stock.

    (c)    <u>Restrictions; Forfeiture.</u> Restricted Stock and Restricted Stock Units awarded to the Participant shall be subject to forfeiture until the expiration of the Restricted Period and the attainment of any other vesting criteria established by the Committee, and shall be subject to the restrictions on transferability set forth in the Award Agreement. In the event of any forfeiture, all rights of the Participant to such Restricted Stock (or as a shareholder with respect thereto), and/or to such Restricted Stock Units, as applicable, including to any dividends and/or dividend equivalents that may have been accumulated and withheld during the Restricted Period in respect thereof, shall terminate without further action or obligation on the part of the Company. The Committee shall have the authority to remove any or all of the restrictions on the Restricted Stock and Restricted Stock Units whenever it may determine that, by reason of changes in applicable laws or other changes in circumstances arising after the date of grant of the Restricted Stock Award or Restricted Stock Unit Award, such action is appropriate.

    (d)    <u>Delivery of Restricted Stock and Settlement of Restricted Stock Units and Deferred Stock Units.</u>

    (i) Upon the expiration of the Restricted Period with respect to any shares of Restricted Stock and the attainment of any other vesting criteria, the restrictions set forth in the applicable Award Agreement shall be of no further force or effect, except as set forth in the Award Agreement. If an escrow arrangement is used, upon such expiration the Company shall deliver to the Participant or the Participant's beneficiary (via book entry notation or, if applicable, in share certificate form) the shares of Restricted Stock with respect to which the Restricted Period has expired (rounded down to the nearest full share). Dividends, if any, that may have been withheld by the Committee and attributable to a share of Restricted Stock shall be distributed to the Participant in cash or in Common Shares having a Fair Market Value (on the date of distribution) equal to the amount of such dividends, upon the release of restrictions on such share.

    (ii) Unless otherwise provided by the Committee in an Award Agreement, upon the expiration of the Restricted Period and the attainment of any other vesting criteria established by the Committee, with respect to any outstanding Restricted Stock Units, the Company shall deliver to the Participant, or the Participant's beneficiary (via book entry notation or, if applicable, in share certificate form), one (1) Common Share (or other securities or other property, as applicable) for each such outstanding Restricted Stock Unit that has not then been forfeited and with respect to which the Restricted

Period has expired and any other such vesting criteria are attained ("***Released Unit***"); <u>provided</u>, <u>however</u>, unless otherwise provided in the Award Agreement, that the Committee may elect to (A) pay cash or part cash and part Common Shares in lieu of delivering only Common Shares in respect of such Released Units or (B) defer the delivery of Common Shares (or cash or part Common Shares and part cash, as the case may be) beyond the expiration of the Restricted Period if such extension would not cause adverse tax consequences under Section 409A of the Code. If a cash payment is made in lieu of delivering Common Shares, the amount of such payment shall be equal to the Fair Market Value of the Common Shares as of the date on which Common Shares would have otherwise been delivered to the Participant in respect of such Restricted Stock Units.

(iii)    Unless otherwise provided by the Committee in an Award Agreement, upon a Participant's separation from service with the Company, the Company shall deliver to the Participant, or the Participant's beneficiary (via book entry notation or, if applicable, in share certificate form), one (1) Common Share (or other securities or other property, as applicable) for each such outstanding Deferred Stock Unit then held by the Participant; <u>provided</u>, <u>however</u>, unless otherwise provided in the Award Agreement, that the Committee may elect to pay cash or part cash and part Common Shares in lieu of delivering only Common Shares in respect of such Deferred Stock Units. If a cash payment is made in lieu of delivering Common Shares, the amount of such payment shall be equal to the Fair Market Value of the Common Shares as of the date on which Common Shares would have otherwise been delivered to the Participant in respect of such Deferred Stock Units.

(iv)    To the extent provided in an Award Agreement, the holder of outstanding Restricted Stock Units or Deferred Stock Units shall be entitled to be credited with dividend equivalent payments (upon the payment by the Company of dividends on Common Shares) either in cash or, if determined by the Committee, in Common Shares having a Fair Market Value equal to the amount of such dividends as of the date of payment (and interest may, if determined by the Committee, be credited on the amount of cash dividend equivalents at a rate and subject to such terms as determined by the Committee), which accumulated dividend equivalents (and interest thereon, if applicable) shall be payable at the same time as the underlying Restricted Stock Units or Deferred Stock Units, as applicable, are settled (in the case of Restricted Stock Units, following the release of restrictions on such Restricted Stock Units), and if such Restricted Stock Units are forfeited, the holder thereof shall have no right to such dividend equivalent payments.

(e)    <u>Legends on Restricted Stock.</u> Each certificate representing Restricted Stock awarded under the Plan, if any, shall bear a legend substantially in the form of the following in addition to any other information the Company deems appropriate until the lapse of all restrictions with respect to such Common Shares:

TRANSFER OF THIS CERTIFICATE AND THE SHARES
REPRESENTED HEREBY IS RESTRICTED PURSUANT TO THE
TERMS OF THE PERFORMANCE SPORTS GROUP LTD.
OMNIBUS EQUITY INCENTIVE PLAN AND A RESTRICTED
STOCK AWARD AGREEMENT, DATED AS OF _____,

BETWEEN PERFORMANCE SPORTS GROUP LTD. AND
_____. A COPY OF SUCH PLAN AND AWARD
AGREEMENT IS ON FILE AT THE PRINCIPAL EXECUTIVE
OFFICES OF PERFORMANCE SPORTS GROUP LTD.

**10. Other Stock-Based Awards.** The Committee may issue unrestricted Common Shares (subject to Section 5(g)), rights to receive future grants of Awards, or other Awards denominated in Common Shares (including performance shares or performance units), or Awards that provide for cash payments based in whole or in part on the value or future value of Common Shares under the Plan to Eligible Persons, alone or in tandem with other Awards, in such amounts as the Committee shall from time to time determine ("*Other Stock-Based Awards*"). Subject to Section 5(g), each Other Stock-Based Award shall be evidenced by an Award Agreement which may include conditions including without limitation the payment by the Participant of the Fair Market Value of such Common Shares on the date of grant.

**11. Performance Compensation Awards.**

(a)   Generally. The Committee shall have the authority, at or before the time of grant of any Award described in Sections 7 through 10 of the Plan, to designate such Award as a Performance Compensation Award intended to qualify as "performance-based compensation" under Section 162(m) of the Code. In addition, the Committee shall have the authority to grant a cash bonus Award to any Participant and designate such Award as a Performance Compensation Award intended to qualify as "performance based compensation" under Section 162(m) of the Code. Notwithstanding the foregoing, (i) any Award to a Participant who is a "covered employee" within the meaning of Section 162(m) of the Code for a fiscal year that satisfies the requirements of this Section 11 may be treated as a Performance Compensation Award in the absence of any such Committee designation and (ii) if the Company determines that a Participant who has been granted an Award designated as a Performance Compensation Award is not (or is no longer) a "covered employee" within the meaning of Section 162(m) of the Code, the terms and conditions of such Award may be modified without regard to any restrictions or limitations set forth in this Section 11 (but subject otherwise to the provisions of Section 14 of the Plan). Notwithstanding any other provision of the Plan, any Award that is intended to qualify as a Performance Compensation Award shall be subject to any additional limitations set forth in Section 162(m) of the Code that are requirements for such qualification, and the Plan and the Award Agreement shall be deemed amended to the extent necessary to conform to such requirements.

