## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| OLD BPSUSH INC., *et al.,*[1] | ) | Case No. 16-12373 (KJC) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Ref. Docket Nos. 1635, 1670, 1671 & 1672** |

## LIQUIDATION TRUSTEE'S REPLY IN SUPPORT OF FIRST OMNIBUS OBJECTION TO CERTAIN CLAIMS (SUBSTANTIVE), RELATING TO CLAIM NUMBERS 203, 483 AND 620 OF SAMUEL E. GASOWSKI, ROCCO COVELLA AND SANDY SEPULVEDA-AYERS

Theseus Strategy Group LLC, the liquidation trustee (the "Liquidation Trustee") in the

chapter 11 cases of the above-captioned affiliated debtors (each a "Debtor," and collectively, the

"Debtors"), by and through its undersigned counsel, hereby submits this reply (this "Reply") to

the responses [Docket Nos. 1670, 1671 & 1672] (each a "Response" and, collectively, the

"Responses") to the *Liquidation Trustee's First Omnibus Objection to Certain Claims*

*(Substantive)* [Docket No. 1635] (the "Omnibus Objection")[2] filed on February 6, 2018 by certain

of the Debtors' former employees (collectively, the "Claimants"). In support of the Omnibus

Objection and this Reply, the Liquidation Trustee incorporates by reference the *Declaration of*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Old BPSUSH Inc. (f/k/a BPS US Holdings Inc.) (8341); Old BH Inc. (f/k/a Bauer Hockey, Inc.) (3094); Old EBS Inc. (f/k/a Easton Baseball / Softball Inc.) (5670); Old BHR Inc. (f/k/a Bauer Hockey Retail Inc.) (6663); Old BPSU Inc. (f/k/a Bauer Performance Sports Uniforms Inc.) (1095); Old PLG Inc. (f/k/a Performance Lacrosse Group Inc.) (4200); Old BPSCI Inc. (f/k/a BPS Diamond Sports Inc.) (5909); Old PSGI Inc. (f/k/a PSG Innovation Inc.) (9408); Old BHR Wind-down Corp. (f/k/a Bauer Hockey Retail Corp.) (1899); Old EBS Wind-down Corp. (f/k/a Easton Baseball / Softball Corp.) (4068); Old PSGI Wind-down Corp. (f/k/a PSG Innovation Corp.) (2165); Old BPSDS Wind-down Corp. (f/k/a BPS Diamond Sports Corp.) (8049); Old BPSU Wind-down Corp. (f/k/a Bauer Performance Sports Uniforms Corp.) (2203); Old PLG Wind-down Corp. (f/k/a Performance Lacrosse Group Corp.) (1249); and Old PSG Wind-down Ltd. (1514) (f/k/a Performance Sports Group Ltd., and also representing the estates of the Debtors formerly known as KBAU Holdings Canada, Inc., Bauer Hockey Corp., and BPS Canada Intermediate Corp., respectively). The Debtors' mailing address is 666 Burrard Street, Suite 1700, Vancouver, British Columbia, Canada, V6C 2X8.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Omnibus Objection.

*Jay Herriman in Support of the Liquidation Trustee's First Omnibus Objection to Certain Claims (Substantive)* as attached to the Omnibus Objection, and further respectfully represents as follows:

**PRELIMINARY STATEMENT**[3]

1.      The Debtors determined that the implementation of separate key-employee incentive and retention programs were essential to ensure an orderly, value-maximizing sale process that would benefit all of their stakeholders in these Chapter 11 Cases.  Accordingly, after securing critical first-day relief and approval of bidding procedures to govern their then-ongoing sale process, the Debtors worked in close consultation with their professional advisors and both Committees to finalize the KEIP and KERP that were ultimately approved by the Court.  The KERP, which is at issue here, expressly superseded the Debtors' Prepetition Retention Program, under which certain employees were eligible to receive a bonus under specified conditions if they remained employed by the Debtors through June of 2018.

