UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | CHAPTER 11 |
| | : | |
| **OLD BPSUSH INC.**, *et al.*,[1] | : | |
| | : | Case No. 16-12373 (KJC) |
| Debtors | : | (RE: D.I. 1843) |
| | : | |

## **OPINION**[2]

Theseus Strategy Group LLC, as trustee (the "Liquidation Trustee") of the Old PSG Wind Down Liquidation Trust (the "Trust") filed a motion pursuant to Bankruptcy Code § 542 (the "Motion") for entry of an order: (i) compelling Richards Kibbe & Orbe LLP ("RKO") and AlixPartners, LLP ("AlixPartners") to turn over certain documents, records, and information related to the investigation conducted by RKO and Alix Partners on behalf of the Debtors' former audit committee (the "Audit Committee"); and (ii) finding that all rights, titles, and interests in any privilege or immunity applicable to the documents, records, and information (collectively, the "Privileges") that remain in effect are controlled exclusively by the Liquidation Trustee.[3] RKO

---

[1] The debtors in these chapter 11 cases are Old BPSUSH Inc. (f/k/a BPS US Holdings Inc.), Old BH Inc. (f/k/a Bauer Hockey, Inc.), Old EBS Inc. (f/k/a Easton Baseball/Softball Inc.), Old BHR Inc. (f/k/a Bauer Hockey Retail Inc.), Old BPSU Inc. (f/k/a Bauer Performance Sports Uniforms Inc.), Old PLG Inc. (f/k/a Performance Lacrosse Group Inc.), Old BPSCI Inc. (f/k/a BPS Diamond Sports Inc.), Old PSGI Inc. (f/k/a PSG Innovation Inc.), Old BHR Wind-down Corp. (f/k/a Bauer Hockey Retail Corp.), Old EBS Wind-down Corp. (f/k/a Easton Baseball/Softball Corp.), Old PSGI Wind-down Corp. (f/k/a PSG Innovation Corp.), Old BPSDS Wind-down Corp. (f/k/a BPS Diamond Sports Corp.), Old BPSU Wind-down Corp. (f/k/a Bauer Performance Sports Uniforms Corp.), Old PLG Wind-down Corp. (f/k/a Performance Lacrosse Group Corp.), and Old PSG Wind-down Ltd. (f/k/a Performance Sports Group Ltd and also representing the estates of the Debtors formerly known as KBAU Holdings Canada, Inc., Bauer Hockey Corp. and BPS Canada Intermediate Corp., respectively) (the "Debtors").

[2] This Court has jurisdiction to decide this Motion pursuant to 28 U.S.C. §§ 157(b)(2), 1334(b). This is a core proceeding as defined in 28 U.S.C. §§ 157(b)(2)(E) and (O).

[3] D.I. 1843.

and AlixPartners object to the relief requested in the Motion, disputing that the Privileges transferred to the Liquidation Trustee, and arguing that RKO, as independent counsel to the Audit Committee, is duty-bound to maintain the confidentiality of any privileged documents.

For the reasons set forth herein, the Motion will be granted, in part, and denied, in part.

## FACTS

The relevant facts generally are not in dispute.

On August 9, 2016, the Audit Committee for Performance Sports Group Ltd engaged RKO as independent counsel in connection with an internal investigation relating to certain issues raised by the Debtors' external auditor, KPMG LLP ("KPMG"), concerning whether the Debtors' senior financial management could be relied upon with respect to financial reporting and certifications (the "Investigation").[4] RKO thereafter retained AlixPartners to provide forensic accounting and consulting services to RKO.