(b)   Discretion of Committee with Respect to Performance Compensation Awards. The Committee may select the length of a Performance Period, the type(s) of Performance Compensation Awards to be issued, the Performance Criteria used to establish the Performance Goal(s), the kind(s) and/or level(s) of the Performance Goals(s), and the Performance Formula. Within the first 90 days of a Performance Period (or the maximum period allowed under Section 162(m) of the Code), the Committee shall, with regard to the Performance Compensation Awards to be issued for such Performance Period, exercise its discretion with respect to each of the matters enumerated in the immediately preceding sentence and record the same in writing (which may be in the form of minutes of a meeting of the Committee).

(c)     Performance Criteria. The Performance Criteria used to establish the Performance Goal(s) may be based on the attainment of specific levels of performance of the Company (and/or one or more Affiliates, divisions, and/or operational and/or business units, product lines, brands, business segments, administrative departments, or units, or any combination of the foregoing) and shall be limited to the following:  (i) net earnings or net income (before or after taxes); (ii) basic or diluted earnings per share (before or after taxes); (iii) net revenue or net revenue growth; (iv) gross revenue or gross revenue growth, gross profit or gross profit growth, or gross billings or gross billings growth; (v) net operating profit (before or after taxes); (vi) return measures (including, but not limited to, return on investment, assets, net assets, capital, gross revenue or gross revenue growth, invested capital, equity, or sales); (vii) cash flow measures (including, but not limited to, operating cash flow, free cash flow, and cash flow return on capital), which may but are not required to be measured on a per-share basis; (viii) earnings before or after taxes, interest, depreciation, and amortization on an adjusted or unadjusted basis (including EBIT and EBITDA); (ix) gross or net operating margins; (x) productivity ratios; (xi) share price (including, but not limited to, growth measures and total shareholder return); (xii) expense targets or cost reduction goals, general and administrative expense savings; (xiii) operating efficiency; (xiv) objective measures of customer satisfaction; (xv) working capital targets; (xvi) measures of economic value added or other "value creation" metrics; (xvii) enterprise value; (xviii) shareholder return; (xix) customer retention; (xx) competitive market metrics; (xxi) employee retention; (xxii) objective measures of personal targets, goals, or completion of projects (including but not limited to succession and hiring projects, completion of specific acquisitions, reorganizations or other corporate transactions or capital-raising transactions, expansions of specific business operations, and meeting divisional or project budgets); (xxiii) system-wide revenues; (xxiv) cost of capital, debt leverage year-end cash position, or book value; (xxv) strategic objectives, development of new product lines and related revenue, sales and margin targets, or international operations; or (xxvi) any combination of the foregoing.  Any one or more of the Performance Criteria may be stated as a percentage of other Performance Criteria, or a percentage of a prior period's Performance Criteria, or used on an absolute, relative, or adjusted basis to measure the performance of the Company and/or one or more Affiliates as a whole or any divisions and/or operational and/or business units, product lines, brands, business segments, and/or administrative departments of the Company and/or one or more Affiliates or any combination thereof, as the Committee may deem appropriate, or any of the above Performance Criteria may be compared to the performance of a group of comparator companies, or a published or special index that the Committee deems appropriate, or as compared to various stock market indices.  The Committee also has the authority to provide for accelerated vesting, delivery, and exercisability of any Award based on the achievement of Performance Goals pursuant to the Performance Criteria specified in this paragraph.  To the extent required under Section 162(m) of the Code, the Committee shall, within the first 90 days of a Performance Period (or within the maximum period allowed under Section 162(m) of the Code), define in an objective fashion the manner of calculating the Performance Criteria it selects to use for such Performance Period.

(d)     Modification of Performance Goal(s). The Committee may alter Performance Criteria without obtaining shareholder approval if applicable tax and/or securities laws so permit. The Committee may modify the calculation of a Performance Goal during the first 90 days of a Performance Period (or within the maximum period allowed under Section 162(m) of the Code), or at any time thereafter if the change would not cause any Performance Compensation Award to

fail to qualify as "performance-based compensation" under Section 162(m), to reflect any of the following events: (i) asset write-downs; (ii) litigation or claim judgments or settlements; (iii) the effect of changes in tax laws, accounting principles, or other laws or regulatory rules affecting reported results; (iv) any reorganization and restructuring programs; (v) extraordinary nonrecurring items as described in Accounting Standards Codification Topic 225-20 (or any successor pronouncement thereto) and/or in management's discussion and analysis of financial condition and results of operations appearing in the Company's annual report to shareholders for the applicable year; (vi) acquisitions or divestitures; (vii) any other specific unusual or nonrecurring events, or objectively determinable category thereof; (viii) foreign exchange gains and losses; (ix) discontinued operations and nonrecurring charges; and (x) a change in the Company's fiscal year.

(e)  Payment of Performance Compensation Awards.

(i)  Condition to Receipt of Payment.  Unless otherwise provided in the applicable Award Agreement or any employment or service agreement between the Participant and the Company or an Affiliate, the Participant must be employed by or rendering services for the Company or an Affiliate on the last day of a Performance Period to be eligible for payment in respect of a Performance Compensation Award for such Performance Period.

(ii)  Limitation.  Unless otherwise provided in the applicable Award Agreement, or any employment or service agreement between the Participant and the Company or an Affiliate, the Participant shall be eligible to receive payment or delivery, as applicable, in respect of a Performance Compensation Award only to the extent that the Committee determines that (A) the Performance Goals for such period are achieved, as determined by the Committee; and (B) all or some of the portion of such Participant's Performance Compensation Award has been earned for the Performance Period based on the application of the Performance Formula to such achieved Performance Goals, as determined by the Committee; provided, however, that if so provided by the Committee in its sole discretion, in the event of (x) the termination of the Participant's employment or service by the Company other than for Cause (and other than due to death or Disability), in each case within 12 months following a Change in Control, or (y) the termination of a Participant's employment or service due to the Participant's death or Disability, the Participant shall receive payment in respect of a Performance Compensation Award based on (1) actual performance through the date of termination as determined by the Committee, or (2) if the Committee determines that measurement of actual performance cannot be reasonably assessed, the assumed achievement of target performance as determined by the Committee (but not to the extent that application of this clause (2) would cause Section 162(m) of the Code to result in the loss of the deduction of the compensation payable in respect of such Performance Compensation Award for any Participant reasonably expected to be a "covered employee" within the meaning of Section 162(m) of the Code), in each case prorated based on the time elapsed from the date of grant to the date of termination of employment or service.