2.      The Debtors implemented the KERP at a time when there was tremendous uncertainty in these Chapter 11 Cases regarding creditor recoveries and the KERP was viewed as an important employee retention initiative that provided a certain administrative claim payment to eligible employees in lieu of an uncertain, prepetition claim.  The KERP was implemented prior to the Debtors' general and governmental bar dates of February 6, 2017 and May 1, 2017, respectively, prior to the closing of their sale effective February 27, 2017 and the related determination of what contracts and leases would be rejected by the ultimate purchaser resulting in rejection damage claims, and prior to the negotiation, compromise and global settlement with both Committees of disputes over purchase price allocation that ultimately allowed for general unsecured claims to be paid in full.  Indeed, as noted in the motion to approve the KERP, prior to

---

[3] Capitalized terms used but not defined in this Preliminary Statement shall have the meanings ascribed to them below or in the Omnibus Objection, as applicable.

implementation of the KERP three key employees originally slated for participation, each a participant in the Prepetition Retention Program, resigned to pursue other employment opportunities citing uncertainty and instability in the Debtors' operations as reasons for their departures.

3.     Following the Court's approval of the KERP, the Debtors sent Letter Agreements to eligible employees clearly indicating: (i) the amount of their potential KERP award; (ii) the conditions under which it would become payable; and (iii) that any KERP award would be *in lieu* of any bonus that such employee may have been entitled to under the Prepetition Retention Program.  The three Claimants – one of whom is a highly experienced California-based attorney and the other two of which also are sophisticated and experienced executives – each voluntarily signed and returned their respective Letter Agreement acknowledging the same and received their designated KERP payments in full shortly after their employment was transferred to the Purchaser upon closing of the Sale, as did dozens of other employees who do not seek to invalidate the Letter Agreements signed in connection with the KERP.

4.     Now, after numerous subsequent developments and confirmation of a Plan that allowed general unsecured creditors to be paid in full, the Claimants transparently seek to re-trade their agreements to forego their potential claims under the Prepetition Retention Program in exchange for KERP payments in hopes of extracting further payment from the Debtors' estates. As set forth more fully below, because the Claimants' waivers of their potential claims under the Prepetition Retention Program in exchange for their KERP payments were clearly valid, they cannot now seek to re-trade to the detriment of the Debtors' other stakeholders.  Assuming, *arguendo*, that California law applies as asserted by the Claimants, the release in the Letter Agreements is not invalid for lack of consideration because the Claimants received consideration

by exchanging a general unsecured claim with then unknown value for an administrative priority claim with certain value. Likewise, the amounts that would have come due under the Prepetition Retention Program were not fully earned at the time the Letter Agreements were signed, causing the Claimants' arguments that the KERP releases violated California wage and hour rules to clearly and simply fail. These facts alone show the Claimants' Responses should be overruled, but the Debtors also believe the Responses fail for the alternative reasons set forth below. Accordingly, the Responses should be overruled in their entirety, and the three Claimants' claims for Prepetition Retention Program Payments should be disallowed in their entirety.

## BACKGROUND

### A. General Background

5. General background information concerning the filing of these Chapter 11 Cases, the appointment of the Committees and the Monitor, confirmation of the Plan, and the appointment of the Liquidation Trustee pursuant to the Plan is contained in the Omnibus Objection and is incorporated herein by reference.

### B. The Prepetition Retention Program and the Key Employee Retention Program

6. As explained in the Motion to approve the KERP but repeated herein for the convenience of the Court, prior to the Petition Date the Debtors implemented a two-year retention program geared towards ensuring that select employees remained with the Debtors until June 2018 (generally, the "Prepetition Retention Program"). The Claimants have asserted that certain terms of the Prepetition Retention Program were set forth in the "Performance Sports Group Ltd. Omnibus Equity Incentive Plan" (the "Prepetition Incentive Plan"), a copy of which is attached hereto as **Exhibit A**. The Claimants' specific incentive awards were governed by one-off agreements (the "Individual Award Agreements"). Copies of the Claimants' Individual Award

Agreements are attached hereto as **Exhibits B-1 – B-3**.  The Claimants attached identical copies

of Exhibits A and B-1 through B-3 to their Responses, and the form of these agreements is not in

dispute.

       7.      On December 22, 2016, the Debtors filed their *Motion for Order, Pursuant to*

*Sections 363(b) and 503(c) of the Bankruptcy Code, Approving Debtors' (I) Key Employee*

*Incentive Plan and (II) Key Employee Retention Plan* [Docket No. 402] (the "<u>KERP Motion</u>"),

which the Court granted by order dated January 5, 2017 [Docket No. 497] (the "<u>KERP Order</u>").

       8.      The KERP Motion notes that shortly after the Petition Date, the Debtors lost three

critical employees that were participants in the Prepetition Retention Program, as well as five

other employees.  Accordingly, the Debtors and their advisors determined that it was in the

estates' best interest to convert the Prepetition Retention Program into the key employee retention

plan described below (the "<u>KERP</u>") and expand its reach to include additional individuals who

were also deemed critical to the Debtors' ongoing operations and who presented a retention risk.