In connection with the Investigation, RKO and AlixPartners (i) collected approximately 4.5 million unique documents; (ii) reviewed approximately 122,000 unique documents; (iii) collected approximately 6.6 terabytes of data; (iv) conducted document collection interviews of at least nine former employees (including the president, CFO, controller, finance director, and internal audit manager); (v) conducted live witness interviews of at least five former employees (including CFO, controller, finance director, and internal audit manager); (vi) performed various

---

[4] Debtor Performance Sports Group Ltd ("PSG" or the "Company") was a designer, developer and manufacturer of sports-related equipment and related apparel. It was incorporated under British Columbia Business Corporations Act on December 2, 2010. From June 25, 2014 to November 18, 2016, its common shares were listed on the New York Stock Exchange ("NYSE"), as well as the Toronto Stock Exchange. Pursuant to Section 10A(m) of the Securities Exchange Act, as amended by the Section 301 of the Sarbanes-Oxley Act of 2002 and Exchange Act Rule 10A-3, the Company, as an issuer on the NYSE, was required to appoint an audit committee of independent directors that, among other things, "shall have the authority to engage independent counsel and other advisers, as it determines necessary to carry out its duties." Sec. Exch. Act of 1934 §10A(m)(5), 15 U.S.C. §78j-1(m)(5).

2

analytics (including general ledger analytics, transaction sampling, and testing); and (vii) engaged in regular communication with the Audit Committee related to the investigation (collectively, the "Investigation Records").

On October 31, 2016, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Each of the Debtors also filed for protection from their creditors under Canada's *Companies' Creditors Arrangement Act* ("CCAA") in the Ontario Superior Court of Justice (Commercial List). According to the Debtors, a significant cause of the bankruptcy filing was their inability to file timely the fiscal year 2016 annual report and audited financial statements, which ultimately resulted in a default under the Debtors' secured debt facilities.[5] In May 2016, certain of the Debtors' shareholders commenced a class action securities law suit against the Debtors alleging, among other things, that the Debtors made false or misleading statements and engaged in accounting manipulations.[6]

After approximately seven months of conducting the Investigation, in March 2017, RKO and AlixPartners made a presentation to the Audit Committee and the Securities Exchange Commission (the "SEC"). The Debtors paid approximately $6.3 million to RKO and AlixPartners for work performed in connection with the Investigation.

On December 20, 2017, this Court entered its *Findings of Fact, Conclusions of Law, and Order Confirming First Amended Joint Chapter 11 Plan of Liquidation of Old BPSUSH Inc. and Its Affiliated Debtors* (D.I. 1566) (the "Confirmation Order"), confirmed the *First Amended Joint Chapter 11 Plan of Liquidation of Old BPSUSH Inc. and Its Affiliated Debtors* (D.I. 1473) (the

---

[5] Declaration of Brian J. Fox in Support of Debtors' Chapter 11 Petitions and First-Day Motions, dated October 31, 2016, ¶¶ 8-9 (D.I. 15).

[6] *Id.* at ¶ 8.

3

"Plan"), and approved the formation of the Trust and the Old PSG Wind Down Liquidation Trust Agreement (D.I. 1532) (the "Liquidation Trust Agreement").

On December 21, 2017 (the "Effective Date"), the Trust was established and all of the Debtors' assets (including the Debtors' "Retained Causes of Action") were vested jointly in the Reorganized Debtors and the Liquidation Trust.[7] The Liquidation Trustee was appointed Litigation Representative for both the Reorganized Debtors and the Liquidation Trust.[8] On the Effective Date, all then-current members of the Debtors' Board were deemed to have resigned and were replaced by the new Board of Directors.[9] Former members of the Audit Committee had already resigned in March and August of 2017.

The Plan defined the "Retained Causes of Action" to include all of the Debtors' causes of action as of the Effective Date of the Plan, including, but not limited to, "any and all causes of action against any party relating to or arising from the Debtors' failure to file their Annual Report for the fiscal year ended May 31, 2016 or alleged irregularities in the Debtors' sales practices."[10]

After the Effective Date, the Liquidation Trustee requested access to RKO/AlixPartners' Investigation Records. RKO claims it has provided the Liquidation Trustee with "all non-privileged factual information" requested by the Liquidation Trustee, and that the remaining materials sought by the Trustee are subject to the work product privilege.[11]

The Liquidation Trustee argues that the Privileges automatically vested jointly in the Reorganized Debtors and the Liquidation Trust on the Effective Date, and the Liquidation Trustee, in its capacity as Litigation Representative, was vested with exclusive powers and authority to