(iii)  Certification.  Following the completion of a Performance Period, the Committee shall review and certify in writing (which may be in the form of minutes of a meeting of the Committee) whether, and to what extent, the Performance Goal(s) for the

Performance Period have been achieved and, if so, calculate and certify in writing (which may be in the form of minutes of a meeting of the Committee) that amount of the Performance Compensation Awards earned for the period based upon the Performance Formula. The Committee shall then determine the amount of each Participant's Performance Compensation Award actually payable for the Performance Period and, in so doing, may apply discretion to eliminate or reduce the size of a Performance Compensation Award consistent with Section 162(m) of the Code. Unless otherwise provided in the applicable Award Agreement, the Committee shall not have the discretion to (A) provide payment or delivery in respect of Performance Compensation Awards for a Performance Period if the Performance Goal(s) for such Performance Period have not been attained; or (B) increase a Performance Compensation Award above the applicable limitations set forth in Section 5 of the Plan.

(f)     Timing of Award Payments. Unless otherwise provided in the applicable Award Agreement, Performance Compensation Awards granted for a Performance Period shall be paid to Participants as soon as administratively practicable following completion of the certifications required by this Section 11. Any Performance Compensation Award that has been deferred shall not (between the date as of which the Award is deferred and the payment date) increase (i) with respect to a Performance Compensation Award that is payable in cash, by a measuring factor for each fiscal year greater than a reasonable rate of interest set by the Committee or (ii) with respect to a Performance Compensation Award that is payable in Common Shares, by an amount greater than the appreciation of a Common Share from the date such Award is deferred to the payment date. Unless otherwise provided in an Award Agreement, any Performance Compensation Award that is deferred and is otherwise payable in Common Shares shall be credited (during the period between the date as of which the Award is deferred and the payment date) with dividend equivalents (in a manner consistent with the methodology set forth in the last sentence of Section 9(d)(iv)).

**12.     Changes in Capital Structure and Similar Events.** In the event of (a) any dividend (other than regular cash dividends) or other distribution (whether in the form of cash, Common Shares, other securities, or other property), recapitalization, stock split, reverse stock split, reorganization, merger, amalgamation, consolidation, split-up, split-off, spin-off, combination, repurchase or exchange of Common Shares or other securities of the Company, issuance of warrants or other rights to acquire Common Shares or other securities of the Company, or other similar corporate transaction or event (including, without limitation, a Change in Control) that affects the Common Shares, or (b) unusual or nonrecurring events (including, without limitation, a Change in Control) affecting the Company, any Affiliate, or the financial statements of the Company or any Affiliate, or changes in applicable rules, rulings, regulations, or other requirements of any governmental body or national securities exchange, accounting principles, or law, such that in any case an adjustment is determined by the Committee to be necessary or appropriate, then the Committee shall make any such adjustments in such manner as it may deem equitable, including without limitation any or all of the following:

(i)   adjusting any or all of (A) the number and kind of common shares of the Company or other securities of the Company (or number and kind of other securities or other property) that may be delivered in respect of Awards or with respect to which Awards may be granted under the Plan (including, without limitation, adjusting any or all of the

limitations under Section 5 of the Plan) and (B) the terms of any outstanding Award, including, without limitation, (1) the number and kind of shares of stock or other securities of the Company (or number and kind of other securities or other property) subject to outstanding Awards or to which outstanding Awards relate, (2) the Exercise Price or Strike Price with respect to any Award, and/or (3) any applicable performance measures (including, without limitation, Performance Criteria, Performance Formula, and Performance Goals);

(ii) providing for a substitution or assumption of Awards (or awards of an acquiring company), accelerating the delivery, vesting, and/or exercisability of, lapse of restrictions, and/or other conditions on, or termination of, Awards or providing for a period of time (which shall not be required to be more than 10 days) for Participants to exercise outstanding Awards prior to the occurrence of such event (and any such Award not so exercised shall terminate or become no longer exercisable upon the occurrence of such event); and

(iii) cancelling any one or more outstanding Awards (or awards of an acquiring company) and causing to be paid to the holders thereof, in cash, Common Shares, other securities, or other property, or any combination thereof, the value of such Awards, if any, as determined by the Committee (which if applicable may be based upon the price per Common Share received or to be received by other shareholders of the Company in such event), including without limitation, in the case of an outstanding Option or SAR, a cash payment in an amount equal to the excess, if any, of the Fair Market Value (as of a date specified by the Committee) of the Common Shares subject to such Option or SAR over the aggregate Exercise Price or Strike Price of such Option or SAR, respectively (it being understood that, in such event, any Option or SAR having a per share Exercise Price or Strike Price equal to, or in excess of, the Fair Market Value of a Common Share subject thereto may be canceled and terminated without any payment or consideration therefor);

provided, however, that the Committee shall make an equitable or proportionate adjustment to outstanding Awards to reflect any "equity restructuring" (within the meaning of the Financial Accounting Standards Codification Topic 718 (or any successor pronouncement thereto)). Except as otherwise determined by the Committee, any adjustment in Incentive Stock Options under this Section 12 (other than any cancellation of Incentive Stock Options) shall be made only to the extent not constituting a "modification" within the meaning of Section 424(h)(3) of the Code, and any adjustments under this Section 12 shall be made in a manner which does not adversely affect the exemption provided pursuant to Rule 16b-3 promulgated under the U.S. Exchange Act. The Company shall give each Participant notice of an adjustment hereunder and, upon notice, such adjustment shall be conclusive and binding for all purposes. In anticipation of the occurrence of any event listed in the first sentence of this Section 12, for reasons of administrative convenience, the Committee in its sole discretion may refuse to permit the exercise of any Award during a period of up to 30 days prior to the anticipated occurrence of any such event.

**13. Effect of Change in Control.** Except to the extent otherwise provided in an Award Agreement, or any applicable employment or service agreement between the Participant and the

Company or an Affiliate, in the event of a Change in Control, notwithstanding any provision of the Plan to the contrary:

(a)    In the event that the Participant's employment with the Company or an Affiliate is terminated by the Company or an Affiliate without Cause (and other than due to death or Disability) on or within 12 months following a Change in Control, the Committee may provide that all Options and SARs held by such Participant shall become immediately exercisable with respect to 100% of the shares subject to such Options and SARs, and that the Restricted Period (and any other conditions) shall expire immediately with respect to 100% of the shares of Restricted Stock and Restricted Stock Units and any other Awards held by such Participant (including a waiver of any applicable Performance Goals); provided, that in the event that the vesting or exercisability of any Award would otherwise be subject to the achievement of performance conditions, the portion of such Award that shall become fully vested and immediately exercisable shall be based on the assumed achievement of target performance as determined by the Committee.