       9.      The Court-approved KERP provided for retention payments to sixty of the

Debtors' non-insider employees (collectively, the "<u>KERP Participants</u>").  Forty-one KERP

Participants had been participants in the Prepetition Retention Program, and nineteen previous

non-participants were added to further secure the Debtors' critical workforce during a pivotal

stage of the Bankruptcy Proceedings.  As set forth in the KERP Motion, without the KERP, the

Debtors believed that the KERP Participants were likely to pursue alternative employment,

harming the value of the estates and affecting the implementation of the Sale process.

       10.     The following summarizes certain relevant terms of the KERP, which were also

summarized in the KERP Motion:

**Participation**

The Debtors limited participation in the KERP to sixty employees, forty-one of which had been participants in the Prepetition Retention Program. The KERP Participants represented a cross-section of various functions of the Company, including business development, product/brand management, research and development, design, sales/marketing, finance, human resources, legal, IT, supply chain and operations.

**KERP Payment and Payment Schedule**

KERP payments were equal to 12.5%, 18.75% or 25% of KERP Participants' base salary, depending on the relative importance of each KERP Participant to the Sale process and, more directly, the Company's perceived retention risk assigned to such KERP Participants.

Earned KERP payments were to be paid as soon as administratively possible following the closing of the Sale.

**Termination Provisions**

The KERP payments were earned upon the earlier of termination without cause or the closing of the Stalking Horse Agreement (or alternative Sale transaction by way of asset purchase agreement and/or plan arrangement).

**Miscellaneous Provisions**

Upon accepting participation in the KERP, KERP Participants became ineligible to receive any payments under the Prepetition Retention Program to the extent they were previously eligible to do so.

11. Upon obtaining Court approval of the KERP, the Debtors sent each KERP Participant a letter agreement (each a "Letter Agreement" and, collectively, the "Letter Agreements") that clearly indicated: (i) the amount of the KERP Participant's potential KERP award; (ii) the conditions under which it would become payable; and (iii) that the KERP award replaced any award that the KERP Participant may have been entitled to under the Prepetition Retention Program. Each of the Claimants voluntarily signed and returned a copy of their respective Letter Agreement accepting the terms and conditions of the KERP, which are attached

01:22841396.5

hereto as **Exhibit C**. The Claimants attached identical copies of these Letter Agreements to their Responses, and the form of these agreements is not in dispute. Mr. Gasowski and Ms. Sepulveda-Ayers each separately signed and dated their Letter Agreements on January 24, 2017. Mr. Covella signed and dated his Letter Agreement on February 1, 2017. In addition to each being executed before this Court's approval of the sale of substantially all of the Debtors' assets, as discussed below, the Letter Agreements were executed prior to the Debtors' general and governmental bar dates of February 6, 2017 and May 1, 2017, respectively, prior to the closing of the Sale (defined below) effective February 27, 2017 and the related determination of what contracts and leases would be rejected by the ultimate purchaser resulting in rejection damage claims, and prior to the negotiation, compromise and global settlement with both Committees of disputes over purchase price allocation that ultimately allowed for general unsecured claims to be paid in full.

C.     **The Sale**

12.     On February 6, 2017, the Court held a hearing and, at the conclusion thereof, entered an order [Docket No. 770] approving the sale of substantially all of the Debtors' assets to Peak Achievement Athletics Inc. (f/k/a 9938982 Canada Inc.) (the "Purchaser") for $575 million, plus the assumption of the Debtors' ordinary course trade liabilities (the "Sale"). The effective date of the Sale closing was February 27, 2017 (the "Closing Effective Date").

13.     Shortly after the closing of the Sale, the Debtors paid each Claimant their respective KERP bonus in full. The Claimants do not dispute timely receipt of these payments.

D.     **The Omnibus Objection and the Claimants' Responses**

14.     On January 22, 2018, the Liquidation Trustee filed the Omnibus Objection, asserting that the Claimants' proofs of claim for amounts allegedly owed under the Prepetition

Retention Program should be disallowed because the Claimants signed the Letter Agreements, expressly waiving their rights under the Prepetition Retention Program, and by subsequently receiving payment of their awards under the KERP.