---

[7] Confirm. Order ¶18, Plan Art. V.B.3.a.; and Liquidation Trust Agr. § 1.3.
[8] Confirm. Order ¶ 17; Plan, Art. V.E.2 and 12; and Liquidation Trust Agr. § 4.1.
[9] Plan Art. V.D.
[10] Plan Art. I.A.164.
[11] RKO letter brief (D.I. 1864).

assert or waive any such Privileges.[12] In response, RKO argues that the Audit Committee was organized as an independent body, created and governed by a separate charter, with the right and power to engage independent counsel with separate attorney-client privileges and other protections, and, therefore, the Privileges did not transfer to the Liquidation Trustee upon confirmation.

## DISCUSSION

(1) <u>The Liquidating Trustee can pursue this action under Bankruptcy Code § 542</u>

The Liquidating Trustee argues that RKO should turnover the Investigation Records pursuant to Bankruptcy Code § 542(e), which provides that "[s]ubject to any applicable privilege, after notice and a hearing, the court may order an attorney, accountant, or other person that holds recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs, to turn over or disclose such recorded information to the trustee."[13] RKO argues that the Liquidation Trustee may not seek relief under Bankruptcy Code § 542 post-confirmation.

Bankruptcy Code § 1123(b)(3) provides that a plan may provide for "(A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or (B) the retention and enforcement by the debtor, by the trustee or *by a representative of the estate appointed for such*

---

[12] Paragraph 21 of the Confirmation Order provides:
On the Effective Date, all of the Debtors' respective rights, titles and interests in any Privileges in respect of any Retained Causes of Action shall automatically vest jointly in the Liquidation Trust and the Reorganized Debtors pursuant to and in accordance with the Plan, and the Liquidation Trustee, as trustee for the Liquidation Trust and in its capacity as the Litigation Representative for the Reorganized Parent Debtors, shall have the sole power and authority to assert or waive such Privileges (subject only to the consent of the Liquidation Trust Advisory Board to the extent required under Section 3.5(b) of the Liquidation Trust Agreement) as further provided in the Plan and the Liquidation Trust Agreement.
[13] 11 U.S.C. § 542(e).

*purpose,* of any such claim or interest."[14] Here, the Plan provides for the retention of § 542 claims as part of the Retained Causes of Action,[15] and the Plan and Confirmation Order provide that all Retained Causes of Action vested jointly in the Reorganized Debtors and the Liquidation Trust as of the Effective Date.[16] The Plan further provides that:

> [F]rom and after the Effective Date, the Liquidation Trustee, as the Litigation Representative on behalf of the Liquidation Trust and the Reorganized Debtors, shall have the right to institute, prosecute, abandon, settle, compromise, or otherwise liquidate any Retained Causes of Action, in accordance with the terms of this Plan and/or Liquidation Trust Agreement, as applicable, and without further order of the Bankruptcy Court, in any court or other tribunal . . . .[17]

When, as in this case, section 542 claims are expressly preserved in a confirmed plan, such claims may be pursued post-confirmation by the estate representative appointed for such purpose.[18]

(2) The Liquidation Trustee is the successor to the Privileges of the former Audit Committee

RKO asserts that it has cooperated as fully as possible with the Liquidation Trustee's turnover request by providing the Liquidation Trustee with all of the non-privileged factual information that RKO and AlixPartners uncovered in their investigation on behalf of the Audit Committee. The Liquidation Trustee, however, claims that confirmation of the Plan vested him with the authority to control all Privileges of the Audit Committee and, therefore, he asks that the entire Investigation Record - - including privileged documents - - be turned over. The transcript of the confirmation hearing shows that the parties discussed this issue as follows:

> Paragraph 21 [of the proposed confirmation order] currently provides that all of the debtors' respective rights, titles, and interests in any Privileges, related

---

[14] 11 U.S.C. § 1123(b)(3) (emphasis added).

[15] The Plan defines "Avoidance Actions" as "any avoidance or equitable subordination or recovery action under sections . . . 542 through 551 . . . of the Bankruptcy Code." (Plan, Art. I.A.7.) Avoidance Actions, in turn, are included in the definition of "Causes of Action." (Plan, Art. I.A.27). And Causes of Action are included in the definition of "Retained Causes of Action." (Plan, Art. I.A.164).