(b)    In addition, the Committee may upon at least 10 days' advance notice to the affected persons, cancel any outstanding Award and pay to the holders thereof, in cash, securities or other property (including of the acquiring or successor company), or any combination thereof, the value of such Awards based upon the price per Common Share received or to be received by other shareholders of the Company in the event. Notwithstanding the above, the Committee shall exercise such discretion over the timing of settlement of any Award subject to Section 409A of the Code at the time such Award is granted.

## 14. Amendments and Termination.

(a)    Amendment and Termination of the Plan. Subject to Section 14(c), the Board may amend, alter, suspend, discontinue, or terminate the Plan or any portion thereof at any time; provided, that no such amendment, alteration, suspension, discontinuation, or termination shall be made without shareholder approval if such approval is necessary to comply with any tax or regulatory requirement applicable to the Plan (including, without limitation, as necessary to comply with any applicable rules or requirements of the NYSE, the TSX, or any other national securities exchange on which the Company has applied to list or quote its Common Shares, for changes in GAAP to new accounting standards, or to prevent the Company from being denied a tax deduction under Section 162(m) of the Code); provided, further, that any such amendment, alteration, suspension, discontinuance, or termination that would materially and adversely affect the rights of any Participant or any holder or beneficiary of any Award theretofore granted shall not to that extent be effective without the consent of the affected Participant, holder, or beneficiary unless the Committee determines that such amendment, alteration, suspension, discontinuance, or termination is either required or advisable in order for the Company, the Plan, or the Award to satisfy any applicable law or regulation.

(b)    Notwithstanding the foregoing, the Board may from time to time, in its discretion, make changes to the Plan or any Award granted hereunder that do not require the approval of shareholders, which may include but are not limited to:

(i)    Any amendment of a "housekeeping" nature, including without limitation those made to clarify the meaning of an existing provision of the Plan, correct or supplement any provision under the Plan that is inconsistent

with any other provision of the Plan, correct any grammatical or typographical errors, or amend the definitions in the Plan regarding administration of the Plan;

(ii)     The addition of a form of financial assistance and any amendment to a financial assistance provision that is adopted;

(iii)    Amend the vesting provisions of the Plan and any Award Agreement;

(iv)    Any amendment respecting the administration of the Plan;

(v)     Any amendment necessary to comply with applicable law or the applicable rules of the NYSE, the TSX, or any other national securities exchange on which the Company has applied to list or quote its Common Shares or any other regulatory body having authority over the Company, the Plan, the Participants, or shareholders; and

(vi)    Any other amendment that does not require the approval of shareholders under Section 14(c).

(c)     Shareholder approval is required for the following amendments to the Plan or any Award granted hereunder:

(i)     Any increase in the maximum number of Common Shares that may be issuable from treasury pursuant to Awards granted under the Plan, except as provided in Section 12;

(ii)    Any reduction in the Exercise Price after an Option or SAR has been granted or any cancellation of an Option or SAR and the substitution of that Option or SAR with a new Option or SAR with a reduced Exercise Price, except in the case of an adjustment pursuant to Section 12;

(iii)   An extension of the term of an Award benefiting an Insider of the Company, except in the case of an extension due to a blackout period;

(iv)    Any amendment that increases the limits on Awards that may be granted to any Participant pursuant to Section 5, except as provided in Section 12;

(v)     Any amendment that would permit Awards granted under the Plan to be transferable or assignable other than for normal estate settlement purposes;

(vi)    A change to the Eligible Persons, including a change that would have the potential of broadening or increasing participation by Insiders of the Company;

(vii)   Any amendment requiring the approval of the Company's shareholders under applicable laws or the applicable requirements of the NYSE, the TSX, or any other national securities exchange on which the Common Shares are listed or quoted; and

(viii)  Any amendment to this Section 14.

(d)     <u>Amendment of Award Agreements.</u>  The Committee may, to the extent not inconsistent with the terms of any applicable Award Agreement, waive any conditions or rights under, amend any terms of, or alter, suspend, discontinue, cancel, or terminate any Award

theretofore granted or the associated Award Agreement, prospectively or retroactively (including after the Participant's termination of employment or service with the Company); provided, that any such waiver, amendment, alteration, suspension, discontinuance, cancellation, or termination that would materially and adversely affect the rights of any Participant with respect to any Award theretofore granted shall not to that extent be effective without the consent of the affected Participant unless the Committee determines that such waiver, amendment, alteration, suspension, discontinuance, cancellation, or termination either is required or advisable in order for the Company, the Plan, or the Award to satisfy any applicable law or regulation; provided, further, that except as otherwise permitted under Section 12 of the Plan, if (i) the Committee reduces the Exercise Price of any Option or the Strike Price of any SAR, (ii) the Committee cancels any outstanding Option or SAR and replaces it with a new Option or SAR (with a lower Exercise Price or Strike Price, as the case may be) or other Award or cash in a manner that would either (A) be reportable on the Company's proxy statement or Form 10-K (if applicable) as Options that have been "repriced" (as such term is used in Item 402 of Regulation S-K promulgated under the U.S. Exchange Act), or (B) result in any "repricing" for financial statement reporting purposes (or otherwise cause the Award to fail to qualify for equity accounting treatment), (iii) the Committee cancels any outstanding Option or SAR that has a per-share Exercise Price or per share Strike Price (as applicable) at or above the Fair Market Value of a Common Share on the date of cancellation, and pays any consideration to the holder thereof, whether in cash, securities, or other property, or any combination thereof, or (iv) the Committee takes any other action that is considered a "repricing" for purposes of the shareholder approval rules of the applicable national securities exchange on which the Common Share is listed or quoted, then, in the case of the immediately preceding clauses (i) through (iv), any such action shall not be effective without shareholder approval.

## 15. General.

(a)    Award Agreements; Other Agreements.  Each Award under the Plan shall be evidenced by an Award Agreement, which shall be delivered to the Participant and shall specify the terms and conditions of the Award and any rules applicable thereto.  The terms of any Award Agreement, or any employment or service agreement in effect with the Participant may have terms or features different from and/or in addition to those set forth in the Plan and, unless expressly provided otherwise in such Award or other agreement, shall control in the event of any conflict with the terms of the Plan.

(b)    Nontransferability.

(i)    Each Award shall be exercisable only by the Participant during the Participant's lifetime, or, if permissible under applicable law, by the Participant's legal guardian or representative.  No Award may be assigned, alienated, pledged, attached, sold, or otherwise transferred or encumbered by the Participant other than by will or by the laws of descent and distribution, and any such purported assignment, alienation, pledge, attachment, sale, transfer, or encumbrance shall be void and unenforceable against the Company or an Affiliate; provided, that the designation of a beneficiary shall not constitute an assignment, alienation, pledge, attachment, sale, transfer, or encumbrance.