15.     On February 6, 2018, the Claimants filed their Responses.  Aside from certain Claimant-specific factual information (such as the amount of the award), the Responses are identical and were filed *pro se*, although Mr. Gasowski is an experienced attorney licensed in the state of California.[4]  The Responses do not dispute that the Letter Agreements contemplated the waiver of claims under the Prepetition Retention Program, nor do they dispute signing the Letter Agreements or receiving the KERP payments contemplated by the Letter Agreements.  Rather, the Responses contend (incorrectly) that the release in the Letter Agreements signed as a condition to receiving the KERP payment is unenforceable for a lack of consideration and because it was implemented in violation of California wage and hour rules – even going so far as to accuse the Debtors of having committed a misdemeanor crime by offering KERP payments contingent on the release of any prepetition retention claims.

## REPLY

16.     The Claimants each knowingly and voluntarily waived contingent, prepetition general unsecured claims of uncertain actual value under the Prepetition Retention Program in exchange for the right to participate in the KERP, which provided an attainable bonus target and the potential for a claim of certain value entitled to prompt payment as an administrative expense of the Debtors' estates.  It cannot be reasonably argued that legally-sufficient consideration was lacking for this exchange and, therefore, the KERP is enforceable and the Claimants' proofs of claim must be disallowed.  Likewise, the Claimants' assertion that the KERP violated California

---

[4] Ms. Sepulveda-Ayers, by contrast, is a human resources professional whose LinkedIn page indicates she is currently the Vice President of Human Resources for the entity that purchased the Debtor's assets.  Mr. Covella's LinkedIn page indicates he is a Senior Director of Global Planning and Customer Service for the new company.

wage and hour rules (and indeed, was a *criminal act*) is likewise incorrect as a matter of law and

fact and so should also be rejected. Accordingly, assuming that California law governs as argued

by the Claimants, the Responses should be overruled in their entirety as a matter of California

law. Alternatively, the Responses should also be overruled for the reasons set forth below.

**A.      The Claimants' Waiver of Their Rights Under the Prepetition Retention Program to Receive a KERP Payment Was Valid and Given For Consideration**

17.      As described in the KERP Motion and clearly explained in the Letter Agreements,

payments under the KERP were *in lieu* of any payments that the Claimants may have been

entitled to under the Prepetition Retention Agreement. The Claimants' waiver of any such rights

under the Prepetition Retention Agreement in exchange for participation in the KERP was valid

and supported by legally-sufficient consideration.

18.      It is hornbook law (of which Mr. Gasowski is surely aware) that a "mere

peppercorn" suffices as consideration. *See* Restatement (Second) of Contracts § 71 (1981)

(stating that all that is required for consideration is a bargained-for exchange); *Id.* § 79 cmt. C

("[C]ourts do not inquire into the adequacy of consideration."); *First Mortgage Co. of Pa. v. Fed.*

*Leasing Corp.,* 456 A.2d 794, 797 (Del.1982) (holding that incurring a legal detriment "in and of

itself constitutes sufficient consideration"); *Taylor v. Taylor,* 66 Cal. App. 2d 390, 398, 152 P.2d

480, 484 (1944) ("Any valid though slight consideration will support the most onerous

obligation"); *Brawley v. Crosby Research Found.,* 73 Cal. App. 2d 103, 112, 166 P.2d 392 (1946)

("The law does not weigh the amount of the consideration in determining whether it constitutes

good consideration for a contract.").[5] Here, the Claimants received much more than a "mere

---

[5] In fact, under California law, the Claimants' release of their contingent rights may have been valid even assuming there was no consideration. *See Newman v. Albert*, 170 Cal. App. 2d 678, 683 (1959) ("Appellant contends that there was no consideration for the waiver . . . [h]owever, the document was in writing and was a release of future interest which does not require a new consideration." (*citing* Cal.Civ.Code, § 1541 – "An obligation is extinguished by a

peppercorn" in exchange for waiving their contingent rights under the Prepetition Retention Program and the Debtors incurred a legal detriment, negotiated and agreed to by the Debtors' lenders and official committees, in the form of a potential noncontingent payment to the Claimants as an administrative expense claim through the KERP.

19.     At the time the Claimants signed their Letter Agreements, the bonus target under the Prepetition Retention Program was still contingent and was no longer appropriately tailored to maximize the Debtors' Sale process.  Moreover, even if the Prepetition Retention Program bonuses had been earned, they were of questionable actual value at the time as prepetition general unsecured claims.  Recognizing this, the Debtors developed the KERP to more properly align the KERP Participants with the Company's now-immediate goal of closing the Sale, by providing the KERP Participants with a new, obtainable bonus target that was entitled to administrative expense priority.  By replacing the Prepetition Retention Program with the KERP, the Debtors substituted post-petition administrative priority obligations for pre-petition obligations that would give rise to general unsecured claims of then unknown value, which, at the time, were far from certain to be paid in full.