[16] Plan, Art. X.E.; Confirm. Order, ¶ 18.

[17] Plan, Art. X.E.1.

[18] *Int'l Asset Recovery Corp. v. Thomson McKinnon Sec., Inc.*, 335 B.R. 520, 525 (S.D.N.Y. 2005) (citing *In re Ice Cream Liquidation*, 319 B.R. 324, 333 (Bankr. D. Conn. 2005).

6

to the retained causes of action . . . are being vested in the liquidation trust and the reorganized debtor - - debtors.

The equity committee requested language, additional language in the confirmation order that, for avoidance of doubt, would expressly include both the board's - - the debtors' board of directors and audit committee rights in any Privileges and we had a discussion about that.

Your Honor, the word "Privileges" is a defined term in the plan; it's in Section 5(e)(11) of the plan and it means, any privilege or immunity of the, emphasis, debtors' estates. It's confined to the debtors' estates.

So the plan language is clear that the debtors are transferring all the privileges that the debtors have the ability to transfer; conversely, the debtors obviously cannot transfer privileges that belong to other - - director, committee, or otherwise.

So, you know, we convinced the equity committee that it was appropriate to leave to another day, any issues that might arise, if at all, with respect to issues of what was or was not vested in the trust. But it is quite clear and we state quite clearly on the record that the debtors are transferring any privileges that the debtors' estates have at this point in time. And we ultimately concluded that we didn't need to tinker with the language, but wanted to reflect that discourse on the record.[19]

The parties left this issue open for another day, and it appears that day has arrived.

In *Commodity Futures Trading Commission v. Weintraub*, the United States Supreme Court held that the "trustee of a corporation in bankruptcy has the power to waive the corporation's attorney-client privilege with respect to prebankruptcy communications."[20] The Supreme Court recognized that "a corporation must act through its agents," and "for solvent corporations, the power to waive the corporate attorney-client privilege rests with the corporation's management and is normally exercised by its officers and directors."[21] "The managers, of course, must exercise the privilege in a manner consistent with their fiduciary duty to act in the best interests of the corporation and not of themselves as individuals."[22]

---

[19] Tr. 12/20/2017 at 14:11 – 15:13 (D.I. 1591).
[20] *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 358, 105 S. Ct. 1986, 85 L.Ed.2d 372 (1985).
[21] *Id.* at 348.
[22] *Id.* at 349.

The *Weintraub* Court also noted (and the parties agreed) that "when control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well." Once a bankruptcy case is filed, "[t]he actor whose duties most closely resemble those of management should control the privilege in bankruptcy, unless such a result interferes with policies underlying the bankruptcy laws."[23] Postpetition, "[t]he powers and duties of a bankruptcy trustee are extensive," while, "[i]n contrast, the powers of the debtor's directors are severely limited."[24] The Court determined that the trustee's control of the corporate debtor's attorney-client privilege would be consistent with the policies of the bankruptcy laws, noting:

> In seeking to maximize the value of the estate, the trustee must investigate the conduct of prior management to uncover and assert causes of action against the debtors' officers and directors. It would be extremely difficult to conduct this inquiry if the former management were allowed to control the corporation's attorney-client privilege and therefore to control access to the corporation's legal files. To the extent that management had wrongfully diverted or appropriated corporate assets, it could use the privilege as a shield against the trustee's efforts to identify those assets. The Code's goal of uncovering insider fraud would be substantially defeated if the debtor's directors were to retain the one management power that might effectively thwart an investigation into their own conduct.[25]

RKO distinguishes the present situation - - involving an independent Audit Committee - - from the facts in *Weintraub*. RKO notes that the Debtors' board of directors granted certain powers to the Audit Committee, including the authority to engage independent counsel, and, therefore, asserts that the Debtor, PSG, was never RKO's client. RKO relies on *BCE West, L.P.*, a decision by the United States District Court for the Southern District of New York (the "SDNY Court"), which observed that "[i]t is counterintuitive to think that while the Board permitted the Special Committee to retain its own counsel, the Special Committee would not have the benefit of the