(ii)    Notwithstanding the foregoing, the Committee may permit Awards (other than Incentive Stock Options) to be transferred by the Participant, without consideration, subject to such rules as the Committee may adopt, to (A) any person who is a "family member" of the Participant, as such term is used in the instructions to Form S-8 under the U.S. Securities Act or any successor form of registration statements promulgated by the Securities and Exchange Commission (collectively, the "*Immediate Family Members*"); (B) a trust solely for the benefit of the Participant and the Participant's Immediate Family Members; (C) a partnership or limited liability company whose only partners or shareholders are the Participant and the Participant's Immediate Family Members; or (D) any other transferee as may be approved either (1) by the Board or the Committee or (2) as provided in the applicable Award Agreement; (each transferee described in clause (A), (B), (C), or (D) above is hereinafter referred to as a "*Permitted Transferee*"), provided that the Participant gives the Committee advance written notice describing the terms and conditions of the proposed transfer and the Committee notifies the Participant in writing that such a transfer would comply with the requirements of the Plan.

(iii)    The terms of any Award transferred in accordance with the immediately preceding paragraph shall apply to the Permitted Transferee, and any reference in the Plan, or in any applicable Award Agreement, to the Participant shall be deemed to refer to the Permitted Transferee, except that (A) Permitted Transferees shall not be entitled to transfer any Award, other than by will or the laws of descent and distribution; (B) Permitted Transferees shall not be entitled to exercise any transferred Option unless there shall be in effect a registration statement on an appropriate form covering the Common Shares to be acquired pursuant to the exercise of such Option if the Committee determines, consistent with any applicable Award Agreement, that such a registration statement is necessary or appropriate; (C) the Committee or the Company shall not be required to provide any notice to a Permitted Transferee, whether or not such notice is or would otherwise have been required to be given to the Participant under the Plan or otherwise; and (D) the consequences of the termination of the Participant's employment by, or services to, the Company or an Affiliate under the terms of the Plan and the applicable Award Agreement shall continue to be applied with respect to the transferred Award, including, without limitation, that an Option shall be exercisable by the Permitted Transferee only to the extent, and for the periods, specified in the Plan and the applicable Award Agreement.

(c)    <u>Dividends and Dividend Equivalents.</u> As outlined in an Award Agreement, the Committee may provide the Participant as part of an Award with dividends or dividend equivalents, payable cash, Common Shares, other securities, other Awards, or other property, on a current or deferred basis, on such terms and conditions as may be determined by the Committee, including, without limitation, payment directly to the Participant, withholding of such amounts by the Company subject to vesting of the Award, or reinvestment in additional Common Shares or other Awards, <u>provided</u>, that no dividends or dividend equivalents shall be payable in respect of outstanding (i) Options or SARs or (ii) unearned Performance Compensation Awards or other unearned Awards subject to performance conditions (other than or in addition to the passage of time); <u>provided</u>, <u>further</u>, that dividend equivalents may be accumulated in respect of unearned Awards and paid as soon as administratively practicable, but no more than 60 days, after such Awards are earned and become payable or distributable (and

the right to any such accumulated dividends or dividend equivalents shall be forfeited upon the forfeiture of the Award to which such dividends or dividend equivalents relate).

(d)    Tax Withholding.

(i)    The Participant shall be required to pay to the Company or any Affiliate, and the Company or any Affiliate shall have the right (but not the obligation) and is hereby authorized to withhold, from any cash, Common Shares, other securities, or other property deliverable under any Award or from any compensation or other amounts owing to the Participant, the amount (in cash, Common Shares, other securities, or other property) of any required withholding taxes in respect of an Award, its exercise, or any payment or transfer under an Award or under the Plan and to take such other action as the Committee or the Company deem necessary to satisfy all obligations for the payment of such withholding taxes.

(ii)    Without limiting the generality of paragraph (i) above, the Committee may permit the Participant to satisfy, in whole or in part, the foregoing withholding liability by (A) payment in cash; (B) the delivery of Common Shares (which shares are not subject to any pledge or other security interest) owned by the Participant having a Fair Market Value on such date equal to such withholding liability, or (C) having the Company withhold from the number of Common Shares otherwise issuable or deliverable pursuant to the exercise or settlement of the Award a number of shares with a Fair Market Value on such date equal to such withholding liability.

(e)    No Claim to Awards; No Rights to Continued Employment.    No employee of the Company or an Affiliate, or other person, shall have any claim or right to be granted an Award under the Plan or, having been selected for the grant of an Award, to be selected for a grant of any other Award. There is no obligation for uniformity of treatment of Participants or holders or beneficiaries of Awards. The terms and conditions of Awards and the Committee's determinations and interpretations with respect thereto need not be the same with respect to each Participant and may be made selectively among Participants, whether or not such Participants are similarly situated. Neither the Plan nor any action taken hereunder shall be construed as giving any Participant any right to be retained in the employ or service of the Company or an Affiliate, nor shall it be construed as giving any Participant any rights to continued service on the Board.

(f)    Non–U.S. Participants.    With respect to Participants who are not U.S. Participants who are not (and who are not expected to be) "covered employees" within the meaning of Section 162(m) of the Code, the Committee may amend the terms of the Plan or appendices thereto, or outstanding Awards, with respect to such Participants, in order to conform such terms with, or accommodate the requirements of, local laws, procedures, or practices or to obtain more favorable tax or other treatment for the Participant or the Company or its Affiliates. Without limiting the generality of this subsection, the Committee is specifically authorized to adopt rules, procedures, and sub-plans with provisions that limit or modify rights on death, disability, retirement, or other terminations of employment, available methods of exercise or settlement of an Award, payment of income, social insurance contributions or payroll taxes, withholding procedures, and handling of any stock certificates or other indicia of ownership, which vary with local requirements. The Committee may also adopt rules, procedures, or sub-plans applicable to particular Affiliates or locations.

(g)    Beneficiary Designation. The Participant's beneficiary shall be the Participant's spouse (or domestic partner if such status is recognized by the Company and in such jurisdiction), or if the Participant is otherwise unmarried at the time of death, the Participant's estate, except to the extent that a different beneficiary is designated in accordance with procedures that may be established by the Committee from time to time for such purpose. Notwithstanding the foregoing, in the absence of a beneficiary validly designated under such Committee-established procedures and/or applicable law who is living (or in existence) at the time of death of a Participant residing or working outside the United States, any required distribution under the Plan shall be made to the executor or administrator of the estate of the Participant, or to such other individual as may be prescribed by applicable law.

(h)    Termination of Employment or Service. The Committee, in its sole discretion, shall determine the effect of all matters and questions related to the termination of employment or service of a Participant. Except as otherwise provided in an Award Agreement, or any employment or service agreement between the Participant and the Company or an Affiliate, unless determined otherwise by the Committee: (i) neither a temporary absence from employment or service due to illness, vacation, or leave of absence (including, without limitation, a call to active duty for military service through a Reserve or National guard unit) nor a transfer from employment or service with the Company to employment or service with an Affiliate (or vice versa) shall be considered a termination of employment or service with the Company or an Affiliate, and (ii) if the Participant's employment with the Company or its Affiliates terminates, but such Participant continues to provide services with the Company or its Affiliates in a non-employee capacity (including as a non-employee director) (or vice versa), such change in status shall not be considered a termination of employment or service with the Company or an Affiliate for purposes of the Plan.