20.     Indeed, among other things, at the time the three Claimants each executed their respective Letter Agreement, the Debtors still faced significant challenges to the approval and consummation of the Sale, including dozens of formal and informal objections or responses to the Sale, and this Court's own consideration and approval.  In addition, and perhaps more importantly, the Letter Agreements were executed prior to the Debtors' general and governmental bar dates of February 6, 2017 and May 1, 2017, respectively.  In addition to the uncertainty as to what claims would be asserted, the approval of the KERP and the Claimants' acceptance of its

_____

release therefrom given to the debtor by the creditor, upon a new consideration, or in writing, with or without new consideration.").  However, as noted herein, consideration was clearly given.

terms occurred prior to the Purchaser's determination of what contracts and leases would be rejected; had the Sale not been approved or the Purchaser (or another purchaser) opted not to assume the many contracts that were ultimately assumed through the Sale, the Debtors would have been saddled with rejection damage claims that would have diluted creditor recoveries.

21.     Finally, the approval of the KERP and the Claimants' acceptance of its terms occurred months prior to the negotiation, compromise and global settlement with both Committees of disputes over purchase price allocation that ultimately allowed for general unsecured claims to be paid in full. Following the Sale, the Debtors were able to secure confirmation of the Plan only after substantial arms'-length negotiations with numerous parties in interest over the course of months, including the Creditors' Committee, the Equity Committee. Thus, at the time the Letter Agreements were executed, not only had the Sale not been approved by the Court and closed, but the Debtors' claims pool was unknown, and the Committees and Debtors had not yet agreed how the proceeds of the Sale would be allocated among the Debtors – a dispute that could have seen some Debtors' creditors receive less than full payment. As such, at the time, the potential recovery to general unsecured creditors, such as the Claimants under the Prepetition Retention Bonus Program, was unknown.

22.     The Debtors were not required to implement the KERP but did so because they believed it was necessary to stem employee departures and ensure a successful and efficient sale process by ensuring the KERP Participants a certain administrative claim rather than a general unsecured claim of unknown value. Likewise, the Claimants were not required to accept the terms and conditions of the KERP but did so anyway – seemingly abiding by the maxim that "a bird in the hand is worth two in the bush." As such, the substitution of the KERP for the

Prepetition Retention Program was a voluntary, bargained-for exchange between the Debtors and the Claimants that was clearly supported by legally-sufficient consideration.

23.     In support of their argument that they received no consideration for the release granted to obtain their KERP payment, the Claimants also cite section 13 of the Prepetition Incentive Plan, which states in relevant part:

> "In the event that the Participant's employment with the Company or an Affiliate is terminated by the Company or an Affiliate without Cause (other than due to death or Disability) on or within 12 months following a Change in Control, *the Committee may provide that* all Options and SARs held by such Participant shall become immediately exercisable with respect to 100% of the shares subject to such Options and SARs, *and that* the Restricted Period (and any other conditions) shall expire immediately with respect to 100% of the shares of Restricted Stock and Restricted Stock Units and any other Awards held by such Participant (including a waiver of any applicable Performance Goals); <u>provided</u>, that in the event that the vesting or exercisability of any Award would otherwise be subject to the achievement of performance conditions, the portion of such Award that shall become fully vested and immediately exercisable shall be based on the assumed achievement of target performance *as determined by the Committee.*"

(emphasis added).

24.     The Claimants somehow interpret this provision to provide for a *mandatory* acceleration of the vesting period with respect to any bonus or other "Award" under the Prepetition Retention Program in the event of a termination without Cause in connection with a Change of Control.  Clearly it does not.  Rather, this provision merely confirms that the Committee *has discretion* to accelerate the vesting period and/or waive certain conditions with respect to incentive Awards in the event of a Change of Control.  Therefore, this provision in no way supports the Claimants' contention that they became legally entitled to their full retention award upon the closing of the Sale.   Even if it did, however, any Change of Control still did not occur until approximately a month later.  The Claimants attempt to sidestep this fact by arguing that in January 2017 it was a "foregone conclusion" that they would soon become entitled to a "fully-vested" bonus payment under this Change of Control provision.  But this argument fails for

multiple reasons, including the fact the Sale had not yet been approved by this Court and was facing a number of objections, and the fact that the Claimants were still obligated to provide the Debtors another month of work before the Sale closed. And, not surprisingly, the Claimants also cannot point to any language in the Prepetition Incentive Plan or their Individual Award Agreements that obligated the Debtors to do *anything* simply because a change of control was "a foregone conclusion," which, again, it never was.