---

[23] *Id.* at 351-52.
[24] *Id.* at 352.
[25] *Weintraub*, 471 U.S. at 353-54 (citations omitted).

attorney-client privilege inherent in that relationship or that the Board of Directors or management, instead of the Special Committee, would have control of such privilege."[26] The *BCE West* Court then decided:

> Because the Special Committee is a separate and distinct group from the Board of Directors, with separate legal representation, the privilege afforded it is not the privilege of the corporation, but rather, is the privilege of the Special Committee. Accordingly, the Plan Trustee cannot waive it.[27]

The Liquidation Trustee, however, argues that a 2015 decision by the SDNY Court, considering the same issue, declined to follow *BCE West*. In *China Medical*, the bankruptcy court recognized a Cayman Islands liquidation proceeding as a foreign main proceeding pursuant to chapter 15 of the Bankruptcy Code.[28] The foreign representative sought production of documents related to an internal investigation conducted preliquidation by the attorneys for the foreign debtor's audit committee.[29] The attorneys largely complied with the document request, but refused to turn over privileged documents. The bankruptcy court ruled that the privileges owned by the audit committee did not devolve to the liquidator.[30] On appeal, the SDNY Court affirmed the bankruptcy court's choice of law analysis determining that United States law controlled; but reversed on the privilege issue, deciding that the foreign representative/liquidator owned the committee's privileges, regardless of the committee's prebankruptcy independence.[31]

The *China Medical* Court noted that *Weintraub* did not squarely address this issue, but determined that many considerations in *Weintraub* apply. The court disagreed that an independent audit committee's status was analogous to that of an individual, deciding, instead, that the

---

[26] *In re BCE West, L.P.*, No. M-8-85, 2000 WL 1239117, *2 (S.D.N.Y. Aug. 31, 2000).
[27] *Id.* at *3.
[28] *Krys v. Paul, Weiss, Rifkind, Wharton & Garrison, LLP (In re China Med. Tech., Inc.)*, 539 B.R. 643, 646 (S.D.N.Y. 2015).
[29] *Id.*
[30] *Id.*
[31] *Id.* at 653, 658.

9

committee was established by the debtor's board of directors "and, thus, [was] a critical component of [the debtor's] management infrastructure."[32] The *China Medical* Court also dismissed the argument that transferring privileges would have a chilling effect on attorney-client communications, relying on the *Weintraub* Court's analysis that "the chilling effect is no greater here than in the case of a solvent corporation, where individual officers and directors always run the risk that successor management might waive the corporation's attorney-client privilege."[33] Further, once "any miscreants have left the company in bankruptcy . . . corporate management is deposed in favor of the trustee, and there is no longer a need to insulate committee-counsel communications from managerial intrusion. Without a legitimate fear of managerial intrusion or retaliation in bankruptcy, Appellee's assertions as to a potential chilling effect ring hollow."[34] The court further observed:

> [T]he Court can see no reason why the turnover of attorney-client communications to a trustee or liquidator in bankruptcy would impede the monitoring and oversight functions of a truly independent audit committee. . . . If anything, the prebankruptcy interests of an audit committee are aligned with the interests of a trustee or liquidator in bankruptcy.[35]

I agree with the *China Medical* Court's reasoning that it is appropriate to extend the Supreme Court's analysis in *Weintraub* and recognize that the trustee appointed as the representative of a corporate debtor controls the privileges belonging to the independent committee established by the corporate debtor. Therefore, in the present case, I conclude that upon confirmation, the Plan transferred control of the former Audit Committee's Privileges to the Liquidation Trustee.

---

[32] *Id.* at 655.
[33] *China Med.*, 539 B.R. at 656.
[34] *Id.*
[35] *Id.* at 657.