(i)    No Rights as a Shareholder. Except as otherwise specifically provided in the Plan or any Award Agreement, no person shall be entitled to the privileges of ownership in respect of Common Shares which are subject to Awards hereunder until such shares have been issued or delivered to that person.

(j)    Government and Other Regulations.

(i)    The Plan, the granting and vesting of Awards under the Plan and the issuance and delivery of Common Shares and the payment of money under the Plan or under Awards granted or awarded under the Plan are subject to compliance with all applicable U.S. federal, state, provincial, local, and non–U.S. laws, rules, and regulations (including but not limited to state, provincial, U.S. federal, and non–U.S. securities law, including the Canadian Securities Laws, and margin requirements) and to such approvals by any listing, regulatory, or governmental authority as may, in the opinion of counsel for the Company, be necessary or advisable in connection therewith. Any securities delivered under the Plan shall be subject to such restrictions, and the person acquiring such securities shall, if requested by the Company, provide such assurances and representations to the Company as the Company may deem necessary or desirable to assure compliance with all applicable legal requirements. To the extent permitted by applicable law, the Plan and Awards granted or awarded hereunder shall be deemed amended to the extent necessary to conform to such laws, rules, and regulations.

(ii)     The obligation of the Company to settle Awards in Common Shares or other consideration shall be subject to all applicable laws, rules, and regulations, and to such approvals by governmental agencies as may be required.  Notwithstanding any terms or conditions of any Award to the contrary, the Company shall be under no obligation to offer to sell or to sell, and shall be prohibited from offering to sell or selling, any Common Shares pursuant to an Award unless such shares have been properly registered for sale pursuant to the U.S. Securities Act with the Securities and Exchange Commission or unless the Company has received an opinion of counsel, satisfactory to the Company, that such shares may be offered or sold without such registration pursuant to and in compliance with the terms of an available exemption.  The Company shall be under no obligation to register for sale under the U.S. Securities Act any of the Common Shares to be offered or sold under the Plan.  The Committee shall have the authority to provide that all Common Shares or other securities of the Company or any Affiliate delivered under the Plan shall be subject to such stop-transfer orders and other restrictions as the Committee may deem advisable under the Plan, the applicable Award Agreement, the U.S. federal securities laws, Canadian Securities Laws, or the rules, regulations and other requirements of the U.S. Securities and Exchange Commission, any national securities exchange upon which such shares or other securities of the Company are then listed or quoted, and any other applicable U.S. federal, state, provincial, local, or non-U.S. laws, rules, regulations, and other requirements, and, without limiting the generality of Section 9 of the Plan, the Committee may cause a legend or legends to be put on any such certificates of Common Shares or other securities of the Company or any Affiliate delivered under the Plan to make appropriate reference to such restrictions or may cause such Common Shares or other securities of the Company or any Affiliate delivered under the Plan in book-entry form to be held subject to the Company's instructions or subject to appropriate stop-transfer orders.  Notwithstanding any provision in the Plan to the contrary, the Committee reserves the right to add any additional terms or provisions to any Award granted under the Plan that it in its sole discretion deems necessary or advisable in order that such Award complies with the legal requirements of any governmental entity to whose jurisdiction the Award is subject.

(iii)     The Committee may cancel an Award or any portion thereof if it determines that legal or contractual restrictions and/or blockage and/or other market considerations would make the Company's acquisition of Common Shares from the public markets, the Company's issuance of Common Shares to the Participant, the Participant's acquisition of Common Shares from the Company and/or the Participant's sale of Common Shares to the public markets, illegal, impracticable, or inadvisable.  If the Committee determines to cancel all or any portion of an Award in accordance with the foregoing, unless prevented by applicable laws, the Company shall pay to the Participant an amount equal to the excess of (A) the aggregate Fair Market Value of the Common Shares subject to such Award or portion thereof canceled (determined as of the applicable exercise date, or the date that the shares would have been vested or delivered, as applicable), over (B) the aggregate Exercise Price or Strike Price (in the case of an Option or SAR, respectively) or any amount payable as a condition of delivery of Common Shares (in the case of any other Award).  Such amount shall be delivered to the Participant as soon as practicable following the cancellation of such Award or portion thereof.

(k)     No Section 83(b) Elections Without Consent of Company.  No election under Section 83(b) of the Code or under a similar provision of law may be made unless expressly permitted by the terms of the applicable Award Agreement or by action of the Committee in writing prior to the making of such election.  If the Participant, in connection with the acquisition of Common Shares under the Plan or otherwise, is expressly permitted to make such election and the Participant makes the election, the Participant shall notify the Company of such election within 10 days of filing notice of the election with the Internal Revenue Service or other governmental authority, in addition to any filing and notification required pursuant to Section 83(b) of the Code or other applicable provision.

(l)     Payments to Persons Other Than Participants.  If the Committee shall find that any person to whom any amount is payable under the Plan is unable to care for the Participant's affairs because of illness or accident, or is a minor, or has died, then any payment due to such person or the Participant's estate (unless a prior claim therefor has been made by a duly appointed legal representative or a beneficiary designation form has been filed with the Company) may, if the Committee so directs the Company, be paid to the Participant's spouse, child, or relative, or an institution maintaining or having custody of such person, or any other person deemed by the Committee to be a proper recipient on behalf of such person otherwise entitled to payment.  Any such payment shall be a complete discharge of the liability of the Committee and the Company therefor.

(m)     Nonexclusivity of the Plan.  Neither the adoption of the Plan by the Board nor the submission of the Plan to the shareholders of the Company for approval shall be construed as creating any limitations on the power of the Board to adopt such other incentive arrangements as it may deem desirable, including, without limitation, the granting of stock options or other rights or awards otherwise than under the Plan, and such arrangements may be either applicable generally or only in specific cases.

(n)     No Trust or Fund Created.  Neither the Plan nor any Award shall create or be construed to create a trust or separate fund of any kind or a fiduciary relationship between the Company or any Affiliate, on the one hand, and the Participant or other person or entity, on the other hand.  No provision of the Plan or any Award shall require the Company, for the purpose of satisfying any obligations under the Plan, to purchase assets or place any assets in a trust or other entity to which contributions are made or otherwise to segregate any assets, nor shall the Company maintain separate bank accounts, books, records, or other evidence of the existence of a segregated or separately maintained or administered fund for such purposes.  Participants shall have no rights under the Plan other than as unsecured general creditors of the Company.

(o)     Reliance on Reports.  Each member of the Committee and each member of the Board (and each such member's respective designees) shall be fully justified in acting or failing to act, as the case may be, and shall not be liable for having so acted or failed to act in good faith, in reliance upon any report made by the independent registered public accounting firm of the Company and its Affiliates and/or any other information furnished in connection with the Plan by any agent of the Company or the Committee or the Board, other than such member or designee.