25.     Finally, the Claimants argue that the KERP "provided [them] no benefit to which [they were] not already entitled to receive under the Prepetition Retention Program." This is also demonstrably false. As of the signing of the Letter Agreements, the Claimants were "entitled" to nothing under the Prepetition Retention Program, as the conditions to payment of their bonuses had not been met. At most, the Claimants had, at that time, a contingent right of uncertain value that, if earned, would have been paid pro-rata with similarly-situated general unsecured claims under the terms of a chapter 11 plan. The Claimants were not entitled to any payment as an administrative expense under the Prepetition Retention Program; at best they may have become entitled to nonpriority general unsecured claims. And at that time, no chapter 11 plan had been proposed and the potential recovery to general unsecured creditors was entirely unknown. By contrast, the KERP bonuses were of a certain value and, once earned, would be entitled to payment in full as an administrative expense shortly after closing of the Sale.

26.     For these reasons, the Claimants' argument that they received no consideration in exchange for their release of claims under the Prepetition Retention Agreement is wrong and should be rejected. Therefore, the KERP is enforceable and precludes the Claimants from seeking any recovery under the Prepetition Retention Program.

**B.     The Claimants Argument That the KERP Violates California Law Must Fail**

27.     The Claimants also contend that the KERP is unenforceable because it violates California wage and hour statutes.  The Claimants' argument is supported by the same misunderstanding and/or mischaracterization of the facts set forth above, as well as a clear misapplication of the law and thus should be rejected as well.

28.     As an initial matter, the Debtors do not concede that California law applies as the Prepetition Incentive Plan and Individual Award Agreements all contain New York choice of law provisions, and the Debtors submit that New York law has no analogous provision.[6] Nevertheless, the Claimants' arguments are without merit even if California law is applied as urged by the Claimants.

29.     According to the Claimants, the Debtors' offering the KERP in lieu of the Prepetition Retention Agreement – which in fact benefitted the Claimants for all the reasons set forth above – was not only impermissible, but was a *criminal act* under California law because the Debtors "required" the Claimants to release claims to "earned wages" that were "indisputably due."  This argument borders - very closely - on the absurd.

---

[6] A federal district court sitting in diversity must apply the choice of law rules of the state in which it sits. *Hionis Int'l Enterprises, Inc. v. Tandy Corp.,* 867 F.Supp. 268, 271 (D.Del.1994) (citing *Day & Zimmermann, Inc. v. Challoner,* 423 U.S. 3, 4, 96 S.Ct. 167, 46 L.Ed.2d 3 (1975).  Under Delaware choice of law rules, express choice of law provisions in contracts are generally given effect, unless the state whose law would otherwise control has a materially greater interest in the subject matter." *See id.; Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc.*, 350 F. Supp. 2d 582, 595 (D. Del. 2004); *Rosenmiller v. Bordes*, 607 A.2d 465, 468 (Del.Ch.1991).  Notwithstanding Claimants' unsuccessful efforts to force this issue into inapplicable California wage and hour rules, as discussed more fully below, the subject matter of this dispute is a basic contract principle (whether the Claimants' agreements to release their contingent rights under the Prepetition Retention Program in exchange for participation in the KERP was invalid for lack of consideration), as to which California has no greater interest than New York.

And, as it relates to sufficiency of consideration, New York and California both apply the same well-understood principles discussed above.  *See Weiner v. McGraw-Hill*, Inc., 57 N.Y.2d 458, 464–65, 443 N.E.2d 441, 445 (1982) ("[T]he value or measurability of the thing forborne or promised is not crucial so long as it is acceptable to the promisee. Thus, courts have not hesitated to find sufficient consideration not only in what is now the proverbial peppercorn, but in 'a horse or a canary, or a tomtit if [the promisee] chose' . . . [and]  [i]n fact, the detriment suffered or the thing promised need be of no benefit to the one who agreed to it.") (internal citations omitted); Cal. Civ. Code § 1605 ("Any benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be suffered, by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor, is a good consideration for a promise.")