(3) <u>The work product doctrine cannot be asserted against a client, and the entire Investigation Records must be turned over, subject to the Internal Documents exception.</u>

Deciding that the Liquidation Trustee controls the Audit Committee's Privileges, however, does not fully resolve this matter. RKO asserts that it has not turned over Investigation Records that are subject to protection under the work product doctrine, not the attorney-client privilege. The *China Medical* Court decided that *counsel* could assert the work product doctrine, and the liquidator could not "waive the protection unilaterally."[36]

The work product doctrine is governed by Fed. R. Civ. P. 26(b)(3) and 'shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case.'"[37] Rule 26(b)(3)(A) provides:

> Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those materials may be discovered if: (i) they are otherwise discoverable under Rule 26(b)(1); and (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.[38]

"There is no question that both the client and the attorney have an interest in work-product material, . . . [t]hus as a general rule, even if the client does not invoke work-product protection, the attorney may do so."[39] "Nonetheless, it is clear that when the interests of the client and the attorney clash . . . it is the client's interest that will prevail."[40]

---

[36] *Id.* at 658. The *China Medical* Court remanded the case to the bankruptcy court for further proceedings.

[37] *In re Cendant Corp. Sec. Litig.*, 343 F.3d 658, 661-62 (3d Cir. 2003) (quoting *United States v. Nobles*, 422 U.S. 225, 238 & n. 11, 95 S. Ct. 2160, 45 L.E.2d 141 (1975)).

[38] Fed. R. Civ. P. 26(b)(3)(A)

[39] *Polin v. Wisehart & Koch*, No. 00-CIV-9624, 2002 WL 1033807, *2 (S.D.N.Y. May 22, 2002) (citations omitted).

[40] *Id.*

11

The Supreme Court described the essential nature of the work product doctrine, in part, as follows: "[i]n performing his various duties, it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion *by opposing parties and their counsel*."[41] Thus, "the work product rule . . . may not be invoked by an attorney to withhold from a client or former client work-product created in representing that client."[42]

The Liquidation Trustee asserts that, for the same reasons he now controls the Audit Committee Privileges, he has stepped into the shoes of RKO's former client, and RKO cannot assert the work product doctrine against him. I agree that - - consistent with the reasoning stated above based on *Weintraub* and *China Medical*, including discussion about the aligned goals of the Audit Committee and the Liquidation Trustee, as well as the policies underlying the Bankruptcy Code - - upon confirmation, the Liquidation Trustee now has stepped into the shoes of the Audit Committee as RKO's former client.

What remains, then, is to determine whether RKO must turn over *all* of the Investigation Record to the Litigation Trustee. RKO relies upon *Sage Realty Corp.* to assert that it may withhold items that are "firm documents intended for internal law office review and use."[43]

The Court of Chancery of Delaware has observed that there is a split in authority regarding an attorney's duty to release files to a client or former client.[44] The majority of jurisdictions follow the "entire file" approach, which means that "[o]n request, a lawyer must allow a client or former client to inspect and copy any document possessed by the lawyer relating to the representation,

---

[41] *Cendant*, 343 F.3d at 662 (quoting *Hickman v. Taylor*, 329 U.S. 495, 510-11, 67 S. Ct. 385, 91 L.Ed.451 (1947) (emphasis added)).
[42] *Polin*, 2002 WL 1033807, *1 (citing *Martin v. Valley Nat'l Bank of Arizona*, 140 F.R.D. 291, 320-21 (S.D.N.Y. 1991).
[43] *Sage Realty Corp. v. Proskauer Rose Goetz & Mendelsohn, L.L.P.*, 91 N.Y.2d 30, 37-38, 689 N.E.2d 879 (N.Y. 1997).
[44] *TCV VI, L.P. v. TradingScreen, Inc.*, C.A. No. 10164-VCL, 2018 WL 1907212 (Del. Ch. 2018).

unless substantial grounds exist to refuse."[45] Narrow exceptions are recognized for "(i) situations when compliance would violate the lawyer's duty to another, (ii) cases of extreme necessity, such as where the disclosure is likely to cause serious harm to the client, and (iii) certain law-firm documents reasonably intended only for internal review, such as a memorandum discussing which lawyers in the firm should be assigned to a case."[46]

The minority of jurisdictions follow the "end product" approach, which "distinguishes between the lawyer's external work product, which the client has a right to obtain, and the lawyer's internal work product, which the client does not have any right to receive."[47]