(p)     Relationship to Other Benefits.  No payment under the Plan shall be taken into account in determining any benefits under any pension, retirement, profit sharing, group

insurance, or other benefit plan of the Company except as otherwise specifically provided in such other plan.

(q)  Purchase for Investment.  Whether or not the Options and shares covered by the Plan have been registered under the U.S. Securities Act, each person exercising an Option under the Plan or acquiring shares under the Plan may be required by the Company to give a representation in writing that such person is acquiring such shares for investment and not with a view to, or for sale in connection with, the distribution of any part thereof.  The Company will endorse any necessary legend referring to the foregoing restriction upon the certificate or certificates representing any shares issued or transferred to the Participant upon the exercise of any Option granted under the Plan.

(r)  Governing Law.  The Plan shall be governed by and construed in accordance with the laws of the State of New York, without regard to principles of conflicts of laws thereof, or principles of conflicts of laws of any other jurisdiction which could cause the application of the laws of any jurisdiction other than the State of New York.

(s)  Severability.  If any provision of the Plan or any Award or Award Agreement is or becomes or is deemed to be invalid, illegal, or unenforceable in any jurisdiction or as to any person or entity or Award, or would disqualify the Plan or any Award under any law deemed applicable by the Committee, such provision shall be construed or deemed amended to conform to the applicable laws, or if it cannot be construed or deemed amended without, in the determination of the Committee, materially altering the intent of the Plan or the Award, such provision shall be construed or deemed stricken as to such jurisdiction, person, or entity or Award and the remainder of the Plan and any such Award shall remain in full force and effect.

(t)  Obligations Binding on Successors.  The obligations of the Company under the Plan shall be binding upon any successor corporation or organization resulting from the merger, consolidation, or other reorganization of the Company, or upon any successor corporation or organization succeeding to all or substantially all of the assets and business of the Company.

(u)  409A of the Code.

(i)  It is intended that the Plan comply with Section 409A of the Code, and all provisions of the Plan shall be construed and interpreted in a manner consistent with the requirements for avoiding taxes or penalties under Section 409A of the Code.  Each Participant is solely responsible and liable for the satisfaction of all taxes and penalties that may be imposed on or in respect of such Participant in connection with the Plan or any other plan maintained by the Company, including any taxes and penalties under Section 409A of the Code, and neither the Company nor any Affiliate shall have any obligation to indemnify or otherwise hold such Participant or any beneficiary harmless from any or all of such taxes or penalties.  With respect to any Award that is considered "deferred compensation" subject to Section 409A of the Code, references in the Plan to "termination of employment" (and substantially similar phrases) shall mean "separation from service" within the meaning of Section 409A of the Code.  For purposes of Section 409A of the Code, each of the payments that may be made in respect of any Award granted under the Plan is designated as a separate payment.

(ii)  Notwithstanding anything in the Plan to the contrary, if the Participant is a "specified employee" within the meaning of Section 409A(a)(2)(B)(i) of the Code, no

payments or deliveries in respect of any Awards that are "deferred compensation" subject to Section 409A of the Code shall be made to such Participant on account of such Participant's "separation from service" within the meaning of Section 409A of the Code prior to the date that is six months after the date of such "separation from service" or, if earlier, the Participant's date of death. All such delayed payments or deliveries will be paid or delivered (without interest) in a single lump sum on the earliest date permitted under Section 409A of the Code that is also a business day.

(iii)    In the event that the timing of payments in respect of any Award that would otherwise be considered "deferred compensation" subject to Section 409A of the Code would be accelerated upon the occurrence of (A) a Change in Control, no such acceleration shall be permitted unless the event giving rise to the Change in Control satisfies the definition of a change in the ownership or effective control of a corporation, or a change in the ownership of a substantial portion of the assets of a corporation pursuant to Section 409A of the Code or (B) a Disability, no such acceleration shall be permitted unless the Disability also satisfies the definition of "Disability" pursuant to Section 409A of the Code.

(v) Clawback/Forfeiture. Notwithstanding anything to the contrary contained herein, the Committee may provide in an Award Agreement that (i) clawback, forfeiture, or similar provisions shall apply if the Participant engages in activity that is in conflict with or adverse to the interests of the Company or any of its Affiliates at any time, or during a specified time period, including fraud or conduct contributing to any financial restatements or irregularities, or if the Participant violates a noncompete, nonsolicit, nondisclosure, or nondisparagement covenant or agreement with the Company or any of its Affiliates, or if the Participant violates any other policy, procedure, or rule applicable to Participant in a manner that adversely affects or could reasonably be expected to adversely affect the business or reputation of the Company or any of its Affiliates, or if the Participant's employment or service is terminated for "cause" (as such term is defined in the sole discretion of the Committee, or as set forth in a written agreement relating to such Award between the Company and the Participant); (ii) in the case of an event described in the preceding clause (i), the Participant will forfeit any compensation, gain or other value realized thereafter on the vesting, exercise or settlement of such Award, the sale or other transfer of such Award, or the sale of Common Shares acquired in respect of such Award, and must promptly repay such amounts to the Company, and all Awards held by such Participant shall terminate; and/or (iii) if the Participant receives any amount in excess of what the Participant should have received under the terms of the Award for any reason (including without limitation by reason of a financial restatement, mistake in calculations, or other administrative error), all as determined by the Committee, then the Participant shall be required to promptly repay any such excess amount to the Company. In addition, the Company shall retain the right to bring an action at equity or law to enjoin the Participant's activity and recover damages resulting from such activity. Further, to the extent required by applicable law (including, without limitation, Section 304 of the Sarbanes-Oxley Act and Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act) and/or the rules and regulations of NYSE or any other national securities exchange on which the Common Shares are listed or quoted, or if so required pursuant to a written policy adopted by the Company, Awards shall be subject (including on a retroactive basis) to clawback, forfeiture, or similar requirements (and such

requirements shall be deemed incorporated by reference into all outstanding Award Agreements).

(w)     No Representations or Covenants With Respect to Tax Qualification.  Although the Company may endeavor to (i) qualify an Award for favorable U.S. or non-U.S. tax treatment or (ii) avoid adverse tax treatment, the Company makes no representation to that effect and expressly disavows any covenant to maintain favorable or avoid unfavorable tax treatment.  The Company shall be unconstrained in its corporate activities without regard to the potential negative tax impact on holders of Awards under the Plan.

(x)     Code Section 162(m) Reapproval.  If so determined by the Committee, the provisions of the Plan regarding Performance Compensation Awards shall be submitted for reapproval by the shareholders of the Company no later than the first shareholder meeting that occurs in the fifth year following the year in which shareholders previously approved such provisions following the date of initial shareholder approval, for purposes of exempting certain Awards granted after such time from the deduction limitations of Section 162(m) of the Code. Nothing in this subsection, however, shall affect the validity of Awards granted after such time if such shareholder approval has not been obtained.