30.    First, the Claimants' own assertions make clear the fact that no "earned wages" were owed to the Claimants as of January 2017 when they signed the Letter Agreements waiving their rights under the Prepetition Retention Program.  Citing *Neisdorf v. Levi Strauss & Co.* (2006) 143 Cal.App.4th 509, 522-523, the Claimants contend that, under California law, "[o]nce a bonus has been promised as part of the compensation for service, ***and the employee fulfills the agreed-to conditions***, the promised bonus is considered earned wages that must be paid." (Gasowski, paragraph 42) (emphasis added).  The Claimants continue: "California Courts have consistently characterized bonus and profit sharing plans as constituting an offer of the stated benefits in exchange for the service of an employee, and ***upon the employee's completion of the required services in accordance with the terms of the plan,*** a binding contract is formed under which the employer is obligated to deliver the promised benefits. (Gasowski, paragraph 43) (emphasis added).   Because the Claimants never achieved their bonus targets under the Prepetition Retention Agreement and were not even arguably "terminated" until the effective date of the closing of the Sale in late February, the amounts they assert could not possibly have been "earned wages" as of January 2017.  It follows, then, that no amounts were "indisputably due" to the Claimants under the Prepetition Retention Program at that time.

31.    Moreover, the Claimants do not contend, nor could they, that the Debtors somehow "required" them to sign the Letter Agreements, let alone that they required them to do so as a condition to payment of "earned wages" that were "indisputably due."   Rather, the Claimants voluntarily executed the Letter Agreements, which clearly provided that they were exchanging any rights they may have had under the Prepetition Retention Program for new rights under the KERP.  As set forth above this was a voluntary, bargained-for exchange supported by consideration, principally in the form of an increased certainty and priority of payment.

32.     For these reasons and others, the only California statute cited by Claimants, Labor Code section 206.5, in clearly inapplicable. That section prohibits an employer from *requiring* that an employee execute a release of claims before paying wages that are *indisputably due*. *See Davis v. Farmers Ins. Exch.*, 245 Cal. App. 4th 1302, 1331, 200 Cal. Rptr. 3d 315, 339 (2016), as modified on denial of reh'g (Apr. 21, 2016), review denied (June 29, 2016); *see also Chindarah v. Pick Up Stix, Inc.*, 171 Cal. App. 4th 796, 801, 90 Cal. Rptr. 3d 175, 178–79 (2009) (cited by Claimants) (discussing the legislative history of section 206.5 as intended to remedy a specific issue, whereby individuals, particularly in the building industry in Southern California, were routinely being forced to forego all defenses and execute a broad release of claims as a condition of receiving compensation that they were indisputably owed.).

33.     For the reasons set forth above, the KERP does not violate any California wage and hour rule cited by the Claimants.

**C.      Alternatively, the KERP Release of Prepetition Retention Bonus Program Rights Is Enforceable as a Matter of Federal Bankruptcy Law**

34.     Though the Liquidation Trustee believes that the Court can resolve this matter in its favor under California law, to the extent it does not, the Claimants' releases of their rights under the Prepetition Retention Program should be enforced, and their claims disallowed, as a matter of federal conflict preemption. *See Freightliner Corp. v. Myrick*, 514 U.S. 280, 287, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995) ("We have found implied conflict pre-emption where it is impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."). Courts have often found that federal court orders effectuating a Federal statute such as the Bankruptcy Code supersede contrary state law. *See, e.g., In re Old Carco LLC*, 442 B.R. 196, 213 (S.D.N.Y. 2010) ("*Old Carco*") (concluding that state laws intended to protect

auto-dealer franchisees were preempted because, among other things, they conflicted with the debtors' ability to reject franchise agreements under section 365 of the Bankruptcy Code and deprived the debtors of the benefit of a bankruptcy court order approving the same); *In re Xpedior Inc.*, 354 B.R. 210, 235 (Bankr. N.D. Ill. 2006) *(citing, generally, Brinn v. Tidewater Transp. Dist. Comm'n*, 242 F.3d 227, 233–34 (4th Cir.2001) ("A state statute that thwarts a federal court order enforcing federal rights 'cannot survive the command of the Supremacy Clause.").