The Delaware Court of Chancery determined that the "cases applying the entire-file approach are more persuasive and consistent with other aspects of Delaware law governing the attorney-client relationship."[48] The *TradingScreen* Court ordered the law firm to produce its entire litigation file to the former client. This result is in accord with *Sage Realty*, which concluded that the lower court erred in restricting the former client's access to end product documents.[49] The *Sage Realty* Court determined that "[b]arring a substantial showing by [the law firm] of good cause to refuse client access, petitioners should be entitled to inspect and copy work product materials," since the client paid for those materials during the course of the firm's representation.[50] The *Sage Realty* Court also recognized an exception for "firm documents intended for internal law office review and use."[51] The *Sage Court* explained:

---

[45] *Id.* at *4 - *5 (quoting RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 46(2) (Am. Law. Inst. 2000)).
[46] *Id.* at *5 (quoting Restatement § 46 cmt. c) (internal quotation marks omitted).
[47] *Id.* at *5.
[48] *Id.* at *6.
[49] *Sage Realty*, 91 N.Y.2d at 37.
[50] *Id.*
[51] *Id.* The *Sage Realty* Court also recognized that the attorneys "should not be required to disclose documents which might violate a duty of nondisclosure owed to a third party, or otherwise imposed by law." *Id.*

> The need for lawyers to be able to set down their thoughts privately in order to assure effective and appropriate representation warrants keeping such documents secret from the client involved. This might include, for example, documents containing a firm attorney's general or other assessment of the client, or tentative preliminary impressions of the legal or factual issues presented in the representation, recorded primarily for the purpose of giving internal direction to facilitate performance of the legal services entailed in that representation. Such documents presumably are unlikely to be of any significant usefulness to the client or to a successor attorney.[52]

In the Objection to the Liquidation Trustee's Motion, RKO asserted that the following Investigation Records were privileged and withheld: (i) attorney notes of employee interviews, (ii) internal analytics or work papers by AlixPartners, and (iii) communications/emails with individual Audit Committee members. After the first hearing on the Motion, at the Court's direction, the parties met and exchanged information about the employee interviews.[53] At this point, the categories of information that have not been turned over to the Liquidation Trustee include the following: (i) draft factual memoranda, (ii) draft legal memoranda, (iii) communications with the individual Audit Committee members, and (iv) documents characterized as counsel's mental impressions.[54]

In accordance with *TradingScreen* and *Sage Realty*, I conclude that RKO must produce the entirety of the Investigation Records to the Litigation Trustee, except for those items that are firm documents intended for internal law office review and use. Only the documents characterized as counsel's mental impressions fall within that category. The draft factual memoranda and draft legal memoranda must be turned over as part of the entire file, even if those documents were circulated only within the firm. Moreover, the communications between counsel and the individual

---

[52] *Id.* 91 N.Y.2d at 37-38 (citations omitted).
[53] Tr. 3/6/2019 at 3:15 – 4:1, 6:12 – 6:21 (D.I. 1863).
[54] *Id.* at 4:2 – 4:8.

Audit Committee members also do not fall within the internal document exception and must be turned over to the Litigation Trustee.[55]

## CONCLUSION

For the reasons set forth above, I conclude that (i) control of the Audit Committee's Privileges transferred to the Liquidation Trustee upon confirmation of the Plan, (ii) RKO may not assert protection of the work product doctrine against the Litigation Trustee, and (iii) RKO must turn over the entirety of the Investigation Records to the Litigation Trustee, except internal firm documents. Accordingly, RKO need not turn over documents consisting of counsel's mental impressions that are intended only for internal review, but RKO must turn over draft factual memoranda, draft legal memoranda, and communications between RKO and the individual Audit Committee members.

An appropriate order follows.

BY THE COURT:

_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated   June 20, 2019

---

[55] *In re Bevill, Bresler & Schulman Asset Mgt. Corp.*, 805 F.2d 120, 125 (3d Cir. 1986) (Deciding that corporate officers do not have an attorney-client privilege with regard to communications made in their role as corporate officials).