(y)     No Interference.  The existence of the Plan, any Award Agreement, and the Awards granted hereunder shall not affect or restrict in any way the right or power of the Company, the Board, the Committee, or the shareholders of the Company to make or authorize any adjustment, recapitalization, reorganization, or other change in the Company's capital structure or its business, any merger or consolidation of the Company, any issue of stock or of options, warrants, or rights to purchase stock or of bonds, debentures, or preferred or prior preference stocks whose rights are superior to or affect the Common Shares or the rights thereof or that are convertible into or exchangeable for Common Shares, or the dissolution or liquidation of the Company or any Affiliate, or any sale or transfer of all or any part of their assets or business, or any other corporate act or proceeding, whether of a similar character or otherwise.

(z)     Expenses; Titles and Headings.  The expenses of administering the Plan shall be borne by the Company and its Affiliates.  The titles and headings of the sections in the Plan are for convenience of reference only, and in the event of any conflict, the text of the Plan, rather than such titles or headings shall control.

*     *     *

As adopted by the Board of Directors of the Company on August 11, 2015.

As approved by the shareholders of the Company on [_____], 2015.

# Exhibit C

PERFORMANCE
S P O R T S   G R O U P

January 11, 2017

Rocco Covella
10536 Woodbridge Street
Toluca Lake, CA  91602

Dear Rocco:

As you know, Performance Sports Group Ltd. ("PSG") is currently engaged in discussions regarding the purchase of substantially all of PSG's assets (the "Transaction"). We are pleased to inform you that PSG is prepared to offer you a retention incentive bonus under the Key Employee Retention Plan ("KERP") as described below, subject to the following conditions:  the successful closing of the Transaction, and your continued employment in good standing until the closing of the Transaction and the payout date (unless earlier terminated without cause).

**KERP Incentive Bonus**
Subject to the conditions referenced above as a part of the Company's KERP, and your ongoing employment with PSG, or its affiliates, you will be eligible to receive a one-time Key Employee Retention Plan Incentive Bonus (the "Bonus") in the amount of $48,036 USD, less applicable withholdings.  This Bonus will be paid out as soon as administratively possible following the closing of the Transaction and will be paid in your local currency.  You must be employed at the time of the payout in order to receive payment, unless earlier terminated without cause.

Under the terms of the KERP approved by the courts, payments received under the KERP will be in lieu of any payments you may have been entitled to receive under previous retention programs offered by the Company prior to commencement of their Chapter 11 and CCAA proceedings.

This letter is not intended as an employment contract or guarantee of continued employment of any kind. Please sign and return a copy of this letter to me and retain a copy for your records.

Thank you for your commitment to the business during the Bankruptcy process and your continued contributions going forward.

Sincerely,

Angela Bass
Executive Vice President, Global Human Resources
Performance Sports Group Ltd.

I have carefully read the foregoing, understand its contents, and acknowledge that the foregoing does not constitute an employment contract or a guarantee of continued employment.  I understand that the content of this letter (including the Key Employee Retention Incentive Bonus) is confidential and agree to keep this letter in strictest confidence and not to share it or its contents with any party without PSG's written consent.

_____          2/1/17
Rocco Covella                                              DATE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
|  | ) Case No. 16-12373 (KJC) |
|  | ) |
| OLD BPSUSH INC., *et al.,*[1] | ) Jointly Administered |
|  | ) |
| Debtors. | ) |

## ORDER OVERRULING LIQUIDATION TRUSTEE'S
## FIRST OMNIBUS OBJECTION TO CLAIM NO. 483

Upon the *Response of Rocco Covella to Liquidation Trustee's Omnibus Objection to Claim No. 483* (the "Response")[2] seeking entry of an order (this "Order") allowing modified Claim No. 483 pursuant to section 502(b) of the Bankruptcy Code and Rule 3007 of the Bankruptcy Rules; and it appearing that the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and it appearing that this proceeding is a core proceeding pursuant to 28 U.S.C. § 157 and the Court may enter a final order hereon consistent with Article III of the U.S. Constitution; and it appearing that venue of this proceeding is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; and adequate notice of the Response and opportunity for reply having been given; and it appearing that

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Old BPSUSH Inc. (f/k/a BPS US Holdings Inc.) (8341); Old BH Inc. (f/k/a Bauer Hockey, Inc.) (3094); Old EBS Inc. (f/k/a Easton Baseball / Softball Inc.) (5670); Old BHR Inc. (f/k/a Bauer Hockey Retail Inc.) (6663); Old BPSU Inc. (f/k/a Bauer Performance Sports Uniforms Inc.) (1095); Old PLG Inc. (f/k/a Performance Lacrosse Group Inc.) (4200); Old BPSCI Inc. (f/k/a BPS Diamond Sports Inc.) (5909); Old PSGI Inc. (f/k/a PSG Innovation Inc.) (9408); Old BHR Wind-down Corp. (f/k/a Bauer Hockey Retail Corp.) (1899); Old EBS Wind-down Corp. (f/k/a Easton Baseball / Softball Corp.) (4068); Old PSGI Wind-down Corp. (f/k/a PSG Innovation Corp.) (2165); Old BPSDS Wind-down Corp. (f/k/a BPS Diamond Sports Corp.) (8049); Old BPSU Wind-down Corp. (f/k/a Bauer Performance Sports Uniforms Corp.) (2203); Old PLG Wind-down Corp. (f/k/a Performance Lacrosse Group Corp.) (1249); and Old PSG Wind-down Ltd. (1514) (f/k/a Performance Sports Group Ltd., and also representing the estates of the Debtors formerly known as KBAU Holdings Canada, Inc., Bauer Hockey Corp., and BPS Canada Intermediate Corp., respectively). The Debtors' mailing address is 666 Burrard Street, Suite 1700, Vancouver, British Columbia, Canada, V6C 2X8.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Response.

no other notice need be given; and the Court having considered the Response and its Exhibits A,

B and C, and any responses thereto; and the Court having determined that there exists just cause

for the relief granted herein; and upon the record herein; and after due deliberation and sufficient

cause appearing therefor, it is HEREBY ORDERED:.

1.      The Liquidation Trustee's Objection is overruled with regards to Claim No. 483;

2.      Claim No. 483 is modified: the claimed amount of $144,108 is reduced by

$48,036.  As a result of this adjustment, Claim No. 483 is now for $96,072.

3.      The Liquidation Trustee is hereby ordered to pay out Claim no. 483 in the amount

of $96,072.

4.      The terms and conditions of this Order shall be immediately effective and

enforceable, and the time to appeal this Order shall commence upon its entry. All time periods set

forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

5.      The Court shall retain jurisdiction with respect to all matters related to or arising

from the Objection or the implementation of this Order.


Dated: _____ 2018
Wilmington, Delaware

                            By:_____
                                Kevin J. Carey
                                United States Bankruptcy Judge