      35.     In rejecting the argument that federal conflict preemption did not apply to judicial orders (but only to regulations and statutes), the United States District Court for the Southern District of New York in *Old Carco* found that "the Bankruptcy Code vests the bankruptcy courts with authority to implement the federal statutory scheme and grants them the power to 'issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." *Old Carco*, 442 B.R. at 213 (*citing* 11 U.S.C. § 105(a)). Therefore, the Court reasoned, "[t]he principles of conflict preemption preclude[d] application of [the preempted dealer-protection statutes] to deny the debtor and the purchaser the benefits of [the Rejection Order] . . . which implemented the rather ordinary action of rejection an executory contract, [and] allowed the debtors to maximize value to the creditors, consistent with the goals of bankruptcy law." *Id*. The Court further reasoned that claims brought under the dealer-protection statutes should be precluded because they "amount[ed] to a use of state law to mount a collateral attack on the Bankruptcy Court's Rejection Order." *Id*. at 208. And, of course, the Court has the power to interpret and enforce its own orders. *In re Marcus Hook Development Park, Inc.*, 943 F.2d 261, 266 (3d Cir. 1991) (noting that Bankruptcy Code Section 105 "gives the bankruptcy court the power and the jurisdiction to enforce its valid orders.") (*quoting In re Radco Merchandising Services, Inc.*, 111 B.R. 684, 688-89 (N.D. Ill. 1990)).

36.     Assuming for the sake of argument that section 206.5 of the California Labor Code applies and would invalidate Claimants' releases given in exchange for KERP payments, the Court should find that such provision is preempted because its application would clearly frustrate the policies underlying the Bankruptcy Code and deprive the Debtors estates of the benefits of the KERP Order.  Moreover, like in *Old Carco*, the Court should find that Claimants' attempted use of section 206.5 of the California Labor Code is precluded because it amounts to a collateral attack on this Court's valid KERP Order.

37.     As discussed above, the Debtors sought and ultimately obtained approval of the KERP pursuant to section 363 of the Bankruptcy Code because they determined, in their business judgment, that the substitution of the KERP for the Prepetition Retention Program was necessary to ensure a stable and efficient sale process and was therefore in the best interest of their estates and stakeholders.  The releases of any claims under the Debtors' Prepetition Retention Program was expressly a condition precedent to any bonuses to be paid pursuant to the KERP, which is a common feature of key employee retention programs approved under section 363 in this District. The KERP benefited the Claimants' and the many similarly-situated employees who have not sought to re-trade their Letter Agreements, for the reasons set forth above, and the Debtors' estates generally by helping to maximize estate value consistent with fundamental bankruptcy policy.  If section 206.5 of the California Labor Code is applied in the manner that the Claimants contend it should be, the Debtors' other stakeholders would suffer for the sole benefit of the Claimants, the Debtors' estates would be deprived of the benefits of the KERP Order, and the aforementioned fundamental bankruptcy policies would be frustrated.  For these reasons, a finding of preemption is appropriate.

**D.     Any Mistakes in the KERP Motion Are Irrelevant**

38.     Lastly, the Claimants note that the Debtors' description in the KERP Motion of the amount of the Claimants' potential bonuses under the Prepetition Retention Agreement, expressed as a percentage of their salaries, was inaccurate in that it, in certain instances, misstated (on the low side) the maximum percentage of base salary that an employee was entitled to under the displaced Prepetition Retention Agreements.  While the undersigned counsel (whose firm previously represented the Debtors and filed the KERP Motion) regrets such error in the KERP Motion and apologizes to the Court, they respectfully submit that it is not relevant to this issue. Each of the three Claimants knew the correct information at the time they signed the Letter Agreement– what their annual salary was, what their Prepetition Retention Agreement provided as a potential bonus, and the amount of the KERP bonus they would receive.  Despite this, they chose to exchange their general unsecured claims under the Prepetition Retention Agreements for administrative claims under the KERP that were promptly paid.  The fact that the KERP Motion incorrectly stated the maximum percentage under the displaced Prepetition Retention Agreement is surely regrettable, but in no way impacted the consent given by the Claimants, who knew the correct numbers.

## CONCLUSION

WHEREFORE, the Liquidation Trustee respectfully requests that the Court overrule the Reponses, sustain the Omnibus Objection in its entirety as to the Claimants' claims discussed herein, and grant such other and further relief as the Court deems just and proper.

Dated: February 26, 2018          YOUNG CONAWAY STARGATT & TAYLOR, LLP
       Wilmington, Delaware

                                 /s/ Justin H. Rucki
                                 Pauline K. Morgan (No. 3650)
                                 Sean T. Greecher (No. 4484)
                                 Justin H. Rucki (No. 5304)
                                 Shane M. Reil (No. 6195)
                                 Rodney Square

1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

*Counsel to the Liquidation Trustee*

01:22841396.5